# PINELLAS COUNTY v INTERPACE, et al.
## Case No. 83-13313-08
Sixth Judicial Circuit, Pinellas County
June 6, 1990

## APPEARANCES OF COUNSEL

John T. Allen, Jr., Esquire, Chief Trial Counsel, **Nicholas C. Glover, Esquire, Rick A. Buchwalter, Esquire,** and **Vernon R. Wagner, Esquire, John T. Allen, Jr., P.A.,** for plaintiff, Pinellas County.

**Michael J. Keane, Esquire,** Baynard, Harrell, Mascara, Ostow, P.A., co-counsel, for plaintiff, Pinellas County.

**Jeffrey S. O'Brien, Esquire,** Masterson, Rogers, Patterson & Masterson, P.A., for defendant, Interpace Corporation.

**G. Lee Garrett, Jr., Esquire, David Baum, Esquire, Steven Kinnard, Esquire,**Jones, Day, Reavis & Pogue, co-counsel for defendant, Interpace Corporation.

**Stephen M. Bull, Esquire, Guy Haggard, Esquire, Steven Schooley, Esquire,** Bull & Haggard, for defendant, CH2M Hill Southeast, Inc.

## OPINION OF THE COURT

FRED BRYSON, Circuit Judge.

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND FINAL JUDGMENT FOR PLAINTIFF, PINELLAS COUNTY

THIS CAUSE is before the Court for determination upon Plaintiff, PINELLAS COUNTY's, First Amended Complaint claiming that a thirteen and one-half mile segment of its major water transmission main made of 54-inch and 60-inch diameter prestressed concrete pipe is defective and should be replaced. The prestressed concrete pipe was manufactured during 1977 and 1978 by a nationally known pipe manufacturer known as Interpace Corporation. On May 3, 1985 Interpace Corporation changed its name to Madison Management Group, Inc. In July of 1987, Clevepak Corporation merged with Madison Management Group, Inc. Therefore, the Defendant, MADISON MANAGEMENT GROUP, INC., is properly before the Court

**66**

as a successor to INTERPACE CORPORATION and throughout the remainder of these Findings will be referred to as "INTERPACE".

In March of 1975 Pinellas County executed an agreement with a consulting engineering firm known as Black, Crow and Eidsness, Inc. to design the pipeline, select the pipeline's route, draw all contracts necessary to the letting of bids including contracts with the pipe manufacturer, test the materials which were to be used in the manufacturing of the prestressed pipe, and to sufficiently inspect the pipe as it was being manufactured and after installation. The engineer's main charge was to protect Pinellas County against improper manufacturing and installation of the pipeline. After the pipeline's construction, Black, Crow & Eidsness, Inc. (BC&E) changed its name to CH2M Hill Southeast, Inc. Throughout the remainder of these Findings the Defendant engineer will be referred to as "CH2M Hill".

In sum, the individual pieces of prestressed concrete pipe, both 54-inch and 60-inch in diameter, were to be manufactured by Interpace at its Lacooochee plant located in Lacoochee, Pasco County, Florida, who would in turn deliver the pipe to Suwanee Transfer and Storage, Inc. for hauling to the laying site to be installed by another contractor known as Bumby & Stimpson, Inc. CH2M Hill's contractual obligation was to design the pipeline, review and approve the plans and specifications submitted by Interpace for the construction of the pipe, review certain component part tests which were to be submitted by the manufacturer, Interpace, draw the contract between Pinellas County and Interpace, and to certify to Pinellas County that the pipeline had been constructed according to the plans and specifications. There are other contractual duties assumed by CH2M Hill which will be referred to in these Findings which bear upon the question of breach of contract and negligence of CH2M Hill.

The Court started hearing testimony in the case on January 17, 1989, with testimony having been concluded on January 24, 1990. There have been 131 days of trial during the time. The case is purported to be one of the longest if not *the* longest case ever heard in Florida. There have been 1,567 exhibits admitted into evidence.

As trier of the facts, the Court has been required to learn and apply a substantial number of engineering and water production disciplines including metallurgy, wire making and drawing, the manufacture of large diameter prestress pipe, pipeline design, pipeline testing, the mathematical formulas associated with pipeline manufacture and design, hydraulics, structures, petrographics (the study of concrete and mortar), chemistry (as applied to groundwater, metallurgy and petro-

**67**

graphics), corrosion, principles of water supply to a large populated county, statistics and population forecasting, computer programs depicting a water supply system, and interpretation and application of the national standard for manufacturing prestressed pipe known as AWWA C301-72 and various American standards testing metallurgical standards applicable in the case such as ASTM A227-71 and ASTM A648-73.

The County has sued the manufacturer Interpace upon several legal theories for providing to Pinellas County a prestressed concrete pipeline which does not have the specified operating pressure of 150 psi and surge pressure of 210 psi, and which is otherwise claimed defective in not complying with the specifications for manufacture of the pipe. Punitive damages are also sought from Interpace based upon the theories of fraud, strict liability in tort, and willful and wanton misconduct. Pinellas County has also sued its engineer whose duty was to protect the County has also sued its engineer whose duty was to protect the County from the manufacturer providing pipe which failed to meet the specified and the required pressure rating and defective pipe. Damages for the cost of the replacement of the pipeline are sought from both Defendants. Pinellas County also sues CH2M Hill for the cost of coal tar epoxy coating the pipeline which the County asserts should have been included by the engineers in the specifications because of the aggressive soil and groundwater attack to which the present pipeline is being subjected. In addition, Pinellas County has sued CH2M Hill for improperly designing certain vacuum relief valves at below ground level in vaults along the pipeline, claiming it was necessary to raise the valves above ground level to present the contamination of the pipeline with groundwater which had accumulated in the vaults. The County claims that the valves would not operate properly to prevent surges in the line when filled with water. Pinellas County claims further damages for replacement of burst pipe, failed tapped pipe and leaking pipe. After serious consideration and deliberation, the Court finds fo the Plaintiff, Pinellas County, and against the Defendant on all counts.

## A. CONSTRUCTION STEPS OF PRESTRESSED CONCRETE STEEL CYLINDER PIPE

There are basically two types of prestressed concrete steel cylinder pipes. Lined cylinder pipe, which Interpace designated as SP-5 pipe, and embedded cylinder pipe or SP-12 pipe. This case involves embedded cylinder or SP-12 pipe. Based upon the testimony and Interpace documents the history of performance of SP-5 pipe is material to the

68

issues in the litigation as to P hydrostatic testing and the use of prestressed wire and outer mortar coatings because, from an engineering standpoint, the wire and mortar coating behavior is representative of what would occur in an embedded cylinder pipe due to the similarity of the manufacturing processes. In the manufacture of embedded cylinder pipe the first step is to manufacture and then hydrostatically test the steel cylinder with joint rings attached. The testing is to insure that the cylinder is water tight. Then the cylinder is encased in concrete by vertical casting and mechanical vibration to construct an inner and outer core on both sides of the cylinder. After proper water or steam curing, the wire reinforcement is wound, under tension, in a layer around the outside of the outer concrete core containing the cylinder which is known as "prestressing". After prestressing the exterior coating of the pipe is applied. The exterior coating may be of premixed mortar or concrete. If the exterior coating is specified to be that of concrete then a concrete outer core is cast into place over the prestressing wire. If premixed mortar coating is applied then the mortar coating is placed by the impact method onto the wire. In addition, if mortar coating is used as the exterior coating then a layer of "slurry" which consists of cement and water is applied to the core just ahead of the mortar coating. The purpose of the slurry is to protect the wire and get under the haunches of the wire and where the wire comes in contact with the outer core. When properly applied, cement slurry will fill in the areas under the wire and in the haunches of the wire to provide an "alkaline environment" having a high pH which will prevent the prestressing wire from corroding. When concrete coating is used the national standard does not require the application of a cement slurry; since the concrete if properly vibrated will filled in the areas where the wire touches the core and in the haunches of the wire. Whether mortar coating or concrete coating is used the national standards require that the outer coating be "a dense, durable encasement". The outer coating is then cured for a specified length of time and is then ready as a "joint" of pipe to be placed in a pipeline.

Lined cylinder pipe is constructed similar to that of embedded cylinder pipe with the exception that there is no outer concrete core and the steel prestressing wire is wrapped directly onto the cylinder.

Therefore, viewing the component parts of an embedded cylinder pipe, which is the subject of this litigation, from inside out you have: an inside core; cylinder; outer core; prestress wire; slurry; mortar coating. There are many details of each step of manufacture which have not been described which will be referred to by the Court in this

judgment when the evidence concerning the manufacture of each step or component part is discussed.

In manufacturing joints of pipe for a pipeline, the manufacturer according to specifications and a laying schedule will construct what is known as "beveled pipe" and "specials". "Beveled pipe" is pipe which is not straight but forms a portion of a large curve in the pipeline so that in configuration the pipeline may be designed to bend and take on new direction. "Specials" are prestressed concrete pipe which are tailor-made for a particular turn or other unusual direction which the pipeline is required to take. "Specials" are one of a kind pieces of pipe and are made by a separate department in the prestressing plant.

In viewing the construction process it is apparent that once a prestress pipe has been constructed there is no way to determine whether the component parts of the pipe have been constructed according to specifications or the national standard AWWA C301-72. Only cracking of the mortar coating, hollows or voids in the mortar coating or bent bell or spigot ends or things of this kind may be observed. The uniform evidence is that all such obvious defects were remedied before the pipeline was accepted, tested, and put into operation. Therefore, all material defects of a prestressed pipe are *latent* in nature and cannot be determined to exist without destruction of the pipe itself. This is one of the primary reasons why the engineer, CH2M Hill, was contractually bound to inspect the pipe as manufactured and to "judge the performance" of Interpace for compliance with the specifications and to certify to Pinellas County completion of the pipeline according to the plans, specifications, and standards. Regrettably, CH2M Hill did not attempt to comply with this duty nor did it have trained personnel who sent to the plant who were qualified, by their own admission, to detect the defective manufacture of the pipe. Therefore, the Court finds that all defects found in the excavated pipe were latent in nature and unknown to both the County or its engineers.

Basically there have been five (5) types of evidence presented for the Court's consideration. The Court has actually physically examined numerous wire specimens from 27 Pinellas County pipes and tests and/or photographs from all of the 33 pipes removed from the pipeline for study. Detailed pipe summaries of the defects found in each pipe have been considered. Numerous other mortar and concrete samples from most of the pipe exhumed from the pipeline in question have also been examined. Numerous boxes of parts of the exhumed pipe have been supplemented by well over 1,000 photographs of all excavated pipe. This physical examination of actually what each part of the pipe looked like when first exhumed and the pipe was delaminated has been

70

the most persuasive to the Court in coming to a decision. When viewed in the light of a literal interpretation of the specifications and standards one can visually determine that the major components of the pipeline have not been manufactured according to the agreed specifications and standards and are well on their way to failure. In view of the fact that the pipeline and each individual pipe should last over one hundred (100) years or indefinitely according to Interpace's own literature, the Court has become convinced that the pipeline must be replaced. The pipeline must be reliable and dependable in order to properly serve the function for which the prestressed pipe was intended.

The Court has heard from former workers who actually participated in the construction of the component parts of the Pinellas County pipe whose testimony confirms the defects which the Court has visually observed in the actual portions of the excavated pipe examined and photographed.

Interpace did not properly develop or draw Interpace Class IV wire placed on all of Pinellas County's pipe. The wire is fraught with brittleness, seams and defects caused by use of improper rod, drawing equipment, and metallurgical techniques. These problems were well known to Interpace during the period of 1972 through 1975 before the Pinellas County pipe was ever manufactured commencing in 1977. In fact, there was no effective quality control at either the Solon Wire Mill or the Lacoochee plant. Eyewitnesses to such improper manufactured wire and pipe specifically testified to improper manufacturing techniques. The head of quality control at Lacoochee testified that quality control reports were *falsified* during the entire time he was at Lacoochee from 1974 to 1979. This occurred during the time the Pinellas County pipe was being manufactured. The Court has viewed numerous defects in the pipes exhumed. No two pipes are the same. Each pipe has numerous defects which could only be attributed to the lack of quality control both at the wire mill and at Lacoochee. Neither Interpace nor CH2M Hill has called any workman at either plant to repudiate such testimony. The proof of lack of quality control virtually stands unrebutted in the record.

Former engineers and hired metallurgists of Interpace have also testified against Interpace to the effect that the component parts of the pipe and the pipe as a whole is improperly manufactured. Neither Interpace nor CH2M Hill called at trial as a live witness any former engineer of Interpace familiar with the manufacturing process of Interpace prestressed pipe. Mr. Robert E. Bald, Former Chief Engineer and Vice President of Technology who was present in court, representing Interpace at the opening statements in this case, was chiefly

**71**

responsible for the defective manufacture of Interpace pipe. The testimony and documentation shows that Mr. Bald orchestrated many of the defects built into the Pinellas County pipe. Mr. Bald was not personally called by Interpace to defend the pipe despite the fact that he obviously was available to be called as an expert witness. His testimony was in part submitted by deposition by both the Plaintiff and Interpace. He failed, however, to address the charges made against him. The failure to call as live witnesses Mr. Bld and other expert engineers whose names repeatedly appear on the documents and to answer Pinellas County's claims that the pipe was made in a defective manner is construed against Interpace and CH2M Hill by the Court. See *Lineham v Everett,* 338 So.2d 1294 (Fla. 1st DCA 1976); *Tri-State System, Inc. v Department of Transportation,* 500 So.2d 212 (Fla. 1st DCA 1986); *Buckrem v State,* 355 So.2d 111 (Fla. 1978).

Pinellas County subpoenaed volumes of Interpace files which involved a number of documents written by Interpace engineers and personnel during the critical times of the middle to late 1960's and throughout the 1970's and into the 1980's. This documentary evidence is viewed by the Court as tantamount to an admission of liability or guilt. The defective nature of the wire at the Solon Wire Mill and in the manufacturing plants, the over drawing or over heating of the wire in manufacturing, and the entire list of defective and splits in the wire made at the Solon plant are simply admitted. Knowledge that the Lacoochee aggregate did not meet AWWA standards is shown to have occurred long before the Pinellas County pipe was manufactured. The lowering of the modulus of elasticity due to the improper use of aggregate at Lacoochee resulting in a lower pressure rating of Lacoochee pipe is also well documented. In a documented dated February 3, 1981, who professes the opinion that all pipe made at Lacoochee are lower in strength than designed because of the use of bad aggregate, an Interpace engineer wrote on a note attached to his report "I suggest this report be given limited circulation due to the potentially damaging nature of its contents". There are other documents which support the Court's ruling that Interpace deliberately and improperly manufactured its prestressed pipe, including the Pinellas County pipe in question, to gain more profits, cut costs, and remove the safety factor from a number of the pipes' component parts. In fact, the Interpace salesman, who was assigned to the Pinellas County area at the time of the manufacture of the pipe in question, so testified.

The final category of witnesses are those who were not regular employees of Interpace but have various expertise in the manufacture of prestressed wire and/or the manufacture of prestressed pipe. The

**72**

plaintiff, Pinellas County, has called numerous experts while the defense has chosen to call a "select few". Their testimony on the major subjects of the defectiveness of the component parts such as, metallurgy, petrographics, pipe design, pipe testing, prestress pipe manufacture, and the interpretation of the applicable engineering standards are hopelessly in conflict. As trier of the facts the Court finds that the testimony of Pinellas County experts far out weighs those produced by the defense. The County has produced volumes of engineering reports in all fields with photographic and actual pipe samples to support its contention that the pipeline is totally defective. Each claim made by an expert witness is carefully and meticulously documented. The only report introduced into evidence by the Defendants is one from Interpace's expert which came in the form of a petrographic report produced by Interpace's petrographer at the insistence of Pinellas County as part of the consideration to allow a petrographic examination of pipe samples to be undertaken during trial. The Court does not the testimony and analysis by Jerrell Thomas, on the question of the alleged life of the pipeline. A sufficient number of pipe to characterize the entire pipeline was tested by Construction Technology Laboratories, Inc. (hereafter CTL) which was formerly a division of the Portland Cement Association. The five (5) volumes of the engineering report of CTL on the testing and examination of the pipe and the numerous meticulous metallurgical reports and analysis of metallurgists Gould and Lewis are most persuasive and are found to reconcile the conflicts in expert testimony against Interpace and for Pinellas County.

Based upon these four (4) categories of evidence, the Court finds that Pinellas County has proven its case by the overwhelming weight of the evidence and certainly by its greater weight.

A substantial amount of evidence, including documentary evidence, has been admitted without objection. The Court has carefully reviewed the evidence which was admitted over objection of the Defendants. In the Court's mind, even excluding the evidence objected to, there is more than enough evidence for the Court to find for the Plaintiff, Pinellas County, and that Pinellas County should prevail in view of the greater weight of the evidence in its favor. See *Parks v Zitnik,* 453 So.2d 434 (Fla. 2d DCA 1984); *Capitoli v State,* 175 So.2d 210 (Fla. 2d DCA 1965).

Because of the protracted and serious nature of this litigation, the Court will specifically rule upon all claims or counts made by Pinellas County. However, the Court is of the opinion that as to recovery for damages for the replacement of the pipeline it is sufficient to find that both Defendants clearly by the greater weight of the evidence breached

**73**

their contracts resulting in the County's being entitled to replacement damages. There must be competent substantial evidence before the Court for the Court to lawfully make its findings of fact. *See* e.q. *Malver v Sheffield Industries, Inc.,* 502 So.2d 75 (Fla. 3d DCA 1987); *Clegg v Chipola Aviation, Inc.,* 458 So.2d 1186 (Fla. 2d DCA 1984); *Poller v First Virginia Mortgage and Real Estate Investment Trust,* 471 So.2d 104 (Fla. 3d DCA 1985). The record is so replete with facts and inferences which support the Court's ruling, that it is not possible to cite *all* of the testimony which has led the Court to find for Pinellas County. However, the Court will cite specific areas of the testimony or proper inferences therefrom upon which the Court in part has relied to render its judgment with the understanding that in the Court's mind there are many more facts and many more exhibits which in and of themselves would be sufficient to constitute competent substantial evidence to support the Court's judgment.

## I. FINDINGS OF FACTS

### A. THE IMPORTANCE AND LOCATION OF THE PIPELINE

Pinellas County imports a substantial portion of its water supply from neighboring counties. The County is a member of the West Coast Regional Water Supply Authority whose task is to implement a regional water supply concept whereby the Authority would supply water to its municipal and county members in Hillsborough County, Tampa, Pasco County, City of St. Petersubrg, and Pinellas County. The Water Authority operates a wellfield known as the Cross Bar Ranch Wellfield located in Pasco County. Water from this wellfield is transmitted through a 60-inch diameter transmission line sought to the Cypress Creek Pump Station. The Cypress Creek Pump Station and wells are also owned by the Water Authority. Water from both the Cross Bar Ranch and Cypress Creek Wellfields are transmitted from the Cypress Creek Pump Sttion sought through an 84-inch diameter prestressed concrete pipeline, which in turn reduces to a 66-inch diameter line. In turn, a 42 and 54-inch diameter transmission line are connected to the main 66-inch line at the Pasco-Pinellas County line. The 42-inch transmission main is intertied to the main 54-inch line by a 24-inch in diameter main, and also to a main at the Keller Pump Station. The 54-inch transmission main discharges into a 60-inch transmission line that runs further south. This interconnection was constructed to give flexibility in operating the water system to the Pinellas County water director and can be closed sending all water coming from the 84-inch and 66-inch diameter transmission lines south through the 54 and 60-inch transmission lines to the 580 North

74

Booster Station. Water is supplied to Pasco County through a main 30-inch's in diameter at U.S. 19 at the Pasco/Pinellas county line. Thus, the 60-inch diameter transmission line begins at the "interconnection" from the 42-inch and 54-inch main and runs sough to the North (State Road 580) Boster Station located just north of the juncture of State Road 580 and U.S. Highway 19. There are bypass facilities at the North Booster Station which would permit all water flowing from the 60-inch transmission line, to bypass completely the 580 booster pumping facilities. There are other transmission lines which run from the Eldridge-Wilde Wellfield and into the North Booster Station which are minimally related to these proceedings. For a complete pictorial understanding of the transmission system, see Exhibit "A" to this judgment which is consistent with Exhibit 12 in evidence.

When the Pinellas County Water System is viewed as a whole, the transmission line which is the subject of the litigation is the most critical section of the Pinellas County Water System. It transmits water from all three major wellfields. The line is so critical to the adequate supply of water to the Pinellas County population that the line cannot be taken out of service except under extreme emergencies and then for only a very short period of time. The volume of water needed on a daily basis by Pinellas County cannot be met without the line being in service, especially during peak demand days and dry seasons. Elimination of the use of the line for any unreasonable or substantial period of time would cause a water emergency, water crisis and at least water rationing. These facts were well known to both CH2M Hill and Interpace at the time the lines were designed and manufactured. Therefore, both Interpace and CH2M Hill knew the critical nature of the line and that the pipeline had to be constructed without material defects in the pipe. Both Defendants knew or should have known by the nature and location of the pipeline that each pipe had to be dependable and reliable much like the wing of an airplane.

Even worse is the potential of "backflow". "Backflow" occurs when the water system is not able to supply the required water to a given area thereby causing a negative pressure to occur in the water distribution lines. This negative pressure draws water into the water distribution lines and ultimately into the water transmission lines and contamination from septic tanks, toilets, and other pollution, etc. occurs. "Backflow" creates a substantial health hazard. When "backflow" occurs the lines must be flushed, disinfected and sampled before potable water can again be supplied to the public. In view of the substantial increase in water maximum day demands in Pinellas County from 100,000,000 MGD in 1987 to a projected 200,000,000

**75**

MGD by the year 2020, any failure or blowout of the pipeline in question could and probably would cause a catastrophe. Under such a threat it is clear that the public interest requires that the line in question be dependable and reliable. Replacement of such a critical pipeline is in the mind of the trier of fact the only plausible solution.

## B. THE LONGEVITY OF A PROPERLY MANUFACTURED PRESTRESSED CONCRETE PIPELINE

The longevity of a properly manufactured pipe is applicable only in the context of the state of decay which the pipe is experiencing because of progressive corrosion mechanisms on the prestress wire. These corrosive mechanisms are ongoing and continuing in the pipeline. The issue is not material on the question of whether the pipe was properly manufactured so that it can be used at the specified pressure of 150 psi working pressure and 210 psi surge pressure. In this context, the pipeline must be replaced because the pipe was not made to the specifications of 150 psi working pressure and 210 psi surge. For this reason alone the County did not get what it bargained for even if there was no ongoing corrosion in the pipeline.

The Court must make a factual determination of how long Pinellas County could reasonably expect the pipeline in question to last if properly manufactured and used without surging the line beyond its design limits. The best reasonable engineering evidence shows that a prestressed pipe should last more than 100 years or indefinitely. Interpace itself in a technical article written by Shaw who was the General Manager of Research and Development in 1965 published in *Civil Engineering,* this statement:

> The high capital investment involved in major pipeline systems demands that they be constructed of materials with maximum economic life. Reinforced and prestressed concrete have achieved increasing popularity as pipeline materials because of their demonstrated consistent longevity; steel encased in concrete will be protected and will preserve its structural integrity for centuries.**

(Plaintiff's Exhibit 17A in evidence)

The article concludes that prestressed pipe will have a very long life generally in excess of 100 years when buried in a natural occurring soil environment. Interpace's Vice President of Technology and former Chief Engineer, Bob Bald, testified properly manufactured prestressed pipe should last *"indefinitely".* Expert engineers agree. The salesman for Interpace prior to the letting of bids for the 60 and 54-inch project represented to Pinellas County and to CH2M Hill in brochures that

76

Interpace pipe should last 100 years. Advertisements of Interpace placed in *Civil Engineering—ASCE* and *Journal American Water Works Association* solicited engineers to specify Interpace prestressed concrete pipe because it would last as long as the Roman aqueducts.

Cores from other prestressed pipe in the ground for many years which are not manufactured with Interpace Class IV wires have been examined and have been clean and totally free of rust. Yet Pinellas County pipe has substantial rust on prestressed wire on every pipe examined. The Court believes the engineering experts who are of the opinion that the life span of prestressed concrete pipe is conservatively well over 100 years. After considering all opinions and qualifications of the engineers and especially the materials which are required to be used in making the component parts of the pipe, Pinellas County should well have assumed it was purchasing pipe which would last more than a century and probably indefinitely barring any unusual circumstances. The greater weight of the evidence shows that from a serviceability and reliability standpoint the line has already failed. All or a substantial number of pipe will prematurely burst if the line was continued to be used without replacement. Each pipe excavated is in a far greater state of decay than would be the case is the pipe were properly manufactured.

The position taken by CH2M Hill engineers that the pipeline should only last from 20 to 50 years is without engineering credibility. The engineer, CH2M Hill, never advised Pinellas County of the estimated 50 year life. The Court believes the testimony of the former Water Director for Pinellas County who was in charge at the time the line was designed to the effect that he understood there was no limit as to how long the pipe would last and had he been told that the pipe would only last for 50 years he would not have agreed to constructing the line with prestressed concrete pipe because of the lines' importance and because of its strategic location.

Just after the Pinellas County pipeline had been constructed, the president of Interpace made a startling admission against interest by directing his second in command to "destroy all documents stating the Interpace pipe would last 100 years or more". (See Exhibit 24) The Court views this exhibit like any other normal trier of fact and completely construes this admission against Interpace. Through this document, Interpace has admitted that it found out that it was not properly manufacturing its pipe and had not constructed the Pinellas County pipe properly and for that matter all of its other pipe and that these pipes and the pipelines would *not* last 100 years or more as

**77**

claimed by Interpace to Pinellas County officials and the engineering public long prior to the construction of the Pinellas County pipeline.

## II. A CHRONOLOGICAL OVERVIEW OF THE CASE

### A. INTERPACE'S QUALITY AND COST REDUCTION PROGRAMS

In the mid 1960's Interpace embarked upon a program of reducing and substantially cutting the quality and quantity of materials used in the manufacture of its prestress pipe. A cement reduction program was initiated which would have the effect of reducing the mortar coating and concrete's ability to produce a high "pH" environment to protect the prestressed wire. Other reductions were accomplished through thinner rod, wire, and steel cylinders because Interpace was trying to make more money. Principle among the quality reductions was the manufacture by Interpace, at its own wire mill located in Solon, Ohio, a higher strength wire to be wrapped on its prestressed pipe. The higher the strength of the wire the less wraps per foot that were required in the manufacture of a single pipe. Substantial cost savings were achieved by this method with the result of a substantial increase in profits. Prestress wire is divided into classes of wire in pounds per square inch (psi) according to the following Table:

| Class | 8-gauge 0.1620 inch diameter | 6-gauge 0.1920 inch diameter |
|---|---|---|
| Class I | 200,000 TO 230,000 psi | 192,000 TO 221,000 psi |
| Class II | 231,000 TO 261,000 psi | 222,000 TO 251,000 psi |
| Class III | 262,000 TO 292,000 psi | 252,000 to 281,000 psi |
| "Interpace Class IV" | 293,000 TO 323,000 psi | 282,000 to 311,000 psi |

Wire classes are made into either 6 or 8-gauge wire. The gauge refers to the diameter of the wire. 8-gauge wire has higher tensile strength than 6-gauge wire particularly in the "Class IV" size and thus was more attractive to Interpace because less steel was involved. The Pinellas County pipe is all made of Class IV 8-gauge wire.

### B. INTERPACE CLASS IV WIRE

In 1968, Interpace was using Class II wire to manufacture prestress pipe. At that time (1968) Interpace started developing or inventing Class III wire and also what is known as "Interpace Class IV wire". No national metallurgical standard or standards for making prestressed pipe refer to a Class IV wire. "Interpace Class IV wire" was not properly developed or tested before its use by Interpace in the latter part of 1972. In fact, there is overwhelming evidence that not only was

78

the wire not properly developed but that Interpace started having substantial problems with "Interpace Class IV wire" from the very beginning. The wire contained numerous defects which included seams, splits, and was very brittle. Breakage of the wire during pipe prestressing at Interpace plants was a common event, despite the fact that the wire is wrapped at only 755 of its ultimate tensile strength, yet Interpace persisted in manufacturing the defective "Interpace Class IV" wire.

Prior to development of "Interpace Class IV wire" Interpace attempted to have its Class IV wire sanctioned through recognition in a national standard. Interpace through its wire mill manager, Rod Walter, appeared before the American Standard Testing Materials (ASTM) Committee which was drafting a national standard exclusively for use in the manufacture of prestressed concrete pipe. The committee which was composed of national and international metallurgists, including representatives from U.S. Steel and Bethlehem Steel, flatly rejected the invitation to include Class IV wire in the proposed standard on the basis that it was not believed that at those tensile strengths the wire would have good ductility. Thereafter, the Committee adopted ASTM A648 in 1972 which permitted the use of up to Class III wire on prestressed concrete pipe. While Class III wire as stated in the standard has no tensile strength upper limit the standard is properly interpreted as limiting the use of Class III wire within the recognized 30,000 psi groupings for classes of wire. Defendants' experts' interpretation that such a standard would permit Class IV wire is without merit. In addition, ASTM—A648 was not a proper standard under which the wire in this case could have been manufactured according to the Court's interpretation and reading of the specifications. Class IV was not permitted to be used under the standard. In 1973 Mr. Walter, representing Interpace, again appeared before the ASTM Committee in an attempt to have Class IV wire written into the standard. Again, the Committee unanimously rejected Interpace's request. It is not controverted in the record that U. S. Steel attempted to make Class IV wire between 1966 and 1970 for Interpace and failed. U.S. Steel wanted the business so badly that it placed its Chief Metallurgist, John Occasione, in charge of the wire's development. A production plant was selected but after many tries, U.S. Steel concluded that it could not "consistently" produce a quality Class IV wire. Bethlehem Steel tried to produce Class IV wire for Price Brothers, a competitor of Interpace, in 1975. Price Brothers complained that Interpace had a competitive advantage in producing the chapter high strength wire and wanted to start using Class IV wire on its prestressed

**79**

concrete pipe. Bethlehem made some wire and sent it to Price Brothers only to have Price Brothers reject the wire and return it to the plant. The chief metallurgist for Bethlehem Steel for 23 years testified that quality Class IV wire could not be consistently made. In sum, despite knowledge that Class IV wire was inherently defective, Interpace manufactured Pinellas County's pipeline using "Interpace Class IV wire". Interpace was forced to abandon production and use of Class IV wire in 1980 after Pinellas County's pipeline had been installed, was in operation and the first rupture had occurred. The reasons for discontinuing production of the wire were those as enumerated in Plaintiff's Exhibit 309 in evidence showing that the wire could not be manufactured with the type of rod and machinery and wire drawing technology known to Interpace together with the occurrence of many pipe breaks throughout the United States in which Class IV wire was used in the failed pipe. Interpace said that the wire did not meet its internal standards. Interpace's own chief engineer in 1975, after a portion of a pipeline in Center, North Dakota failed, reasoned that Class IV wire was defective and should not be used. The chief engineer wrote a letter to the Vice President of Technology, Mr. Bald, recommending that the wire not be used in the future. Mr. Bald brought him the letter and told him to tear it up as he didn't want such a letter to be in the company's files. The letter was torn up. The wire was continued to be produced and was exclusively used on the pipeline in question.

## C. FURTHER COST REDUCTIONS

Another attempt to cost reduction involved the fine and coarse aggregate used at Interpace's Lacoochee plant in Pasco County, Florida. The Lacoochee plant was started in 1973 for the purpose of constructing for Pinellas County the 84-inch transmission line from Cypress Creek to the Pinellas-Pasco County line. Pinellas County later transferred full ownership to the West Coast Regional Water Supply Authority of the 84-inch and 66-inch lines in 1976. Interpace management knew from the very outset that the Brooksville limestone aggregate slated to be used would not meet AWWA C301 standards. The aggregate was used anyway. The end result of the use of the improper aggregate is to make the prestressed pipe weaker with a lesser pressure rating than assumed in design or as specified. The only other alternative to the Brooksville aggregate was a Vulcan limestone from Alabama which, if used, would have meet AWWA standards. Interpace selected the cheaper Brooksville aggregate from which all of the 60-inch and 54-inch diameter transmission main, which is the subject of this litigation, was made. Tests done by Pinellas County consultants confirm that most, if not all, pipe in the line was *not* manufactured to the

80

specific pressure rating of 150 psi working pressure—210 surge. The history of Lacoochee aggregate not meeting the national standards from the time the plant first opened was admitted by Interpace engineers in 1973 and 1974. One of Interpace's test engineers, when reviewing the history of Lacoochee aggregate, concluded in effect that all prior pipe manufactured at Lacoochee was defective and had a low modulus of elasticity, which resulted in a weaker pipe or pipe which would not meet the specified pressure ratings. Further specific findings of fact will be made by the Court later as to the Lacoochee aggregate and its use.

## D. PINELLAS COUNTY CONTRACTS WITH CH2M HILL AND LETS OUT BIDS FOR ITS 60-INCH AND 54-INCH DIAMETER PIPELINE

In March of 1975, Pinellas County entered into an engineering consulting agreement with CH2M Hill to provide: the preparation of a complete basis for the design of the 54-inch and 60-inch diameter transmission main; consultation and advice as to laboratory testing and inspection of samples or materials; preparation and furnishing of all necessary contracts, specifications, schedules of quantities and estimates of cost; the visitation of the pipe manufacturing construction site on an average basis of four (4) visits per month in order to protect the County against defects and deficiencies in the work of the manufacturer; the approval of shop drawings; the judging of the manufacturing performance of making the prestressed pipe according to specifications; the recommendation of final acceptance of the pipeline after its completion; etc., etc. Contractually the engineer, CH2M Hill, was obligated to act as Pinellas County's representative.

CH2M Hill prepared the plans and specifications and bid documents for the pipeline in 1976. Only two pipe manufacturers bid on the project. Price Brothers bid was $6,113,024.00 while Interpace bid $4,446,337.00. CH2M Hill did not inquire or make any determination as to why the bids were so far apart.

Since Interpace was the successful bidder, CH2M Hill drafted the contract between Interpace and Pinellas County. While CH2M Hill is not a signatory on the contract, numerous duties of the "engineer" "acting for the owner" are specifically enumerated in the Intepace-Pinellas County contract. These duties include: approval or disapproval of materials to be delivered; the right of the engineer to reject unsuitable pipe; the acceptance by the engineer of minor imperfect materials; and receipt and approval of all tests of component materials furnished by Interpace showing compliance with specifications. The

81

engineer, CH2M Hill, was given the right to inspect the manufacturing process and the component materials used in the pipe manufacture. Interpace was required to furnish at its expense to the engineer "all reasonable facilities, labor and materials deemed necessary by the engineer for conducting such inspections and tests".

A substantial controversy arose during pretrial hearings and trial as to whether the engineer, CH2M Hill, was contractually bound by the language and duties it had been *paid* to draft for Pinellas County. CH2M Hill contends that originally when it executed its consulting engineering contract with Pinellas County in 1975 it did not know, nor was it contemplated, that Pinellas County would elect to contract directly with the pipe manufacturer or other contractors, and that, therefore, the duties granted to the "engineer" in the Interpace-Pinellas County contract are not the obligations of CH2M Hill. The Interpace contract clearly defines the "engineer" as CH2M Hill (BC&E) and refers to Pinellas County as the "owner". The engineer for CH2M Hill who drafted the document contended that he had made a mistake in not utilizing "resident engineer" rather than "engineer" in certain sections of the Interpace contract. The Court finds this contention to be without merit. However, the engineer acknowledged that most of the responsibilities of the engineer were assumed by CH2M Hill as the pipeline was constructed. CH2M Hill's engineer, Mr. Henderson, quarrels mainly with the interpretation of the wording of the Interpace contract. CH2M Hill called an expert who interpreted the clauses in both the contracts between Interpace and Pinellas County, and CH2M Hill and Pinellas County, in favor of the engineer. Pinellas County called experts that contend that the duties enumerated in both contracts should be read together and construed against CH2M Hill.

The Court finds that the contract between Pinellas County and CH2M Hill, and the contract between Pinellas County and Interpace, should and must be read together (in *pari materia)* to determine the duties owed to Pinellas County and contractually assumed by CH2M Hill. *Standard Newspapers, Inc. v Woods,* 110 So.2d 397 (Fla. 1959). *See also* Section VIII(A) at page 133, footnote 836, of this Court's findings.

*See Editor's Note 1 hereinabove.* To rule otherwise would not only be contrary to law but would conflict with the surrounding facts and circumstances found by the Court to have existed at the time CH2M Hill drew the Interpace contract. Mr. Henderson stated that he was aware of the provisions of the contract between Pinellas County and CH2M Hill of March 1975 when he drafted the contract between Pinellas County and Interpace. *No amendment* to the contract between

82

CH2M Hill and Pinellas County was sought in view of the contract terms agreed upon between Interpace and Pinellas County. Therefore, any engineering duty written into the Interpace contract not originally assumed by CH2M Hill in its contract with Pinellas County was assumed by the engineer at the time of the execution of the Interpace contract. If such an interpretation was not placed upon such documents the Interpace contract would have become unworkable.

It is academic that where there are two possible interpretations of a contract or provision of a contract, the provision or contract must be construed against the drafter or author. *Sol Walker & Co. v Seaboard Coast Line Railroad Co.,* 362 So.2d 45 (Fla. 2d DCA 1978); *Bouden v Walker,* 266 So.2d 353 (Fla. 2d DCA 1972); *Alleghany Mutual Casualty Co. v State,* 176 So.2d 362 (Fla. 2d DCA 1965). Since CH2M Hill was *paid* to draw the contract between Pinellas County and Interpace, and also drew the contract between Pinellas County and CH2M Hill, the duties assigned to the "engineer" CH2M Hill in the Interpace contract require the broadest interpretation and are legally the duties of the Defendant engineer in the project.

The Court has also viewed the contracts separately and finds that the duties assumed by CH2M Hill in its original contract fit "hand and glove" with those delegated to the engineer in the contract between Interpace and Pinellas County. The Interpace contract serves to explain and clarify the true intent of the contracting parties. In construing the contracts together, the Court has arrived at a reasonable interpretation of the documents. *Bay Management, Inc. v Beau Monde, Inc.,* 366 So.2d 788 (Fla. 2d DCA 1978). The converse would be unreasonable and inconsistent with the engineering charge assumed by CH2M Hill to "protect the county".

### E. THE SPECIFICATIONS

The specifications as interpreted by the Court as the trier of fact called for the prestressed concrete pressure pipe to be manufactured by Interpace pursuant to the national standard AWWA C301-72 as amended as of 1976. Through the many months of testimony the Court has become intimately familiar with the applicable provisions of this standard. The pipe was required by the clear English language in the specification to be designed and manufactured at 150 pounds per square inch (psi) design (operating) pressure and 210 psi transient (operating plus surge) pressure. During trial, counsel for Interpace agreed with this finding as to the obligation of Interpace to manufacture a pipe which had an operating pressure of 150 psi and a transient pressure of 210 psi. Operating pressure is defined by AWWA C301-72

**83**

in Section 1.2.7 and 1.2.10 to be the "design pressure". The "design pressure" is the maximum sustained hydrostatic pressure to which the pipe is to be subjected or the "operating pressure". This means that Pinellas County bought and paid for pipe which was expected to be safely operated at 150 psi.

A surge in a pipeline is known as a transient pressure. Several conditions such as a pump voltage outage at one of the pumping stations, can occur or combine to create a wave effect in the pipeline that can cause severe damage to the line if the pipe is not properly designed. The pipe in question was supposed to be manufactured to withstand a maximum transient pressure of 210 psi.

When a prestressed pipe is placed in the ground under pressure it is subjected to both external and internal pressures. The 3-edge bearing equivalent of the earthload (W) provides the external pressure while the internal pressure is provided by the design pressure (P). The specifications called for the pipe in question to be designed pursuant to the requirements of Appendix A of AWWA C301-72. By this requirement being precisely specified in the specifications, Interpace was required to manufacture each of its pipe so that, if tested, the pipe would fall on or above the design curve of Appendix A. In order to manufacture a pipe meeting the design curve, Interpace was required to manufacture the pipe with all material properties; wire area, tension, and spacing under which the wire is wound; and appropriate core thickness so that the pipes provided pressure and earthload carrying capacity would fall on or above the curve of the Appendix A parabola. Whether a pipe meets the design criteria of the earthload may be determined by a three-edge bearing test which simulates the earthload on the pipe. Pressure-strain tests determine the adequacy of the pipe in response to internal pressure. Three-edge bearing tests determine the adequacy of the pipe in response to external load. Appendix A defines the cubic parabola design curve based on P , as the internal pressure required to overcome all compression in the core concrete exclusive of the effect of external load and W , 90% of the three-edge bearing load producing incipient cracking in the core. P is the most important consideration in determining whether the pipe was manufactured according to Appendix A. Each of the pipe tested by CTL for Pinellas County fell below the cubic parabola and had an internal pressure design of less than the specified 150 psi "design" or working pressure and 210 psi working plus surge (transient pressure).

Other specifications require: a concrete (not mortar) coating ⅞ths inch thick "at all points"; test reports of all steel, wire and concrete used by the manufacturer were to be submitted to CH2M Hill for

84

analysis pursuant to the requirements of Section 1.9 of AWWA C301-72; and an affidavit from Interpace at the completion of the job attesting to the fact that the pipe was constructed in accordance with AWWA C301-72.

The outer coating of the pipe was not made of concrete but mortar coating. In many instances, the mortar coating on the pipe excavated and examined was not a minimum of 7/8ths of an inch at all points. No tests on steel or concrete were ever submitted by Interpace pursuant to the specifications. CH2M Hill did not require submittal of the tests on the wire or concrete to it as the consulting engineer. Had such tests been submitted it would have been determined that both the steel wire (Interpace Class IV wire) and the core concrete were defective. CH2M Hill certified the job as complete and the pipe constructed according to the contract documents, specifications and AWWA C301-72. The pipe delivered to Pinellas County by Interpace did not meet the requirements of the specifications or the national standard, AWWA C301-72.

## F. PINELLAS COUNTY PIPE FAILURES

The pipeline was manufactured and installed between March of 1977 and October of 1978. During construction of the pipe, employees from CH2M Hill visited the manufacturing site at Lacoochee but did not attempt to determine if the pipe was being properly manufactured. On October 2, 1978 the pipeline was placed into service. On November 13, 1979 a section of the 60-inch pipe exploded creating a giant hole in the pipeline and causing other property damage of $53,331.51. According to the greater weight of the evidence, this rupture was the first factual indication to Pinellas County that the line may be defective. The burst pipe was removed from the line and sent to Interpace for examination. The remnants of the pipe were later returned to Pinellas County by Interpace. This pipe burst caused Pinellas County to embark upon an extensive investigation as to the cause for the failure and the condition of the entire line. During a pressure test on December 11, 1980 of a section of the line another 60-inch pipe burst in the area of Pinellas County's Eldridge-Wilde Wellfield at a pressure less than 150 psi. The consultants for the County continued their investigation and on November 1, 1983 the Pinellas County Board of County Commissioners determined that not only were the two pipe failures caused by improper manufacturing materials and techniques but that the entire pipeline was defective and should be replaced. In March of 1987 a third pipe started leaking and threatening to burst where the 60-inch pipe been tapped to serve the City of Oldsmar. The cause of the pipe failure was an eccentrically positioned or "out-of-round" cylinder

85

which when tapped caused the inner core to spall off exposing the cylinder to the water in the pipeline which in turn rusted out the cylinder causing the pipe to leak. The "out-of-round" cylinder required the replacement of the pipe. Proper pipe manufacturing techniques and production of pipe in a workmanlike manner pursuant to Section 1.8 of AWWA C301-72 requires that the cylinder be cast between the inner and outer core in a concentric position so that the pipe may be tapped even while in service. As in-service tap is known as a "hot tap" while a tap made when water is not being transmitted in the pipe is known as a "cold tap". Section 3.6.10 of AWWA C301-72, in effect, requires each cylinder to be cast "in-round" so that the pipe may be "cold" or "hot" tapped anywhere along the pipeline. During trial another tap failed on the 60-inch line in the area of of Countryside Boulevard and St. George Drive on May 29, 1989 for the identical reasons as the Oldsmar tap failure. Both failures were due to Interpace's failure to properly manufacture the pipe. Based upon this evidence and the testimony of one of Interpace's engineers who did quality audits on the Lacoochee plant during the time the pipeline in question was being constructed, that the method of production at Lacoochee caused many pipe to be manufactured which were not "in-round". Therefore, the Court concludes that many of the pipe in the pipeline in question are not "in-round" and the pipeline may not be safely and properly tapped anywhere along the line. This means that *the* major transmission line of Pinellas County which transcends the County from its northern end to State Road 580 may not be safely tapped to supply water to newly developed areas as Pinellas County grows. The inability to safely and properly tap the transmission line constitutes yet another and separate reason for replacing the entire pipeline.

Another pipe started leaking during trial on July 18, 1989. The cause of the leak was the faulty casting of a cast iron manhole in one of the 60-inch pipes. This faulty casting was clearly a manufacturing defect which should have been discovered by Interpace and corrected before the pipe was delivered.

Between May 1981 and September 24, 1981, Pinellas County consulting engineers uncovered and examined 10-½ pipe. Between July 8, 1983 and March 12, 1987 Pinellas County consulting engineers uncovered and examined 72 pipes, of which 25 pipe were totally or partially dismembered, including coating removal and the pipe examined and photographed. The "Interpace Class IV" prestress wire was subjected to extensive metallurgical examination and testing. The Court has reviewed the photographs of each pipe and actual samples of the component parts of each pipe, including wire from each pipe, and has

86

further reviewed the detailed engineering summary of all of the defects found by the engineers in the excavated pipes. The Court finds that all of the defects noted in the summaries and metallurgical examination by Gould and Lewis did in fact exist and was caused by Interpace's failure to manufacture the component parts of each pipe according to the specifications and applicable standards.

Of the 31 pipe, six 60-inch pipe were removed from the pipeline and examined and tested at CTL Laboratories in May and June of 1984, and in March of 1985. Also two 54-inch pipe were excavated and tested at CTL Laboratories in late 1985. Metallurgical examination of the wire and cylinders were conducted. CTL has produced five (5) volumes of a report on the extensive investigation of these pipes. The Court has reviewed the extensive reports and reviewed the photographs of each pipe and the component parts of each pipe examined at CTL, together with an independent metallurgical analysis report of the wire by Gould and Lewis. The Court has also reviewed actual wire tests from the CTL tested pipe. The Court adopts the analysis, findings, and facts stated in both the CTL reports and the Gould & Lewis reports as true. The defects reported in the reports of the pipe and component parts as stated are true. Interpace's failure to manufacture the component parts of each pipe according to the specifications and applicable standards caused the defects as specifically noted in the respective reports.

## III. FINDING OF FACT INVOLVING EACH COMPONENT PART OF THE PIPE

### A. THE DEFECTS FOUND IN THE EXCAVATED AND STRIPPED PIPE BY CTL AND CONSULTING ENGINEERS

There are certain common defects which without doubt exist in all pipe in the pipeline. These defects are: a porous, weak, and layered mortar coating which was not properly mixed and is not dense or durable as required by Section 3.9.2 of AWWA C301-72; overdrawn or over-heated "Interpace Class IV wire" which is brittle, has serious seams, and is highly subject to corrosion and hydrogen embrittlement; carbonated outer core surface which was caused by improper exposure to $CO_2$ from the water used in curing at the Lacoochee plant or from being left in the open air too long, which has a pH of approximately 8 instead of a pH of 12.5, which causes the wire to rust in the area where the wire touches the core; the absence of an effective slurry which was not applied at all or at best was not uniformly or properly applied to the core or wire thereby promoting corrosion; a concrete core which has a lower modulus of elasticity than assumed in design

87

which in turn produces a lower working pressure pipe; and presence of fine and coarse aggregates which do not comply with the requirements of AWWA C301-72, which also contributes to a lower working pressure and surge pressure than specified or assumed in design.

Random defects which were found on some pipe but not all are: (1) Wire ultimate tensile strength measured, analyzed; (2) wire torsion (failed 7 criteria); (3) wire diameters less than .1600"; (4) wire seams (splitting); (5) wire corrosion present; (6) coating thickness less than ⅞"; (7) zone of high permeability, wire level (8) void beneath wire haunches; (9) limestone dust in core concrete; (10) carbonated core concrete; (11) core thickness variation; (12) P test failed; (13) three-edge bearing test failed; (14) low cement content, coating; (15) contamination in core or coating; (16) delamination and cracking of coating; (17) insufficient curing time; (18) poor quality patches, corroded wire; (19) blue-gray oxide in wire.

Since there are at least five major manufacturing defects which are found in all pipe in the pipeline, there exists a substantial basis to completely replace the line. The County was entitled to a pipeline constructed of pipe which meets the specifications and nothing less. With these number of uniform defects the line has been rendered unreliable, unpredicatable, and untrustworthy. As far as serviceability is concerned the line has already failed. Such a pipeline cannot be maintained by piecemeal maintenance or a "band-aid" approach as suggested by Defendants. The Court will make specific findings as to the major uniform defects in the pipe and some of the random defects which require further findings of fact to be made.

## B. THE DEFECTIVE MORTAR COATING FOUND ON EVERY PIPE

Under Section 3.0 of AWWA C301-71 the outer covering or coating of the prestressed pipe may be specified as mortar or concrete. The specifications in this case called for concrete and there is ample evidence in the record to conclude that, had a concrete outer covering been applied, it would have provided better protection, a better alkaline environment to protect the prestress wire, and would be more dense and durable. The Court adopts this view. The specifications were obviously violated by Interpace in providing a mortar rather than a concrete outer covering for all of the pipe in the pipeline. This violation of the specifications should have been detected by CH2M Hill although CH2M Hill has testified that its engineers believed that mortar coating was specified.

There is testimony that a good mortar coating when properly applied

88

can adequately physically protect the prestress wires and provide a sufficient alkaline environment which can and should prevent *any* rust from attacking the wire. The mortar coating on every pipe in the pipeline is inadequate to provide such protection. Section 3.9.2 of AWWA C301-72 requires that mortar coating be properly and thoroughly mixed and provide a dense and durable encasement of the pipe and prestress wire. The Court has examined numerous mortar coating samples from each pipe excavated and finds that on each pipe the mortar coating was not properly mixed, is extremely porous and does not form a dense or durable encasement of the wire. Solid proof of these facts is the observation that major active rusing of the prestress wire is observed on certain areas of all pipe excavated. Even to the naked eye the rust is in all stages of development from complete rusting through of wires and major rust to moderate or mild rust. The active corrosion mechanisms found on every pipe shows that substantial decay of the wire is ongoing throughout the pipeline which will prematurely cause failure of each pipe. Interpace's Chief Engineer agrees that if rust is found when the pipe is delaminated, the mortar coating is not protecting the wire. If the mortar coating was properly performing its function no such rust would be apparent. CH2M Hill's design engineer of the line concurs with this conclusion.

The cause of this extreme and varying rusting condition of the prestress wire is obvious when the photographs of the wire, the microscopic photographs of the mortar or thin-sections, the testimony of a nationally recognized petrographer, and the mortar itself are considered. The mortar coating is more prone to cracking and shrinkage than properly made coating. Once the mortar cracks the wire is substantially exposed to groundwater and the pipe will prematurely fail. The mortar coating is *layered* due to improper mixing of the material prior to application and improper mechanical application. One can see with the naked eye the layering. Microscopic examination conclusively demonstrates the layering effect. Areas of dark cement are layers next to relatively paste poor porous areas. This layering effect provides a direct pathway for groundwater to move easily through the coating and attack the wire. Under this process, the cement past and alkaline environment which is designed to protect the wire is "washed out" causing the wire to corrode. Interpace's Chief Engineer agrees. When groundwater is freely moving through the mortar coating secondary deposits are found. A secondary deposit is a change in the chemical composition of the coating due to its reaction with groundwater. The CTL petrographer has sufficiently demonstrated to the Court through thin-section analysis and photographic evidence which shows

**89**

massive light areas in the mortar coating, that secondary deposits of ettringnite, calcium hydroxide, and carbonation are found in the voids of the inner portion of the coating. The existence of these deposits scientifically prove that the mortar coating in general is so defectively made that groundwater moves freely in and out of the coating while the pipe is in service. A coating with these properties is neither dense nor durable.

There is a relatively uniform porous zone in the coating at mid wire level. Interpace's petrographer agrees that this zone of weakness exists. It can be observed with the naked eye. Microscopic examination of the area confirms its existence on all mortar coating samples. The existence of this porous zone violates the requirement that the coating be dense and durable. This zone of porosity provides a pathway for groundwater to move up and down the entire pipe at mid wire level, thus accelerating corrosion and forming a plane of weakness which causes the coating to shear and crack at mid wire level. The Court has examined and reviewed many specimens and photographs of the porous zones at mid wire level with cracks running all the way through the zone from one wire to another. With these characteristics the mortar could not possibly protect the pipe and wire for the anticipated life of a properly made prestressed pipe.

A number of pipe were found with hollows and *delaminations* in the coating as well as extremely sandy and porous portions of the coating. The coating on the pipeline has numerous locations where there are delaminations and slumping of the coating which indicates that the coating was applied *too moist* at the time of manufacture. Delamination of the mortar coating is also caused by the slickness of the core and carbonation of the core which causes lack of bond between the mortar coating and the core. Once a pipe is delaminated it is certain to prematurely fail. Interpace's own petrographer found this condition to occur on many samples.

A major defect on all pipes is the existence of a semi-continuous void in the haunch area of the wire as well as voids at the wire level within the mortar coating. This semi-continuous void is caused by improper manufacturing techniques and not obtaining adequate compaction of the coating under the haunch area of the wire. A substantial contributing factor is also the failure of Interpace to fill in the haunch area where the wire touches the core with slurry which is addressed in another section. Thus, there are pockets or voids all along the wire sides and bottom area where the core comes in contact with the wire. These void areas are the areas in which the main corrosion of the prestress wire is occurring although there have been found areas of

90

heavy rust on the top and sides of the wire as well. This uniform defect is sufficient in and of itself to cause substantially accelerated corrosion of the pipe and thus ultimate premature failure of the pipe.

The CH2M Hill specifications require the mortar coating be ⅞ths of an inch thick "at all points". Examination of the excavated pipe reveals that this specification was consistently violated by Interpace in a number of pipe. Failure to meet the mortar coating thickness requirement is a significant material defect contributing to the failure of the mortar coating to protect the wire. The thinness of the mortar coating also contributes to the mortar coating's proneness to cracking which is extremely detrimental to the long-term longevity of the pipe.

The fine aggregate from which the mortar coating was made did not meet the specifications of Section 2.2.1 and 2.2.2 of AWWA C301-72. This specification provides that the gradation requirements represent the *extreme limits* for determining the suitability of fine aggregate under the standards. The improper gradation of sand leads to poor compaction, slumping of the coating, and lack of proper water content during manufacture. In the Court's mind the fact that the fine and coarse aggregates did not meet AWWA sieve requirements has been conclusively demonstrated. Interpace knew before, during, and after the making of the Pinellas County pipe that Lacoochee aggregate did not meet specifications. The Interpace employee who advised upper management of the problem when the plant first started in 1973 testified at length on the subject. Interpace documents verify the fact that the deficiency existed in both fine and coarse aggregates from the opening of the plant in 1973 until it was corrected in 1980. The Court is shocked at this disclosure. If non-conforming aggregate were to be used permission of the purchaser was required. No such permission was obtained from Pinellas County. Interpace was under the belief that good mortar coating could be made despite the aggregates deficiencies. The Court believes the former engineer from Interpace who testified that despite this belief the mixture for the coating was not "finely tuned" as required to make a proper mortar coating. The non-conformance of the aggregate was simply covered up by Interpace engineers and executives. To add to this conspiracy, Interpace used an admixture to make its mortar coating and concrete. Approval of the customer must be obtained for use of an admixture under Section 2.6 of AWWA C301-72. The admixture was needed so that Interpace could get the non-conforming aggregate to stick to the pipe. No approval of the use of an admixture was obtained from Pinellas County or disclosure of its use made known to CH2M Hill. Advising an engineer of the use of an admixture would have caused a prudent engineer to inquire as to why

**91**

it was being used. The use of non-conforming aggregate would there-fore have been exposed and the practice stopped. As consulting engineer on the project CH2M Hill should have made inquiry of Interpace as to whether an admixture was being used.

Debris of all types was found in the mortar coating including dirty material, chunks of concrete, stones and other debris, etc. Carbonate mud splashed upon the core concrete and lodged in between the mortar coating and core was found on many excavated pipes. The Court has examined specimens of mortar coating containing large amounts of carbonate mud. The debris and other deleterious substances promotes corrosion and lack of bond between the mortar coating and the core. The CTL petrographer found laitance between the core and the mortar coating which he attributed to the propensity of the pipe to have poor bonding qualities. The manufacturing of such an important product in such a haphazardous fashion is not tolerated under Section 1.8 of AWWA C301.72 which requires all phases of the manufacture of component parts to be done in a thorough, workmanlike manner by mechanics skilled in their various trades.

Therefore, based upon the above findings, the Court concludes that the facts indicate that all of the mortar coating on the pipeline is grossly inherently defective which was caused by improper manufactur-ing procedures, techniques, and numerous violations of AWWA stan-dards to the point that replacement of the entire line is required.

## C—IMPROPER PATCHING OF PIPE IN PLANT AND IN THE FIELD

It was Interpace's responsibility to properly patch any damaged mortar coating or coating that had holes or hollows. A manufacturing procedure for pipe repair had been adopted by Interpace. Investigation of the excavated pipe showed a number of pipe, including the second Pinellas County rupture, had mortar coating delaminations or were not repaired or patched consistent with Interpace's procedures or Section 1.8 of AWWA C301-72 requiring all steps in the manufacturing process to be performed in a workmanlike manner. This resulted in rusting of the prestress wire under the patches and delaminations (hollows) causing the pipe to become in a state of decay which would lead to premature failure.

Section 1.8 of AWWA C301-72 in effect requires defective mortar or concrete to be removed from the mortar coating. Chunks of concrete and stone were found in the mortar coating which violated the standard. This finding reinforces the Court's conclusion that improper

mortar coating was placed on Pinellas County pipes and is evidence of poor quality control.

### D—THE ABSENCE OF ADEQUATE SLURRY ON ALL PIPE

A major step in manufacturing prestressed pipe requires that concurrent with the mortar coating a cement slurry be applied to the wire and core. The purpose of the application is to apply a rich alkaline environment produced by the slurry on the core and around and under the prestressing wire so that the wire is *encased* with the cement slurry. The alkaline environment protects the wire from corrosion by creating an alkalinity of 12.5 or more completely around the wire. The extensive corrosion on the inner surface of wire on all pipes excavated indicates the wire was not protected by slurry.

A controversy arose at trial about the question of whether or not proper manufacturing techniques require the core to be slurried prior to prestressing of the wire in order to insure that slurry was beneath the wire and core to prevent corrosion of the wire at its contact with the core. Interpace's internal manufacturing procedure MP-11 eliminates the controversy. The manufacturing procedure requires that slurry be applied underneath the wire and on the core. Interpace obviously interpreted the AWWA requirement to apply slurry under the wire and cover the core. This would be consistent with the Court's findings of fact that to apply slurry in a workmanlike manner, as required by Section 1.8 of AWWA C301.72, Interpace was required to totally encase the wire, including its contact with the core, with cement slurry.

Quality audits from the time period in question indicate that the slurry was not being properly applied to the pipe at Lacoochee. Based upon testimony of Interpace engineer Robert Price, and Daryl Tadlock, the quality control supervisor, together with the statements made in the quality audits the Court concludes that slurry was not properly applied to the Pinellas County pipe. The slurry gun was regularly clogging, the workers were watering down the slurry so that the nozzle would not clog, slurry was being shot over the pipe, and sprayed from too great a distance. Interpace's petrographer admits that in all of his petrographic analyses he did not find evidence that slurry was on the samples he examined. The CTL petrographer states that based upon sections of other prestressed pipe he has examined he would expect to find a dense paste on the core between the wires if there was an application of slurry. The Court has viewed photographs of what slurry would look like if properly applied to encase the prestress wire. At least two photographs in the report of Interpace's petrographer shows spots of

**93**

slurry in the haunch of a wire on one side and no slurry on the other. The Court has also reviewed many photographs and pictures of thin-sections and samples from many pipe and concludes that in the main no slurry was applied to the Pinellas County pipe.

Taken as a whole the evidence is that no slurry or very little slurry was applied to any of the excavated pipe. The existence of numerous high porosity areas in the wire haunches demonstrates that if the slurry was applied and was present it was not uniformly applied and does not cover or encapsulate the wire as required by the standard. Interpace's chief engineer testified that after a quality audit and before the Pinellas County pipe was made, engineering management was aware in early 1977 that Lacoochee was having trouble with the slurry pumps. As a result of the corrosion of the inner surface of the wire with the carbonated core it is obvious that the wire is not protected by an adequate slurry coat on all pipes examined. The area where most of the rust is the worst is the area which should have been covered and filled in with thick slurry. Therefore, Interpace has improperly manufactured all of the pipe in the pipeline in violation of the AWWA standards. The prestressing wires on all pipes are uniformly not encased with slurry and will thus prematurely corrode and fail. This defect occurs throughout every pipe examined. All cores are carbonated due to improper manufacturing and curing processes. This major manufacturing omission leads to the conclusion that active corrosion is on-going in the entire line which has effectively impeded the line's serviceability and reliability which requires the pipeline to be completely replaced.

## E. CLASS IV WIRE WAS NOT PROPERLY DEVELOPED BY INTERPACE

Class IV wire was developed by Interpace during the late 1960's and early 1970's. The wire was placed into commercial production in late 1972. The development of such a new untried product required that every effort to determine the quality, dependability, reliability, and performance of the product should have been made because the prestress wire is the heart of a prestressed pipe. If the wire fails the pipe fails. The Court after a review of the development documents and considering the expert opinions on the subject finds that Class IV wire was not properly developed, tested, and its performance on the pipe satisfactorily determined before it was commercially used. The Court believes the expert opinion produced by Pinellas County on this point. The wire should have been developed by a metallurgist but was not. The wire was never subjected to the torsion test during development. In the torsion test the wire is twisted until it breaks. The appearance of

94

the wire, the type of break, and the number of twists to failure are examined to determine if the wire has been made satisfactorily. If there are seams in the wire they will readily be exposed. The chief of engineering of Interpace testified that there were splits and seams in the wire in 1972. After the wire was put into production and used in the Pinellas County pipe and metallurgists were called in by Interpace to determine what was wrong with Class IV wire the torsion test was used by Interpace itself. The torsion test was found to be the best indicator of the problems with the wire; but far too late. When the torsion test was finally applied a high percentage of Class IV wire had to be scrapped. The wire would be generally split and the ends frayed and they would "just break off and shatter". Torsion tests of wire on all pipe examined have been reviewed by the Court and are in evidence. Virtually none passed the torsion test. If the wire had been properly developed the seams and brittleness which were inherent in Class IV wire itself and have existed all along should have been found and eliminated.

Interpace did not test Class IV wire for hydrogen embrittlement during development. Hydrogen embrittlement is a form of corrosion which is in the Court's opinion the major corrosive action which is causing the wire in the Pinellas County pipe to break and corrode. Hydrogen embrittlement is a process whereby hydrogen is caused by the corrosive process to diffuse into high strength steel and accumulate at dislocations in the steel crystalline matrix until the wire shatters, cracks or breaks. This failure to test the wire for hydrogen embrittlement before placing it in pipe throughout the country constituted an improper development of the wire. Class IV wire is extremely susceptible to hydrogen embrittlement which makes it unsuitable for use as prestressing wire. Interpace has offered no substantial evidence to refute the claim of Pinellas County that it improperly developed Class IV wire. Based upon all of the testimony and evidence, Class IV wire was not properly developed before it was placed upon the pipe in the Pinellas County pipeline.

## F. IMPROPER SELECTION AND PREPARATION OF THE ROD FOR WIRE DRAWING OF CLASS IV WIRE

The manufacture of wire in a wire mill is very complicated especially when drawing high strength carbon wire such as Class IV. Each step of the process is critical. Defective wire will be produced if the proper procedure at each step is not followed.

First the make and size of the rod from which the wire is ultimately drawn must be selected. Three eights inch (3⁄8ths) rod and 13⁄32nds

inch rod made from Krup or German rod and a number of other manufacturers were used to draw Class IV wire. The brands of rod were apparently mixed interchangeably. The rods are placed on spools and welded together to form a continuous strand of rod which is then run through a patenting furnace at high temperatures and then cooled in a lead bath and cut into bundles. These bundles are then cleaned in an acid bath to remove mill scale. The bundles are then baked to drive out hydrogen and other undesirable materials from the rod. The bundles of rod are now ready for the wire drawing machine. The bundles are placed on spindles or payoff stands and again welded together to form a continuous strand of rods going into the wire drawing machine.

The wire drawing machine is composed of a series of dies or "holes" and cylinders or "blocks". As the wire is drawn through each successive die it gains tensile strength and is reduced in diameter as it is run through smaller and smaller dies until wire is made. As the wire goes through each die it is wound onto a "block" or cylinder and allowed to cool before entering the next die. Drawing machines are either air cooled or water cooled. Water cooling is far more effective as water is circulated through the blocks and die-holders, carrying off the hear with the water. Hence the term "cold working". As the wire enters and leaves the final die it is naturally at its highest temperature since there is no means to completely cool the wire before it enters each successive die. Thus, heat builds up in the wire until it goes through the last die and onto a bale or spool. When a spool becomes full it is cut off and the end coming from the machine quickly changed to another rotating spool so that the drawing machine can be kept continuously running. The speed which the drawing machine is run and the amount of wire allowed to accumulate on the block is critical. Running a machine too fast or not allowing the wire to accumulate and sufficiently cool on the block will result in improperly changing the grain structure of the wire by over heating which is referred to as "dynamic strain aging". Dynamic strain aging may also be caused by improper temperatures in the lead patenting machine or using too small a rod to achieve the desired tensile strength of the wire.

After the wire is taken off the drawing machine the proper procedure requires the testing of both ends of the bundle or coil of wire by: tensile test to determine strength of wire and reduction in area; torsion test to determine brittleness ductility and the existence of serious seams, scratches or die marks; wrap test where the wire is wrapped around a mandrel. The greater weight of the evidence indicates that the torsion test is the arbiter of a wire mill making high carbon strength

96

steel. It is the best determiner of the ductility of the wire and will reveal any defects including brittleness or seams or splits in the wire. At the time the Class IV wire was made in Solon the industry standard was to use the torsion test. The test was used by Bethlehem Steel and U.S. Steel. The metallurgical experts relied upon the trier of fact as constituting the greater weight of the evidence say that the torsion test should have been used by Interpace in making Class IV wire. Interpace itself started using a torsion test in 1961. From 1977 to 1979 the torsion machine was found missing but the plant manager and foreman had no explanation of why or when the test was stopped. When Interpace perceived it had wire problems it too used the torsion test to evaluate Class IV wire and because of the test scrapped a large percentage of the wire.

Pinellas County claims that almost at every phase of the wire making process Interpace did not properly make Class IV wire in a workmanlike manner consistent with the wire drawing trade in violation of Section 1.8 of AWWA C301-72 which was put on Pinellas County's pipe. Regrettably, the greater weight of the evidence shows the County to be correct.

The County, through a wire mill foreman who had been at the Solon plant from 1969 through 1983, and the wire mill designer, Bill Bawden, proved that almost every phase of the wire making procedure was done improperly, resulting in dynamic strain aged wire, severely seamed wire, brittle wire, and wire not suitable for use as prestressed wire. The improper practices at the Solon wire mill date from at least 1972 until 1980 proven by a consistent chain of evidence and witnesses who were at the wire mill during this time. The improper practice is also supported by a number of Interpace documents.

The *rod* size of ⅜″ and ¹³⁄₃₂″ was too small to draw the high tensile strengths obtained in the wire on Pinellas County pipe. The chief metallurgist of Bethlehem Steel testified that under normal wire drawing practice rods of this diameter could never have attained the tensile strength of over 300,000 psi average without dynamically strain aging the wire. Dynamic strain aging lowers the torsional ductility and produces brittleness and seam splits. With such small rods the drawing practice had to cause dynamic strain aging.

Krup rod or "German dirty steel" was used at Solon at least starting in 1969. The mill foreman testified that despite the fact that the Krup rod was known to contain impurities which caused seams and defective wire the rod was still used to make Class IV wire. After such bad experience with Krup rod another boat load of wire was purchased and

**97**

used. Krup was sued by Interpace for supplying defective rod in approximately 1975 and the suit apparently settled in 1979. Mr. Bawden, the wire mill expert, has examined wire from the Pinellas County line and has identified wire which in his opinion "had to come from Krup rod". Breaking of wire upon prestressing was attributed to Krup rod as early as in 1972. Wire breaks at Lacoochee during the making of Pinellas County pipe were common. From the description of the impurities in the Krup rod, the fact that it was in stock at the time Pinellas County wire was made, and from examination of the torsion tests themselves by the Court, the Court believes that the wire made from acknowledged undesireable Krup rod is laced throughout Pinellas County's pipeline. Even with the use of better rod the wire would be defective. The use of Krup rod in the Pinellas County line is inexcusable after full knowledge by Interpace of its poor characteristics.

The wire broke as it was pulled through the patenting furnace stopping the rod. Each time this occurred, at least 16 coils of wire were made defective because the procedure would change the grain structure of the rod. The lead patenting temperature was set back from 1,000 to 920 - 940 degrees Fahrenheit which also changed the grain structure causing brittle and strain aged wire. The Pinellas County wire examined by the Court is consistent with this poor drawing practice.

The scale was not properly cleaned off the rod because two bundles were put on one hook for dipping in the acid bath whereas only one should have been used. Sulfuric acid rather than preferred hydrochloric acid was used, which would have helped eliminate the wire's propensity for being susceptible to hydrogen embrittlement. The baking oven was not maintained at the right temperature which failed to drive off the hydrogen in the wire. In 1976 the wire mill expert recommended the use of phosphate lubricant instead of the chapter lime lubricant. The phosphate would have helped with the temperate and lubricating and produce a better finished wire. The suggestion was ignored.

A thorough review of the wire and the testimony of the wire foreman lead the Court to conclude that improper preparation of the rod before wire drawing was being practiced at every step of the process. There was no quality control in the plant from at least 1975 until 1978 or 1979. This was during and after the time when Pinellas County wire was drawn. The preparation of the rod for wire drawing was not done in a workmanlike manner and standards of the industry when the wire on Pinellas County's pipeline was made.

## G. THE WIRE DRAWING MACHINES USED TO DRAW PINELLAS COUNTY WIRE WERE NOT CAPABLE OF PROPERLY DRAWING CLASS IV WIRE

When Class IV wire was experimentally drawn it was drawn on a two-hole and then a three-hole wire drawing machine. When production started all Class IV wire was drawn on the five-hole CR30 or Morgan machine. Because of the dates of manufacture of the Pinellas County wire and the normal shipping time from finished wire to plant, it is obvious that most of the Pinellas County wire was made on the five-hole CR30 machine which was air, not water, cooled. Because of the dates involved some of the wire may have been made on a newly acquired Fenn machine which was installed in September of 1977.

In June of 1976 the wire mill expert, Bill Bawden, was asked by Interpace to recommend a machine that could make Class IV wire. Mr. Bawden recommended the Fenn machine which was purchased in June of 1976, delivered in July of 1977, and started in operation on October 1, 1977. By October 1, 1977 Pinellas County pipe had been in production since at least February of 1977. As stated, this means that the CR30 machine was used to make most of the wire placed on Pinellas County's pipe. The CR30 continued to produce Class IV wire into the 1978-1979 era. A number of experts have testified that the five-hole Morgan was not physically capable of drawing proper Class IV wire. A superintendent of the wire mill starting in 1979 testified that "there was no way in hell we'd ever make IV on the Morgan machine (CR30)". There were not enough drafting holes. There is uncontested proof by the wire foreman that the CR30 machine during the crucial time the wire was made for Pinellas County pipe was deliberately run at too fast a speed. He saw the plant foreman deliberately turn up the speed on the machine on numerous occasions just to increase production. Wire would commonly break and splinter all over the mill from the drawing machine. The workers' union was up in arms about the problem. But Interpace executives continued to run the machine too hot in order to achieve Class IV tensile strengths. The wire was deliberately dynamically strain aged to attain the Class IV tensile strengths. This improperly made strain aged wire is on a vast majority of Pinellas County pipe. Observation by the Court of the wire and the wire tests prove this fact to the Court's satisfaction.

The Class IV wire was drawn at temperatures from 500 to 650 degrees Fahrenheit. The maximum temperature for cold drawing should not exceed 350 degrees Fahrenheit. This drawing temperature was far below the range of temperatures used at the Solon wire mill to make dynamically strain aged Class IV wire which was brittle and

**99**

much more susceptible to corrosion of all types. Physical evidence of the temperatures which the wire was produced at is present in seamed wire with *blue-gray oxide* inside the seam. By use of the temperature color chart, which is of ancient vintage, the temperature at which blue-gray oxide is formed may be determined. The chart shows that the oxide and thus the wire was exposed to a drawing temperature of between 600 and 700 degrees Fahrenheit or higher. This finding is consistent with Interpace documents describing drawing temperatures of 650 degrees Fahrenheit at Solon for a substantial period of time. Other documents also confirms the Court's findings. Many wire experts who have examined the oxide and wire agree that temperatures far beyond those acceptable in cold working steel to make wire are evidenced by the oxide. They all agree that the wire grain structure has been changed by dynamic strain aging. The evidence offered to the contrary by Interpace, by an Interpace hired metallurgist, is rejected. Eye witnesses at the mill, Interpace documents, and nationally known wire experts have convinced the Court that the wire on Pinellas County's pipe was drawn at too high temperatures. Once corrosion attacks the seams where the blue oxide is located the corrosion cannot be stopped. Hydrogen embrittlement has caused many wires to fail in the seamed areas. Pinellas County pipe is laced with wire with the blue-gray oxide and thus requirements replacement. The wire has not been produced in a workmanlike manner as required by the national AWWA standard.

## H. INTERPACE CLASS IV WIRE WHICH IS WRAPPED ON ALL PIPE IN THE PIPELINE IS DEFECTIVE

The question of the defectiveness of Interpace Class IV wire was the subject of the greatest amount of testimony and cross examination at trial. The Court has already identified the history and description of Class IV wire. All pipe made was wrapped with Class IV wire. Therefore, if the wire is defective then the entire pipeline is defective.

Pinellas County has alleged that Class IV wire was improperly developed, was developed by inadequate personnel, was not properly prepared for wire drawing, was drawn on wire drawing machines which were inadequate and incapable of drawing Class IV wire, has many defects as the result of improper manufacture, was not subject to proper testing after manufacture, and is wire which is so susceptible to the three forms of corrosion that it was unsuitable for the use intended as a prestress wire. Pinellas County further contends that Interpace breached its contract with the County in failing to supply to the County's engineers its steel and wire mill results as required by Section

100

1.9. of AWWA C301-72. The Court finds each of the allegations to be factually correct.

In judging the truthfulness of these allegations, the Court has been guided and persuaded by certain evidence and engineering principles, standards, and metallurgical experts.

It is academic that the prestress wire was required to be developed, tested, and manufactured in a workmanlike manner by wire manufacturers skilled in their trade pursuant to Section 1.8 of AWWA C301-72. It is an engineering fact that Class IV wire is far more susceptible to not only the common type of corrosion known as aqueous corrosion but also to the deadly and more susceptible forms of corrosion known as hydrogen embrittlement and stress corrosion. Therefore, the wire's development should have been thorough and conducted by metallurgists schooled in wire development. The wire mill's selection of rod from which the wire was to be drawn should have been of proper size and quality. It was not. Proper wiring drawing machines capable of drawing Class IV wire should have been used in the development and ultimate drawing for commercial purposes of the wire. They were not. The wire when manufactured should have been of proper quality, ductility, and free of serious defects and seams and suitable for use on prestressed concrete pipe. On the whole it was not.

Nine metallurgists have testified at length before the Court on all of these issues. Interestingly, four metallurgists or experts extremely familiar with wire drawing were *hired by Interpace* in the 1970's to determine what was wrong with Solon's wire mill and Class IV wire. They all testified against Interpace that Class IV wire is defective. Many Interpace documents clearly admit the gamut of Plaintiff's allegations. One exhibit of particular note written by Interpace's head of quality control *admits* the numerous defects alleged to exist in the wire by Plaintiff Pinellas County. Plaintiff's Exhibit 309 in evidence, dated April of 1978, when the Pinellas County pipeline was nearing its completion, shows that at Solon there were extensive problems with Class IV 8-gauge wire. Brittleness of the wire was attributed to the rod and drawing practice. Seam splits were caused by the drawing practice. The rod contained foreign particles and piping. The proposed solution was to coat the rods, *lower the drawing speed,* modify the drawing practice, and switch to Class III wire. The reliability factor for the 5-hold Morgan CR30 drawing machine, which drew most of the wire for the Pinellas County pipeline, was said to be "zero".

The documents shows problems with 8-gauge Class IV wire at the prestress pipe manufacturing plants, including wire breaks, brittle

**101**

seams and splits. Problems with failed pipe are listed as corrosion, splits, and brittleness of the wire. The exhibit states that Interpace was to "continue program to develop quality Class IV wire". The Court construes this document as not only an admission that Interpace knew that Class IV wire was defective prior to the time the Pinellas County pipe was made, but that quality Class IV wire still had not been developed as of 1978 yet Interpace had commercially used the wire on its pipe beginning in late 1972. The Court has reviewed hundreds of wire samples and pictures of corroded wire taken from the Pinellas County pipeline. The specimens identically match the statements by Interpace in Plaintiff's Exhibit 309 as to what was wrong with Class IV wire. The document also confirms the metallurgists' testimony who were hired by Interpace during the 1970's as to what they found wrong in their investigation of Class IV wire.

The Court is extremely impressed with the metallurgical experts produced by Pinellas County. They truly are nationally and internationally known metallurgists who know and have studied prestress wire and particularly Class IV wire which has been removed from Pinellas County pipes. The Court has heard testimony from the metallurgist who drew the first prestress wire in America and who for many years before his 80th birthday traveled the country teaching other metallurgists about wire and wire drawing of all types. He recently is consulting on the corrosion problems of the Brooklyn Bridge and Williamsburg Bridge in New York. The Court was shocked to hear that this metallurgist was asked to advise Interpace "how to make prestress wire" in 1980 and what to do with accumulated defective Class IV wire when Interpace had been operating its Solon Wire Mill since 1962 for the express purpose of making prestress wire.

Among the other experts condemning Class IV wire was the Manager of Process Metallurgy for U.S. Steel for 11 years who authored portions of the book, *The Making, Shaping, and Treating of Steel,* which is considered by the experts as the "Bible" of the steel industry. He attempted to make Class IV wire for Interpace in 1970 -71 and had to turn down the business because U.S. Steel could not consistently make quality Class IV wire. Other witnesses condemning Class IV wire are: a man who purports to have designed and built more wire mills than anyone else in the world; the chief metallurgist who was with Bethlehem Steel for 39 years; a metallurgical specialist in pitting corrosion who has achieved the rank of fellow in the Metallurgical Society, a rank reserved for not more than 100 living metallurgists in the world.

The main wire testimony on all pipe excavated was by engineers and

102

metallurgists Gould and Lewis who have rendered reports which have been adopted by the Court as fact.

Interpace asked Dr. Ronald Latanision of MIT for an opinion of Class IV wire in 1980. Dr. Latanision confirmed the criticism of the wire made by other Pinellas County expert metallurgists in finding "There seems to me to be solid circumstantial evidence to suggest that hydrogen embrittlement is involved in the failure of the high tensile strength wire which is wrapped around the steel cylinder in the construction of pipe."; "In short, the probable cause of wire failure seems to me at this stage to involve hydrogen embrittlement."; "I suspect that the failure at Center and more recent failures have in common the hydrogen component.; In short, it may well be that the high tensile strength materials which are in question in this case are not suitable for this application without more positive protection with the alkaline mortar, e.g. epoxy coating, etc.". The Court gives great weight to the testimony of all former Interpace hired metallurgists.

Pinellas County, through Mr. Lewis, its metallurgist, demonstrated the extreme susceptibility of Class IV wire to hydrogen embrittlement by performing an ammonium thiocyanate test on Class IV wire samples from the Pinellas County pipe and Class III wire obtained from another manufacturer. The results confirm in the Court's mind that Class IV wire is much more peculiarly susceptible to hydrogen embrittlement than Class III wire. The first piece of Class IV wire failed in 15 minutes 30 seconds. Several pieces failed within the first hour. All Class IV wire failed by 77 minutes 15 seconds into the test. Class III wire first failed in between 54.5 and 69.5 *hours.* There were 2 pieces of Class III left still intact at the conclusion of the 3 day test. All specimens are in evidence. See Exhibits P-693A-E & P-694A-D. The hydrogen embrittlement breaks on the tested wire are identical to the brittle fractures found on Pinellas County pipe which the Court concludes were caused by hydrogen embrittlement.

CH2M Hill called no metallurgist who had been retained by it for the express purpose of testifying in this case. In fact, the testimony was that at no time during the history of the engineering firm or while acting as a consultant for Pinellas County on the pipeline project in question did CH2M Hill have a metallurgist on its staff.

Interpace called one metallurgist who gave the opinion that Class IV wire on Pinellas County's pipe meets the applicable standards and is sound prestressed wire. The credibility of this witness was substantially damaged in the Court's view when a report issued by the expert in 1980 was produced on cross examination in which this expert found

103

Class IV wire to be defective and the cause for prestress pipe failure in Gwinnett County, Georgia. Based upon all of the points brought out by Pinellas County on cross examination, his opinions and conclusions must be rejected as not believable.

The Court will now make findings of fact as to the allegations made by Pinellas County.

## I. CLASS IV WIRE IS NOT PERMITTED BY SECTION 2.8.1 OF AWWA C301-72

Even before the contract was signed by Interpace it submitted a "submittal sheet" to CH2M Hill for approval stating the parameters that would be used to manufacture the pipe. No citation of a standard appears next to "Class IV wire". For the diameter of the wire ASTM A227-71 and A648-73 is cited as authority. Towards the bottom of the submittal sheet appears a specific reference to the manufacture of the pipe according to AWWA C301-72. *Interpace's contract specifically holds Interpace liable for any deviations from specifications even if approved by the engineer.* The design engineer, Mr. Dink Henderson, in effect, approved the submittal with his initials on the 7th day of February, 1977.

The threshold question presented is whether Section 2.8.1 of AWWA C301-72 includes within its standards the right to use Class IV wire. Everyone agrees that current standards do not permit the use of so class "Class IV wire" and it is now an "outlawed" wire because its defectiveness has caused many pipe breaks throughout the country. The question is was it permitted under the applicable standards in 1976?

The court notes the testimony of John Hendrickson, a hired expert for BC&E. Hendrickson has a masters degree in engineering. He is qualified as an expert in prestressed concrete pipe. CH2M Hill send Hendrickson to CTL to examine the tested Pinellas County pipe. Although his testimony is not necessary to the court's conclusion on liability, the court is amazed that one of CH2M Hill's owned hired experts would, in substance, admit that the wire and pipe observed at CTL was *defective* and his nationally known engineering firm will not specify or permit Class IV wire to be placed on prestressed concrete pipe. The court finds such testimony very damaging to both defendants' case on the question of whether or not the Pinellas County pipe is defective.

The Court has heard from many experts as to their opinion of whether or not Class IV wire is permitted under Section 2.8.1 of

104

AWWA C301-72. A number of pleadings of Pinellas County's experts have said the wire was not permitted while an expert from CH2M Hill and two from Interpace believes it is permitted. The Court has made its own independent study of the specification. Section 2.8.1 refers to the ASTM standard then in existence, ASTM A227-21. Therefore, the AWWA standard and ASTM standard must be read and interpreted together to determine whether Class IV wire comes within the specifications. In further making a determination on the question, the Court has reviewed the prior and subsequent ASTM and AWWA standards in evidence as well as the committee notes of the AWWA committee made during the two year period of 1970 and 1971 prior to adoption of Section 2.8.1. No standard refers specifically to Class IV wire by name. The ASTM standard A227-71 refers only to Class I and II wire. ASTM A648-73 only references Class I, Class II and Class III wire.

Based upon a literal interpretation, the surrounding circumstances of the adoption of Section 2.8.1, and the expert testimony the Court finds that Section 2.8.1 of AWWA C301-72 does *not* permit the use of Class IV wire. Section 2.8.1 states in part:

> 2.8.1—*Prestressing Wire.* The wire for circumferential reinforcement shall conform to "specifications for steel wire, hard drawn for mechanical springs" (ASTM designation A227). Wire with specified *minimum* tensile strengths exceeding those in A227, Class II, may be used if the wire meets the other *requirements* for Class II in that specification, and the pipe design may be based on these higher strengths. (Emphasis supplied.)

The reasoning of Pinellas County experts is adopted. Strengths higher than the minimum of Class II wire may be used as long as they do not exceed the other "requirements" of Class II wire, one of which "requirements" is the maximum tensile strength of Class II. Literally this is what the standard says. If a literal interpretation were not applicable to standards then they would be open to varied and non-uniform interpretation. At the time Section 2.8.1 was passed on January 31, 1972, Class IV wire had not been developed. The wire was not commercially used by Interpace until late 1972. No other wire manufacturer was making Class IV wire although some had allegedly tried to make the wire experimentally but had failed. The ASTM committee had rejected Class IV wire to be included in ASTM A648-73 in 1968 in its deliberations for specifying wire exclusively for prestressed pipe which it later published in 1973. Interpace was again rejected by the ASTM committee in 1973 after Section 2.8.1 was approved and a known standard in AWWA C301. If Interpace truly believed that Class IV wire was already sanctioned by AWWA then

**105**

why seek its approval one year later? The Minutes of the AWWA committee do not mention Class IV wire but only Class III.

The expert for CH2M Hill and Interpace both agree that if their interpretations that Class IV wire was permitted under Section 2.8.1 is correct then the "sky is the limit" and you could have Class V and Class VI and Class XX—and so forth, under this interpretation. This rationale is hardly a basis for sanctifying a completely unheard of class of wire that would give Interpace a monopoly on Class IV wire in 1972.

CH2M Hill's witness was a member of the AWWA committee who passed Section 2.8.1. He professed to have been at the formative meetings in 1970 and 1971 and to have played a substantial part in its passage. But the Minutes show that he was absent both years despite his initial testimony to the contrary. His experience with prestress wire is seriously questioned in the Court's mind. The credibility of the witness was damaged to such an extent by cross-examination that the Court concludes that the witness's testimony and credibility was impeached and must be disregarded.

Interpace produced the chairman of the AWWA committee who passed Section 2.8.1. The witness is not a metallurgist nor has he had in the Court's opinion any material experience with prestress wire or prestress pipe. He had no explanation as to why the Minutes did not mention Class IV wire. His demeanor was questionable especially in the areas of the requirements by AWWA that if a product is specified it must be the subject of intense investigation, have been in existence a sufficient length of time to have proven itself and not create a monopoly. He acknowledges that the standard is construed to permit Class IV wire would violates these principles. Despite his reluctant admission to the existence of these standards on cross-examination, he indicated that the committee's intent was to permit new innovations or improvements of higher strength wire in the future. The witness had not even heard of Class IV wire until 1988 and had only considered whether Class IV wire was permitted after being hired by Interpace's law firm. The witness states that there is but one interpretation of the standard despite an Interpace letter to the contrary by Mr. Robert Bald who was on the committee. The letter indicates a marketing scheme would be undertaken by Interpace to use a play on words in the standard to get purchasers to agree to buy Class IV wire. What the Court is asked to do if it rules with Interpace and CH2M Hill is to find that Interpace before its development of Class IV wire was given a monopoly and a blank check by the AWWA committee who decided to specify any high strength wire a manufacturer could produce

**106**

without special consideration and testing or a proper time to prove the product. As trier of the facts the Court refuses to apply such an interpretation. Since Interpace produced according to its own documents a "hybrid wire" unspecified by the specifications the Court concludes that Class IV wire was not permitted to be placed on Pinellas County's pipe. This departure from the specifications constituted a material departure from Interpace's contract which has lead to a defective product being placed on every Pinellas County pipe which is the chief component of the prestress pipe. Its inherent defectiveness is not what Pinellas County paid for. In the strictest terms the pipeline must be replaced.

## J. THE PROPERTIES OF CLASS IV WIRE

Approximately one week after a prestressed pipe is put in the ground its design contemplates that the wire will be saturated with water. The theory of design contemplates that corrosion will be prevented by the alkaline environment of the pipe which will be kept at an alkalinity of 12.5 or higher. A dense durable mortar coating without voids is envisioned to prevent the movement of water in and out of the pipe and to prevent the "washing out" of the alkalinity. Yet all of Pinellas County's pipe have been found to contain major rusting and loss of cross section of the wire. Rust in all stages of progression have been observed by the Court on every pipe.

There seems to be little controversy that ASTM A227-71 applies and that it requires the prestressing wires to be "free from rust" and not contain any serious seams. Serious seams in rusted condition are found on almost every pipe. The standard requirement that the prestress wire be free from rust has special engineering significance. *The metallurgists for Pinellas County agree that Class IV wire cannot tolerate any rust.* Once rust starts on Class IV wire it is doomed to premature failure. Interpace advertised its prestressed pipe seeking to gain approval of engineers claiming that Interpace pipe *will not rust.* This is not puffing. High carbon prestress wire is known by the engineering community to fail and be unworthy of use in prestress pipe if its rusts. Therefore, Interpace was advertising that its prestress wire would not rust yet Pinellas County's pipe is laden with rust.

The properties of Class IV wire are that it is highly susceptible to rust. It is also highly susceptible to hydrogen embrittlement and stress corrosion cracking. As made Class IV wire is not suitable for its intended purpose. Its properties are that it is brittle, is replete with serious seams, has been dynamically strain aged, lacks torsional ductility, and is highly susceptible to corrosion.

**107**

A lot of the wire when measured falls below the minimum specified diameter tolerances. Section 1.8 of AWWA C301 provides that the tolerances specified are the absolute minimums permitted. Section 2.8.1 of AWWA C301-72 refers to ASTM A227-71 which specifies the minimum diameter of the wire. In many cases the wire measured fell below the allowable tolerance in these standards. Defendant's expert's explanation of the standard and tolerances is rejected. This point would not have been material in writing this judgment if it were not for the fact that the testimony reveals that by use of a lower tolerance wire, Interpaced saved substantial steel and cost to where it got approximately one-half mile of pipe wrapped for free. This fact is consistent with Interpace's policy since 1965 to reduce pipe material and make more profit and therefore must be deplored by the Court.

## K—THE APPLICABLE MECHANICAL METALLURGICAL TESTS

Interpace has taken the position that all it had to do to be in compliance with its contract was to produce Class IV wire which would meet the mechanical wire tests specified in ASTM A227-71. The tests listed in the specification are the tensile test and the wrap test. The Court finds Interpace's initial position to be incorrect because Class IV wire and wire with serious seams are not permitted under the standard. The Court has already found a violation of the standard in this regard.

Setting these facts aside, Interpace overlooks the requirement of Section 1.8 of AWWA C301-72 which applies to wire drawing as well as to every other phase of the manufacture of components of prestress pipe. This section requires that the wire be manufactured in a workmanlike manner consistent with other wire manufacturers in the trade. It is perceived that Section 1.8 was put in the AWWA standard in order to avoid the argument advanced by Interpace. The aim is to produce quality prestress wire which will serve its intended purpose. It is a finding of fact that competent metallurgists and wire manufacturers routinely use the torsion test to find serious seams and to properly appraise high strength carbon wire. When Interpace perceived it had a problem in its wire mill it immediately resorted to the torsion test and even discontinued Class IV wire production because of the wire's failure to pass the torsion test. These actions by Interpace are considered as admissions contrary to Interpace's stated position. In 1975, before Pinellas County pipe was made, Harold Swanson and Lee Booty questioned the propriety of Class IV wire and torsion tested the wire only to find that it failed. Nothing was done about the findings even

108

though Swanson was Chief Engineer of the Design and Test Group for Interpace Corporation. When Interpace employed metallurgists to find out what was the problem with the wire they used the torsion test. The head of the Solon wire mill for ten years was first asked by upper management to inspect the Solon wire mill and determine the problems. His initial report recommended the torsion test after commenting that "Whether through misunderstanding or other cause, Solon has not made quality its primary commitment".

If the torsion test is applied the whole pipeline is defective. The Court finds that it does apply and that indeed the entire line is defective.

Interpace claims that the wire is not torqued on the pipe and therefore no torsional load is applied upon prestressing. This position is incorrect. The wire rod is first torqued when it comes off the payoff stand when going into the wire drawing machine. The Court has seen actual videotapes of the drawing procedure and observed this phenomenon itself. Next, the wire is torqued when prestressed as shown by Plaintiff's exhibit 527 showing a seam in a cross section of mortar coating wire and core when its seam changes direction as it is torqued around the pipe.

A torsion test is not eliminated simply because a wire is not torqued in application. If this were so Interpace would not have used it in the middle to late 1970's at Solon. The torsion test's major function is to determine the ductility of the wire, whether proper wire drawing practices have been applied, and whether or not there are seams or other defects. For all of these reasons the wire on Pinellas County pipe does not meet the mechanical tests required.

## L. CORROSION OF THE PRESTRESS WIRES

Most of the time a pipe ruptures after a sufficient number of prestressing wires have rusted or broken. Varying opinions have been offered as to how many wires must rust or break before actual burst. The point CTL engineers make and other County experts is that after rusting of prestressing wire the pipe has already failed in that its serviceability has been compromised. The Court finds that in such a strategic pipeline which lies under roads and near homes and mobile homes that a pipe does not have to burst and endanger lives or property before it is deemed necessary to replace the pipe or pipeline. Defendants' theory is that disaster in the form of a pipeline break which endangers lives and property must actually occur before a pipe must be replaced. Under the facts of this case the Court rejects this philosophy. This would mean that Defendants could knowingly pro-

**109**

duce a grossly deficient manufactured pipe and require it to remain in service while the public awaited repeated disruptions of its water supply, continuously ran the risk of backflow, and loss of life or property.

The Court believes the experts who say that if one wire corrodes and breaks a chain reaction is set in place whereby the mortar coating is pushed up as the wires on either side corrode until the pipe eventually ruptures. The Court viewed many pipe which were in substantial distress and in a state of delamination. In the Court's mind replacement is the only answer unless each pipe were inspected at wire level. To make such an inspection would destroy the pipe. The Court does not believe that the status of a pipe may be determined by visual inspection either inside or outside of the pipe. The only sure way to really tell is to delaminate the pipe and to look at the wire.

Experts are correctly of the opinion that the main cause of failure of the prestress wire on the Pinellas County pipe is hydrogen embrittlement. The wire is full of common corrosion and pits. As the corrosion takes place hydrogen is liberated from the water surrounding the wire and diffuses into the wire. The hydrogen travels to the near flaw in the wire and accumulates until the hydrogen changes to molecular hydrogen which expands and cracks or breaks the wire. This type of corrosion is so insidious that a wire can become embrittled with only a slight amount of corrosion showing on the outside of the wire. The wire can look shiny and new and still be broken with one's hands. This demonstration was shown to the Court during trial. This is the reason that prestressed wire of the type on Pinellas County's pipe cannot be permitted to corrode.

Hydrogen embrittlement build up usually takes place very slowly but then the wire fails rapidly. This buildup can occur over short or long periods of time dependent upon the precise environment the particular pipe is buried in. When the water table moves down and a portion of the pipe drains, normal corrosion is activated and takes on the color of red rust. When the water table rises the mechanism of hydrogen embrittlement takes over and the corrosion appears black in color. The Court has observed both red and black corrosion product on most pipe. The Court finds that active normal and hydrogen embrittlement corrosion of the pipe is now ongoing in every pipe in the pipeline which is subject to premature burst at any time.

The Court is not impressed with the claim that all pipe that are going to fail have failed. The Court agrees with the experts that a number of pipe that were examined and excavated were near burst or

110

complete delamination of their sides. Prestressed pipe which is supposed to have a life of more than a century or indefinitely in no way should look like the pipe viewed by the Court.

There are a number of areas of large pits on the wire of each pipe. The Court has seen photomicrographs of these pits. Surely a layman does not realize what a pit looks like at its bottom. At the bottom of the pits are hair-like crevices running in all directions. These crevices are not apparent from looking at the top of the pit or wire. One of the foremost authorities on pitting corrosion has satisfactorily demonstrated to the Court that the pits in the prestress wire are active and if left on the wire will cause the wire to fail in a matter of a few years. Defendant's contention that the pits have stopped progressing and are stifled by the surrounding alkaline environment of the wire does not comport with common sense, the size of the pits, or the photomicrographs and, therefore, must be rejected.

The Court finds that there is ongoing corrosion on every pipe in the pipeline in the form of normal corrosion, pits, and hydrogen embrittlement or stress corrosion cracking in wire that is extremely susceptible to such corrosion attack. It does not make common sense to constantly interrupt the public's water supply, risk backflow and watch a potential catastrophe develop as more pressure is applied to the line as Pinellas County grows. Pinellas County paid for a reliable and dependable pipeline and has not received what it paid for.

## M. THE THICKNESS OF THE STEEL CYLINDER WAS LESS THAN SPECIFIED IN THE SPECIFICATIONS

The specification submittal sheet called for a minimum sheet thickness of 16 gauge cold rolled steel. The measured thickness of 6 pipe at CTL showed that a significant number of cylinders fell below the .0548 requirement of the specifications. The design formulas indicate the amount of wire used is a function of the steel cylinder thickness. In addition to cost savings in providing a thinner cylinder less wire would be used reducing the cost of making each pipe.

The improper cylinder sheet thickness shown on the specification sheet should have been detected by CH2M Hill when the submittal sheet was reviewed - but it wasn't.

## N. WIRE WAS NOT PROPERLY SPACED WHEN PRESTRESSED

The Court in examining the cores on a number of excavated pipe observed that when the pipe was initially prestressed, the prestressing wire broke and the pipe had to be rewrapped. This is a direct

**111**

indication that the wire wrapped on the pipe was brittle. In addition, the rewrap marks of the wire do not coincide with the original marks on the core when prestressed. This observation means that on the rewrapped cores the spacing between the wires was improper. The spacing of the wraps of the wire in prestressing the core is absolutely critical. If the wire is not properly spaced the strength of the pipe is compromised and the pipe is not manufactured according to design based upon Appendix "A". By this observance the spacing of the prestress wire could not have been correct on the cores observed by the Court. This observation clearly indicates improper manufacture of the pipe.

### O. THE DEFECTIVENESS OF THE CONCRETE CORE

The outer concrete core has already been found to be defective on all pipe because of the extensive carbonation of the surface of the outer core upon which the prestress wire is wrapped. This manufacturing defect causes extreme corrosion of the wire because of the pH, which is about 8 at the core level, does not provide sufficient alkalinity where the wire touches the core. This adverse affect causes another detrimental phenomenon. The pH over the core in the concrete is higher than the pH at the wire-core level. These differences have created the effect of an alkaline battery which serves to further corrode the prestressing wire. This is yet another reason for the Court's conclusion that corrosion is ongoing and will continue to increase in the pipes in the pipeline.

Of note is the fact that the Court has also found that the cylinders between the inner and outer cores are eccentrically positioned so that the pipeline may not be reliably tapped to feed other transmission lines in the area along the pipeline as growth continues in Pinellas County.

There remains for discussion the low modulus of elasticity of the core concrete and an improper design assumption of the creep factor. Both of these manufacturing defects directly relate to the concrete core.

The coarse aggregate never did meet the sieve requirements of Section 2.3 of AWWA C301-72 from the very beginning. As stated, this fact was known from the inception of the construction of the plant by Interpace, yet Interpace used its boiler plate or common design formulas for prestressed pipe in Lacoochee. An additional and major defect was the soft Florida aggregate which was in violation of AWWA C301-72 Section 2.3.1. This resulted in the design assumptions or figures for the modulus of elasticity of the concrete and the creep factor to substantially depart from the actual aggregate material used. Modulus of elasticity ($E_c$) is the ratio of an increment in stress to an

112

increment of strain below the proportional limit of the material. The creep factor ($C_r$) is the ratio of inelastic strain to elastic strain caused by a sustained load. Modulus of elasticity of a material is a measure of its stiffness. Modular ratio is the ratio of the steel and concrete elastic moduli. Thus, a low concrete modulus of elasticity has the effect of producing a high modular ratio. The initial modular ratio at the time of wrapping ($E_{ci}/E_s$) the pipe with wire was assumed in design to be 7 while the resultant modular ratio after aging of several years ($E_{cr}/E_s$) was assumed to be 6 in design.

A lower modular ratio than assumed in design translates into a weaker pipe than designed. In order to obtain the highest working pressure as designed the existence of a low modulus of the core concrete would have to be supplemented by increasing the number of wraps of the prestressing wire on the pipe or changing the aggregate altogether. These engineering principles are well supported by expert analysis and opinion. An Interpace document concludes that the engineering executives unanimously agreed that because of the improper aggregate at Lacoochee there was a lower concrete modulus of elasticity than assumed in design. Steps were taken in 1980 to correct the problem by increasing the wire wraps on existing pipe and curing the problem permanently by importing new aggregate from Alabama.

Lower modulus in the core concrete results in higher initial and resultant modular ratios. The major factors affecting the concrete modulus of elasticity are unit weight, *type of aggregate,* and concrete strength. An analysis of the concrete moduli in the core was lower and in most cases significantly lower than the 4,650,000 psi figure Interpace assumed in design. For example, in pipe 97+82 when the initial modular ratio should have been 7 the real modular ratio was 12.3; while the resultant modular ratio should have been 6, it was 10.5, etc. The higher the modular ratios the worse the pipe. If the manufacturer does not take measures to insure appropriate moduli of elasticity in the *actual materials* used to compute the actual P , the P of the pipe will be lower than required by Appendix "A" of AWWA C301-72. A decrease of P results in a lower maximum pipe working pressure .

An analysis of the creep factor assumed in design of 2 did not correspond to the actual "effective" creep factor with the material properties used in the manufacture of the pipe. A creep factor is supposed to take into account a design that recognizes *"all losses"* due to the elastic and inelastic deformations which the pipe will experience such as shrinkage, wire relaxation, and plastic strains in the concrete. *See* Section 3.2 of AWWA C301-72. CTL analysis of the proper creep factor which should have been used, assuming the actual materials used

**113**

to construct the 60-inch pipe at Lacoochee, required a creep factor of from 2.0 to 3.3 with an average of 2.7. The proper range for the 54-inch pipe creep factor was 3.7 to 4.0. Unless Interpace had taken proper measures to insure an adequate creep factor, considering the actual material used, then the actual P was lower than the P required in Appendix "A" of AWWA C301-72. Since P is a key factor in determining the maximum allowable pipe working pressure, a lower P will cause a lower maximum allowable pipe working pressure. A creek factor of 2 did not properly compensate for the variations in factors and materials affecting the actual performance of the pipe made by Interpace at Lacoochee. In sum, the aggregate used constituted different materials than assumed in design and significantly altered the initial and resultant modular ratios and the creep factor so that a significantly lower than specified operating and transient rated pipe was produced. This resulted in Interpace using the wrong design calculations in its submittal sheet, which resulted in manufacturing of pipe lower than the specified 150 psi working pressure and 210 working plus surge pressure or transient pressure. For a complete analysis of the facts see Chapter 11, Volume I of CTL 60-Inch Report, Exhibit P-402A, and Chapter 10, Volume I of CTL 54-Inch Report, Exhibit P-401A.

After considering this complicated subject and the testimony of the experts assisted by the tabulated tests on the materials, the Court finds that Interpace used improper aggregate at its Lacoochee plant commencing in 1973 through 1980 and on *all* of the Pinellas County pipe. Design equations used by Interpace which were developed using proper harder aggregate that met AWWA standards was not used in making Lacoochee pipe. Since the aggregate was soft it resulted in: a lower concrete modulus of elasticity than assumed in design; high initial and resultant modular ratios than assumed in design; the use of an incorrect creep factor. Translated into common sense language the modulus used did not conform to the numbers used in the design of the pipe. When the pipe was made the pipe's maximum working pressure and surge pressure was lower than the specifications called for. The technical effect of all of these miscalculations was to sell Pinellas County pipe which had a lower P and working pressure and working plus surge (transient) pressure than specified. As an example, pipe 97+82 had a low P of 135 and an operating pressure of 103 psi and transient pressure of 163 psi. Pipe 98+22 had a P of 146 versus a required P of 178 psi, an operating pressure of 111 psi, and transient pressure of 176 psi. All pipe tested of the 60 and 54-inch pipe fell below the specified working and transient pressures. (See Table 11-7, page 11-19 of Volume I of CTL 60-Inch Report, Exhibit P-402A and

114

Table 10-5, Page 10-16, of Vol. I of CTL 54-Inch Report, Exhibit P-401A.

In addition to the performed physical properties testing, these results were confirmed by CTL's pressure-strain P testing which is addressed by the Court later in this opinion. Neither Interpace nor CH2M Hill undertook to test the physical properties of the core concrete, aggregate, or to actually rebut in substance the findings by CTL. Interpace offered the opinion of an expert engineer that CTL P tests results should be increased thus showing sufficient working and transient pressures . This testimony is rejected as being contrary to the greater weight of the evidence and found to be contrary to a far greater in depth study of the subject by more experienced and learned engineers.

In 1975 Lacoochee pipe was tested with other pipe from other Interpace plants. The measured pressure strain P values were lower than the design P values and so a test technician was sent to Lacoochee to verify the test results. The pressure strain curves again fell below the required P. The problem was traced to the aggregate and a los modulus of elasticity for the concrete. The Court has reviewed the actual strain gauge tests taken in 1975 and compared them with tests of CTL on Pinellas County pipe. They are remarkably similar. This testimony came from an Interpace engineer who was head of the Interpace testing facilities at Wharton, New Jersey and from a well recognized technician. As far as the Court is concerned their testimony stands unrebutted in the evidence. Their testimony is verified by Interpace documents. Therefore, the tests of material properties by CTL of Lacoochee made pipe sold to Pinellas County have been verified by Interpace documents and personnel.

Even if the Pinellas County pipe had no defects except the improper aggregate, the fact that the Pinellas County pipeline has lower design and transient pressures than specified would require total pipeline replacement. The County ordered 150 psi design pressure and 210 working plus surge (transient) pipe and was entitled to pipe with such pressure ratings and nothing less.

*P—THERE WAS NO ADEQUATE QUALITY CONTROL AT THE LACOOCHEE PLANT —INTERPACE VIOLATED ITS IN-HOUSE STANDARDS IN MANUFACTURE OF PINELLAS COUNTY PIPE*

In other sections of these findings the Court has found as fact that there was grossly inadequate quality control of the manufacture of all of the Pinellas County pipe. The importance of quality control cannot be over emphasized, because without such control, numerous latent

**115**

defects can be built into the pipe and never observed until actual burst or destructive testing. Based upon the quality of pipes inspected, quality control was poor to non-existent. CH2M Hill engineers at a time before the execution of the contract between Pinellas County and Interpace stated that when the engineers went to the Lacoochee plant Interpace stressed the excellent quality control Interpace had at Lacoochee. The engineers believed that quality control is definitely one of the things the County was purchasing when it purchased the prestressed pipe. The engineers relied upon this factor in drawing the specifications for the pipe.

The Court rules that adequate quality control was certainly implied in the agreement between the County and Interpace. Even if such was not the case quality control is specifically required under Section 1.8 of AWWA C301-72 which require pipe be constructed in a workmanlike manner.

The in-house standards in Exhibit 316 are found to constitute the standards of the trade or industry as testified by engineer Robert Edmunds. Many of these standards reflect the requirements of the national standard AWWA C301 and simply embellish or describe the manner in which the workmen manufacturing the component parts of the pipe and building these parts into the pipe should proceed. Evidence of a substantial lack of quality control was evident when the Court examined the parts of the excavated pipe and photographs.

Violations of internal and industrial standards included: defects in the outer core with concrete "runs" and foreign material such as oil, dirt, and carbonate mud; 100% of the aggregate at Lacoochee did not meet Interpace in-house requirements; the mortar coating was not properly cured or kept wet causing porous and permeable coatings; poor compaction of the mortar coating indicating that the brush setting was not correct or the mix was too dry; delaminations and voids in the mortar coating indicating that the coating was sloughing off; the aggregate was improper; the core was not being cleaned and there was improper moisture control; numerous voids in the mortar coating at mid wire level and beneath haunches indicating incorrect gradation of the coating sand, poor compaction and lack of water control; failure to reject pipe with cracks on the barrel; numerous cracks in the pipe were found; repair patches were of poor quality and made without grout or slurry being applied prior to patching resulting in corrosion of the underlying prestress wires. Patching was also poorly densified to eliminate voids; batching requirements were not followed causing areas of significant unmixed fine sand in the mortar coating; debris in the core concrete and hardened chunks of concrete and straw in the

116

mortar coating; fine aggregate containing non-conforming gradations of both the mortar coating and core concrete; the use of defective wire; permitting of more than two breaks on a pipe during prestressing. As many as four breaks were found on a single core.

These findings of poor quality control and violation of in-house standards and much more are supported by the testimony of Interpace's engineer, Bob Price, and quality control supervisor, Darryl Tadlock. Examination of the pipe by CTL showed definite lack of quality control. At CTL 5 out of 6 pipe examined exhibited poor coating to core bond in substantial portions of the pipe and sometimes the entire length of the pipe.

One of the first-hand witnesses who observed the production of the Pinellas County pipe was Interpace's engineer, Robert Price. At the time he headed several quality audit teams visiting the various Interpace plants including Lacoochee. He stated that there was literally no quality control during the time that Pinellas County's pipe was being manufactured. Emphasis was on production instead of quality. The quality audit done by Mr. Price at the crucial time period in the Court's view shows a deplorable quality control condition at Lacoochee. There was no property *laboratory* or equipment at Lacoochee in which to even properly test the mixes or other component parts. The report and subsequent follow up quality audit report well explains the haphazard manufacture of the component parts observed from the excavated pipe. According to Price, the result of the quality audit is the best that the plant felt it needed to do or had to do to produce pipe. The personnel at Lacoochee were not properly trained in quality control. The Lacoochee manager, general manager, and vice president of manufacturing did not think it was necessary to produce a quality product as much as one they could sell and get by with. The plant manager at Lacoochee was not interested in correcting the poor quality control reflected in Price's quality audit. Had Interpace's own manufacturing procedures, test procedures, and quality assurance program been followed during Pinellas County pipe production you would not have been seeing the condition of Pinellas County pipe which Mr. Price personally observed. Neither Interpace nor CH2M Hill really tried to cross-examine Mr. Price concerning his testimony on the quality control at Lacoochee. Neither Defendant brought forward witnesses to rebut Price's testimony. The Court adopts Mr. Price's testimony as true which constitutes findings of fact.

CTL quality control expert Steve Gebler with many years of experience in prestressed pipe quality control reviewed the quality control audits and the findings and pictures of excavated pipe. Without quality

**117**

control you do not know if you are making the pipe according to specifications or whether the pipe was built as designed. Review of the documentation shows that the same improper manufacturing procedure had gone on for years which showed a complete disregard for quality control. Gebler was especially critical of a deplorable *laboratory* at Lacoochee and the plant's inability to have the right measuring devices and equipment to verify that manufacturing was being done right. Pinellas County pipe were not manufactured in a workmanlike manner. There were crucial and major defects in the materials that Mr. Gebler had actually seen himself on Pinellas County pipe.

The Court concludes that there was no quality control at Lacoochee during Pinellas County pipe production and that major material manufacturing defects appear on each pipe in the pipeline as they do on each pipe excavated.

### Q - INTERPACE FAILED TO COMPLY WITH SECTION 1.9 OF AWWA C301-72 AND SUPPLY CONCRETE, STEEL AND WIRE REPORTS TO THE CONSULTING ENGINEER OR SUBMIT AN AFFIDAVIT OF COMPLIANCE WITH THE NATIONAL STANDARD

Interpace has acknowledged that it did not comply with Section 1.9 of AWWA C301-72 in submitting concrete, steel and wire reports as required by its contract with Pinellas County. Its position is that the engineer or County did not ask for them. No such requirements are in the contract. Neither did Interpace comply with its contract requiring an affidavit to be submitted after the pipe had been manufactured attesting to the fact that the pipe had indeed been manufactured in compliance with the specifications. CH2M Hill fell below the standard of care in not insisting on the affidavit or tests and in certifying the job to the County as complete before first acquiring the affidavit from Interpace.

The Court quite legitimately infers from Interpace's actions and admission that the pipe produced and particularly the mortar, concrete and wire did *not* meet AWWA standards. This finding is most consistent with the physical examination and viewing of the pipe and its component parts. Interpace's chief engineer stated it was not Interpace's policy to provide such an affidavit unless pressed because the aggregate was known not to comply with AWWA standards. Apparently the plant manager at Lacoochee did not want to perjure himself by signing such an affidavit; however, the Court is privileged to find against Interpace because of this failure. If the tests had been submitted and examined by CH2M Hill they would have shown what

118

Pinellas County's proof has been in this case, i.e. defective wire, mortar and concrete.

## IV.

## PINELLAS COUNTY PIPE BURST AND LEAKS CAUSED BY FAULTY MANUFACTURE OF PIPE

The Pinellas County line was placed into service on October 2, 1978. In the early morning of November 13, 1979, a power outage at the Cypress Creek Pumping Station caused a surge in the pipeline of between 125 and 133 psi. The surge pressure of less than the design working pressure of 150 psi did not approach the working pressure plus surge (transient) allowance of 210 psi supposedly designed into the pipe. Therefore, the rupture was not caused by water hammer or surge. At the time of the surge the line was being operated at 94 psi pressure and 60 MGD flow.

The rupture caused considerable damage to the pipe, the right-of-way, the pipeline, which had to be cleaned out, loss of a substantial amount of potable water, and destruction of condominium privately owned land. The hole made by the rupture extended all the way up to the floor slab and footing of the condominium. The burst caused substantial "other property damage".

The pipe was examined by Pinellas County consulting engineers to determine the cause of rupture. The exhumed pipe was sent to Interpace for analysis and returned approximately two weeks later. The chief engineer of Interpace who usually inspected pipe breaks was told by Bob Bald not to investigate the rupture and that Bald would take care of the problem. However, the chief engineer viewed the pipe after it was shipped to Interpace and determined that the cause of the rupture was due to manufacturing defects. The coating on the reverse side of the rupture was very thin and not up to specifications or standards. The thin coating on the opposite cathodic side of the burst started an anodic cell in the burst area and caused the wire to embrittle. The minor surge in the line caused the side of the pipe weakened by embrittlement to rupture. Mr. Bald wrote Pinellas County and advised that the cause of the burst was "contractor damage". The chief engineer disagreed with this analysis. The claim of contractor damage and surge were the two phrases frequently used by Interpace when investigating pipe breaks. When Interpace couldn't think of anything else it used these excuses. The Interpace salesman assigned to the area viewed the break and recalls wire being pealed in two by hand. He saw lines of rust on the core which he thought was bad because if you rust wire it will eventually break and you won't have

**119**

anything to maintain the pressure in the line. In his mind, somebody had not made the pipe right.

After review of the photographs of the Pinellas County break and considering the expert testimony as to the cause the Court concludes that the wire contained chronic defects in the form of seamed and split wire and the transverse steps in the wire caused by improper drawing practice together with a thin substandard mortar coating on the reverse side caused the wire to cathodically embrittle and become in a state of incipient failure. Surges in transmission mains are common. When a surge lower than the working pressure moved through the line the pipe was unable to withstand a pressure of 133 psi and exploded. Therefore, the main cause of the rupture was due to a manufacturing defect quite similar to those viewed on other excavated pipe which had not yet ruptured. The failure was not caused by contractor damage.

Pinellas County's second rupture occurred on December 11, 1978 while the line was being presssure tested at 150 psi near the Eldridge-Wilde Wellfield. A pressure test is not a definitive approach to finding detrimental pipe since only the lowest part of the line actually reaches 150 psi. The upper portions of the line reach must lower pressures. A pipe has to be grossly deteriorated with many wires broken and ready to rupture in order to rupture in a pressure test.

The Court has viewed a series of photographs contained on composite Exhibits 50 through 53, and a complete report on the rupture. Ninety wire breaks, two-thirds of which were broken in brittle fashion, occurred on the pipe. There were dark areas of corrosion and a longitudinal crack in the mortar coating.

The Court determines the cause of the second rupture to be a delamination of the mortar coating which occurred during the manufacturing process resulting in brittle wire failure and a longitudinal crack in the mortar coating, with development of aeration cells by an incomplete encasement of the wires in the mortar coating. Therefore, the pipe failed because of a series of manufacturing defects. Again, the condition of the pipe in the second rupture is similar to defects in the excavated pipe which have been viewed by the Court which have not yet ruptured.

In other sections of these findings the Court has already concluded that the leaks in the tapped pipe and also the manhole leak was caused by manufacturing defects.

## V.

### THE CTL TESTS OF THE 60" AND 54" PIPE

The Court has already adopted the findings and engineering conclu-

120

sions found in the CTL Reports as fact. However, certain specific findings are necessary because of the defenses to the reports raised by Defendants.

The main diagnostic test of proof of design is the P strain gauge test. Interpace literature and test procedures prior to and during the time Pinellas County pipe was made support this finding. This conclusion is supported by Interpace's own chief engineer.

The proper and most diagnostic method for determining proof of design is the limiting strain method as opposed to the intersectional method. The limiting strain method was the test used long before and during the time Pinellas County pipe was made. It is far more objective than the intersectional method which was created in its present diagnostic form in approximately 1983 in an effort to obtain an engineering defense because of the pipe failures being experienced by Interpace's successor Lockjoint Pipe Company. Simply stated, under the limiting strain method if the test curve falls below the design curve the pipe fails and has a manufacturing defect. Despite all of the claims to the contrary the key Interpace Technical Bulletin on the subject specifically indicates that if the test curve falls below the design curve a manufacturing defect exists. Contrary to Defendant's position the test is found to have constituted a pass-fail method by Interpace. Factually, each of the Pinellas County pipe tested failed the limiting strain method thereby confirming the low P computed from the elastic modulus of the core concrete used in manufacturing the pipe.

Interpace produced an expert whose opinion was that under AWWA 301 all pipe are designed for the exact environmental conditions which will be seen by the pipe while in service. The chief engineer of Interpace strongly disagrees with this proposition as well as a number of long-time experienced prestressed concrete pipe experts offered by Pinellas County. Interpace claims that there was more moisture and thus less shrinkage in the pipe in service than when tested and that if this additional moisture was added to the pipe by CTL the pipe would have passed the limiting strain method. Under Section 3.2 of AWWA C301-72 "all losses" are interpreted by Interpace's expert as a modified "all losses" when the pipe is in the ground and in service. Interpace technical memorandums contradict this view. The pressure-strain test data based developed by Interpace which was used to actually test P was based upon all shrinkage losses which could occur in the pipe, since the tested pipe had been stored outdoors for several years. The safety margin for all prior pipe in the development years of Interpace

**121**

showed a substantial pressure strain test margin *above* the design or theoretical curve even with all shrinkage and creep losses having occurred. Shrinkage is but one of the many losses which are taken into effect in the creep factor. The Interpace expert admits that the shrinkage component in the creep factor cannot be quantified. In sum, if Interpace's contention is correct then pipe could not be made and stockpiled for future use or be installed in a dry environment. There could be no stockpiling of pipe by water departments because the pipe would suffer all shrinkage losses especially when heated by sunlight while stockpiled for use if a pipe should break or some other reason to use the pipe would occur. Such spare part pipes would simply be unavailable. The term "all losses" means exactly that — "all losses" and not some modified version convenient to explain away precise CTL tests performed the same way Interpace did them in the late 1960's and all of the 1970's. The cross-examination of the Interpace expert, together with the rebuttal on this point, has satisfied the Court that in weighing the engineering facts Interpace's contention on this point is without merit.

The complicated engineering distinctions between the two methods are accurately explained in Section 4, Volume I of the CTL 60-Inch Report. The Court notes that under the intersectional method a number of the pipe tested by CTL still fail. See Section 15 of Volume II of CTL 60-Inch Report, Plaintiff's Exhibit P-402B.

In the hydrostatic or coating crack test the pipe is pressurized in increments until a "first crack" is identified. CTL initially used Interpace's "TP-12" to judge the test. TP-12 used a failure criterion of first crack below 125% of P, with a definition of "first crack" as 12" long with an average width of .002" excluding 6" from the spigot end of the pipe and 12" from the bell end of the pipe.

After CTL had written its reports and conducted the coating crack test or hydrostatic test based upon the criteria of "first crack" of TP-12, Interpace documents were found that showed that in fact Interpace disregarded TP-12 and used a "first crack" criterion of between 150% and 175% of class of pipe. The class of pipe was determined not by P but by the code specifying the class of pipe at the bottom of Interpace submittal sheets. Using the actual Interpace in-house criteria, 3 out of 5 pipes failed the coating crack test. Including end cracks, 4 out of 5 failed. The testimony of Interpace's chief engineer, the testing technician, and other engineers confirm the increased in-house criteria.

The coating crack test is a quality control test used to check newly made pipe. It is not determinative of whether a pipe is properly

122

manufactured as claimed by Defendants. The Court has observed a number of pipe which have substantial rusting under what would appear to be uncracked mortar coting. The Court has been shown that a crack .005 inches in width can pass a substantial amount of water through to the wire sufficient to cause the rusting of the pipe and premature failure. The realities of this demonstration together with the physical evidence observed by the Court in examining the pipe has led the Court to conclude that the criteria of TP-12 is invalid and not definitive of whether a sound mortar coating has been manufactured. Excluding longitudinal cracks or cracks at both ends of the pipe is unrealistic. The pipe will fail if it has longitudinal cracks or cracks at the bell or spigot ends. Nature does not distinguish between the location of a crack on a pipe. After a review of the coating crack information, the real criteria used by Interpace, and the fact that a majority of the pipe removed from the Pinellas County pipeline failed the test, the Court concludes that the test is supportive of the opinion that the Pinellas County pipe are defective and not properly manufactured.

One of the two tested pipe failed the three-edge bearing test. This should not have happened unless the pipe is seriously defective. The burst test information is helpful but in the opinion of the Court not definitive on the question of the defective manufacture of the pipe.

The Court concludes that the CTL tests on a whole indicate that the pipe are not made according to design working pressure and transient pressure specifications and show that the pipe is riddled with manufacturing defects.

The thickness of the concrete core was also checked. Some of the excavated pipe do not meet the tolerances for total core thickness which produces a weaker pipe. The inner core of the Lake St. George tap leak was significantly below that of any pipes tested.

A major problem was the fact that the cores and the pipe have *not* been properly *water cured.* Under Section 3.7 of AWWA C301-72 the pipe may be water or steam cured. There was no steam curing at Lacoochee so that the pipe was water cured under Section 3.3 of AWWA C301-72. Water curing requires continuous curing for the first 32 hours following which the pipe may be "tipped" from their bases, placed in a storage yard and kept continuously moist by spraying for an additional three days. This is a total of 104 hours. Interpace's chief engineer knew about the problem and water curing in 1976. The quality audits indicate that improper curing was ongoing at Lacoochee during the time that Pinellas County pipe was being manufactured. An

123

Interpace engineer testified that the cores were simply not properly cured.

Section 3.6.8 of AWWA C301-72 requires test cylinders to be used to verify the proper compressive strength of the core has been reached before the wire is wound on the core or is prestressed. Prestressing is prohibited for the first 4⅓ days to insure minimum compressive strength. Six of the pipe out of 31 have been found with stenciled dates of curing and prestressing indicating they were prestressed prematurely. Based upon this uncontradicted testimony the cores on the pipeline were not cured properly and a certain percentage were not properly prestressed. If the cores are not cured properly then their ultimate strength would be impaired. Concrete if properly cured increases in strength for the first 50 years. Therefore, a majority of the pipe will not achieve their ultimate strength and will creep more because of inadequate curing while another portion of the pipes compressive strength has been impaired because of improper prestressing. The manufacture of prestressed pipe in this fashion is inexcusable. There is no way to eliminate such improperly manufactured pipe from the pipeline without destructive analysis and testing which is obviously not remedial. Here is yet another reason the Court believes that the only remedy is for the pipeline to be replaced.

## VI.

### THE STATISTICAL BASIS SUPPORTING THE COURT'S CONCLUSION THAT THE ENTIRE PINELLAS COUNTY PIPELINE HAS MAJOR DEFECTS IN EVERY PIPE AND MUST BE REPLACED

Pinellas County produced a qualified expert, Richard Scheaffer, who has his doctorate in the field of small statistics mathematical analysis. The main purpose of the witness's testimony was to take the number of pipe excavated and examined and their noted defects and predict with mathematical probability the number and frequency of defects which would occur in the entire pipeline. In the Court's mind this procedure is the only rational way to characterize the entire pipeline absent excavating and destructively testing the entire line. After a review of the physical, photographic, and other evidence specified in these findings and Defendants attempted rebuttal of Dr. Scheaffer's testimony, the Court in weighing the evidence hereby completely adopts Dr. Scheaffer's mathematical analysis and conclusions in his report, Exhibit 1052. The number of Pinellas County pipe excavated and stripped or tested constitutes a random representative geographical sample of the entire pipeline.

Dr. Scheaffer considered 29 pipe which had been excavated. One pipe had not been inspected for defects but he used the number 29 anyway in his calculations. Dr. Scheaffer constructed a mathematical model to determine the percentage of pipe with a certain defect as the defect would relate to the whole pipeline. Of course, there are certain defects that constituted 100% of the samples which are: failure of the P test; torsion tests; wire corrosion; permeable void space at wire level; carbonated cores.

The mathematical probabilities of defects in the pipeline have an upper and lower boundary. There is also a competence level attributable to each of the boundaries. Dr. Scheaffer's ultimate conclusion was that no less than 85% of the pipes are defective with a confidence level of 95%. The portion of the line that has at least one defect is at least 99%. Although not included on Dr. Scheaffer's analysis, it is assumed that all of the wire in the line is defective and no estimates are needed in that the entire pipeline is wrapped with defective Class IV wire.

The Court based upon observation and consideration of expert testimony finds that 100% of the pipeline is defective without the need for mathematical modeling since there are a number of major material defects which are known to occur on 100% of the pipe. These defects are: defectively made Class IV wire; defective layered permeable mortar coating; carbonated cores; low modulus of elasticity in core concrete; the use of aggregates that do not meet AWWA C301 specifications. Based upon the weighing of all of the evidence in the case the Court concludes that 100% of the pipeline is materially defective and has major defects and, therefore, must be entirely replaced.

## VII.

## PINELLAS COUNTY'S ACTION FOR BREACH OF CONTRACT AGAINST INTERPACE

Interpace agreed in its contract with Pinellas County to manufacture prestressed pipe according to the plans and specifications which included the national standards AWWA C301-72 and ASTM A227-71. The standard AWWA C301 provides for certain elections to be made in specifications which only become the obligation of the manufacturer if specified. The contract specifically made a part of the specifications the requirement that the pipe was to be designed according to Appendix "A" of AWWA C301. Under Section 1.9 of AWWA C301, tests of wire mill reports and concrete reports were to be supplied to CH2M Hill for approval prior to manufacture. An affidavit certifying that all pipe and fittings furnished under the contract comply with AWWA C301 and any additional requirements was required to be given.

Independent of the specifications of AWWA, although also in accordance with such specifications, Interpace was to provide prestressed pipe with an operating pressure of 150 psi and 210 working plus surge pressure or transient pressure. Interpace could still manufacture the pipe in accordance with AWWA C301, except for Appendix "A", and still breach its contract by not producing pipe with the specified operating and transient pressures.

There were certain rights and duties given to Pinellas County's engineers, CH2M Hill, by the contract which will be addressed in the Court's ruling on the claim of the County against its engineers. The finding here is that Interpace was contractually bound to permit the engineers the latitude and rights granted the engineers under the Interpace contract. Most importantly, Interpace specifically agreed that approval by the engineer or acceptance by the County did not release Interpace of any of the contractual duties or liabilities for breaching its contract:

"**Such failure shall not relieve the supplier of his obligations to fulfill his contract, even though such materials may have been previously inspected by the engineer and accepted or estimated for payment, nor shall it obligate the owner to final acceptance, or prevent the owner at any time subsequent from recovering damaged materials shown to be defective."

(See Section C-03, "Conduct of Work", P C02 of Pinellas County/Interpace contract, Exhibit 3)

Section 1.7.3 of AWWA C301-72 further provides:

1.7.3 — *RESPONSIBILITY*. Inspection by the purchaser, or failure of the purchaser to provide inspection, shall not relieve the contractor of his responsibility to furnish materials and to perform work in accordance with this standard.

Therefore, even if Pinellas County engineers had inspected the plant at Lacoochee or the pipe at the time it was being laid , Interpace would not be contractually released from its obligations under the contract to manufacture pipe according to the standards or contract terms and specifications.

The Court has made findings of fact that Interpace did not manufacture the pipe in the Pinellas County pipeline in accordance with AWWA C301-72 and ASTM A227-71. The mortar coating, wire, lack of slurry, carbonation of the core, faulty concrete core, eccentric cylinders, lack of quality control, failure to properly cure the core concrete or mortar coating and all of the other material manufacturing

**126**

defects found by the Court clearly violates Interpace's contractual duties assumed by the manufacturer of the pipe. The pipe was not made in a workmanlike manner and all pipe in the pipeline are grossly defective and must be replaced.

Pipe tests using the tests developed by Interpace show that the pipe supplied are not manufactured or properly designed to perform at operating pressures of 150 psi and transient or working plus surge pressures of 210 psi. The pipe was not manufactured according to these specifications and according to Appendix "A" of AWWA C301-72 as required by the contract.

Interpace's breach of contract in not providing Section 1.9 AWWA tests as required or an affidavit that the pipe was made as specified was a material breach of the agreement.

## A. BREACH OF IMPLIED WARRANTY AND MERCHANTABILITY

One claim asserted by Pinellas County against Interpace was that the pipe breached the implied warranty of merchantability set forth in Section 672.314, Florida Statutes.

The Court finds that Pinellas County has established its claim in that, as reflected throughout these findings, Pinellas County proved by the greater weight of the evidence that the pipe materials were not merchantable because they were not fit for the ordinary purposes for which they were intended.

The Court rejects Interpace's defense that because Pinellas County provided some specifications for manufacture of the pipe, the implied warranty of merchantability should be excluded. This argument fails to recognize that frequently a buyer will specify certain things regarding the manufacture and sale of a product but leave others to the manufacturer. In this case, the proofs demonstrated that Interpace had developed very detailed manufacturing and technical procedures for manufacturing. AWWA C301-72 represents only a minimum standard and does not answer all of the questions regarding the manufacture of pipe.

For Interpace to prevail on this issue, the proofs must be been that Pinellas County's specifications described the goods so precisely that no other kinds of goods would have satisfied the contract. The description would have to have been so specific that a person with no prior knowledge of the transaction could have gone to the supply room and picked out the goods described. R. A. Anderson, 3 Uniform Commercial Code 316 (1983).

For example, in *Valley Iron & Steel Co. v Thorin*, 278 Or. 103, 562

**127**

P.2d 1212 (1977), the seller of metal castings to be used in joining a handle and blade in a tree planting impact tool sought to avoid liability by making the same argument that Interpace made in this case. The Oregon court, however, found that seller responsible for breach of an implied warranty of merchantability because the seller knew the intended purpose of the metal castings and the choice of the metal to be used was left to the seller's discretion. Just as in the *Valley Iron & Steel* case, Interpace had wide latitude in selecting the materials to be used, the manufacturing procedures to be used and the formulation of design criteria for the manufacture of the pipe. Therefore, the Court finds that the implied warranty of merchantability was not excluded simply because Interpace was given product descriptions found in AWWA C301-72.

The Court perceives that this finding is consistent with Section 672.317, Florida Statutes, which promotes a policy of construing warranties as cumulative whenever possible.

## B. BREACH OF IMPLIED WARRANTY OF FITNESS FOR PARTICULAR PURPOSE AGAINST INTERPACE

Pinellas County also asserted that the pipe manufacturer, Interpace, was liable on the theory of breach of an implied warranty of fitness for a particular purpose found in Section 672.315, Florida Statutes.

A warranty of fitness for a particular purpose is established when a seller, such as Interpace, had reason to know of Pinellas County's particular purpose, had reason to know that Pinellas County was relying on the skill or judgment of Interpace to furnish appropriate goods and in fact Pinellas County relied upon Interpace's skill or judgment.

As to each of these elements, the proofs established that Interpace well knew in advance of the particular use of the pipe. Its salesman, Jack Butler, had numerous conversations with representatives of Pinellas County prior to the submission of Interpace's bid and the bid documents themselves reflected substantial information regarding the use to which the pipe would be put. The proofs also establish that Pinellas County did rely on Interpace's skill and judgment to furnish appropriate goods and Interpace knew that. The submittal sheet, promising pipe conforming to AWWA C301-72 submitted by Interpace prior to the formation of any specific contract, was given to induce reliance by Pinellas County on Interpace. The submittal sheet was approved by Pinellas County's engineer, CH2M Hill. The contract documents between Pinellas County and Interpace demonstrate that Pinellas County indeed relied upon Interpace's skill and judgment.

128

Interpace defends this claim largely on the same basis as it defends the merchantability claims—urging that since detailed specifications were supplied no implied warranties attached to the transaction. As previously discussed, the Court rejects that argument.

Interpace further asserts that no particular purpose implied warranty can be established when the buyer possesses equal or superior skill or knowledge with respect to the produce purchased. The facts, however, do not support that position.

In *Custom Automated Machinery v Penda Corp.,* 537 F.Supp. 77 (N.E. Ill. 1982), the manufacturer of a thermoforming machine knew that its buyer required a machine that would operate at 120 seconds per hours. When the machine failed to perform, the buyer asserted breach of the warranty of fitness for particular purpose. The seller asserted the same defense which Interpace poses, namely, that because the buyer had produced technical specifications and was a sophisticated buyer no reliance existed and, therefore, no warranty could be established. The *Penda Corp.* court rejected the argument, finding that the buyer's specifications were more descriptive of operational needs and were not the type of precise and complete technical specifications that preclude implied warranties of fitness for particular purpose.

The Court finds a substantially similar situation in this case. Pinellas County required 60-inch diameter pipe and 54-inch diameter pipe capable of transmitting water at operating pressures up to 150 psi. Pinellas County also required surge protection up to a minimum of 210 psi. Those descriptive requirements are not the type of technical specifications that preclude the existence of implied warranties. Instead, they were operational requirements which advised Interpace of Pinellas County's particular needs.

In *Aluminum Co. of America v Electro Fla Corp.,* 451 F.2d 1115 (10th Cir. 1971), Alcoa made a similar argument as that made by Interpace. The Tenth Circuit reasoned that "If sellers were to be excused from implied warranties of fitness whenever a buyer makes his general requirements known, there could seldom be such warranties." *Id.* at 1119. The Alcoa court required precise technical specifications in order to preclude warranties. The court further held that when, as Alcoa did in that case, a manufacturer expressly tailors a product for a buyer's use, the warranty of fitness for particular purpose applies.

Therefore, on all the proofs, the Court finds that Pinellas County has proved a sufficient factual basis for an implied warranty of fitness for particular purpose which was breached by Interpace.

129

## C. ACTION FOR NEGLIGENCE AGAINST INTERPACE

Interpace was required to exercise due care consistent with that care taken by manufacturers of prestressed pipe in the pipe making industry at the time the pipe was manufactured. This negligence standard is contractually specified and agreed to under Section 1.8 of AWWA C301-72 which requires that all phases of the manufacture of the pipe be made in a workmanlike manner by mechanics skilled in their various trades. Violation of the national standards specification is also evidence of negligence.

Interpace negligently manufactured the Pinellas County pipe by violating the national standard in producing pipe which is defective in that the mortar coating was improperly mixed and applied to the pipe, the wire was defectively manufactured and does not come within the specifications of the contract, slurry was not applied pursuant to the national standard requirements, an improper manufacturing process caused the carbonation of the core, a faulty concrete core with improper modulus of elasticity made from improper aggregate was placed on the pipes, eccentric cylinders were placed in the pipes, there was a total lack of quality control at the Lacoochee plant during manufacturing, and Interpace was negligent in producing defective pipe as found by the Court in these findings which have not otherwise been specified here. The pipe was also negligently manufactured by Interpace failing to produce pipe with an operating pressure of 150 psi and 210 psi working plus surge (transient) pressure.

The Court has already ruled upon Pinellas County's right to bring suit upon the theory of negligence. That interlocutory order is affirmed in these findings and the Court's order is made a part of these findings as Exhibit "B".

## D. STRICT LIABILITY IN TORT AGAINST INTERPACE

Pinellas County has also sued Interpace for strict liability in tort. Since the seminal Florida decision in *West v Caterpillar Tractor Co.,* 336 So.2d 80 (Fla. 1976), the doctrine of strict liability has been applied to compensate parties injured by unreasonably dangerous and defective products placed on the market by manufacturers.

Pinellas County, as these findings reflect, has demonstrated that the pipe in question is defective and unreasonably dangerous. The County has further demonstrated damage to property other than the pipe itself. That damage includes the loss of water, loss of water revenues, destruction of rights-of-way, and the need to purchase or acquire additional rights-of-way or interests in land.

130

Thus, the Court finds that Pinellas County has established liability against Interpace on this products liability theory.

## E. CULPABLE NEGLIGENCE

Another claim asserted by Pinellas County is that Interpace is liable for culpable or gross negligence. The Court is cognizant of the strict proofs required to make out a culpable negligence case against the manufacturer of a product. In order to sustain the proofs on this type of cause of action, Pinellas County was required to prove that Interpace was guilty of negligence in the manufacture of its product. The negligence must be:

1. Flagrant, egregious, and gross;

2. Tantamount to the level of conduct as would sustain a conviction for manslaughter;

3. Rise to the level of a public wrong; and

4. Reflect a course of action reflecting a complete and total disregard of human rights, safety and welfare.

*Chrysler Corp. v Wolmer,* 499 So.2d 823 (Fla. 1986); *Carraway v Revell,* 116 So.2d 16 (Fla. 1959); *Jeep Corp. v Walker,* 528 So.2d 1203 (Fla. 4th DCA 1988); *Keller Industries, Inc. v Waters,* 501 So.2d 125 (Fla. 2d DCA 1987).

Applying this standard to this case, the Court finds that if ever a case for an award of punitive damages and a finding of culpable negligence in the manufacture of a product existed under Florida law—this is the case. By the evidence presented, Pinellas County has proven a culpable negligence claim against Interpace.

The most important factor which courts consider in this area is whether the manufacturer had actual knowledge of the defects in the product prior to the sale to the aggrieved plaintiff. In this case, Interpace knew that Class IV wire had not been adequately and rigorously tested as new products should be. It knew that the wire suffered from brittle fractures, splits and seams, all at unacceptable levels. Interpace had previously experienced similar performance from another type of wire called "oil-tempered wire." That product was removed from the market for exhibiting the same performance that Class IV wire later exhibited.

Interpace knew the wire could not and would not pass the torsion test, which is the best test for determining all types of harmful defects in wire. Messrs. Booty and Swanson tested the wire with torsion tests in 1975 because of their personal concerns that the wire was defective.

Their tests confirmed indeed that the wire was defective. Mr. Swanson was at the upper level of the chain of command in product development at Interpace.

Interpace misrepresented the true state of facts to its hired metallurgical consultant, Bill Bawden. Interpace indicated to him that it was manufacturing Class IV wire only experimentally when it asked him to design a wire-making machine known as the Fenn Machine. The truth of the matter was that Interpace had been manufacturing Class IV wire for production since 1972.

The work of Bawden and others indicated to Interpace that its manufacturing procedures were incapable of producing satisfactory Class IV wire. Interpace also knew that ASTM Committees charged with approving wire for use in prestressed concrete pipe had rejected Class IV wire in 1968 and 1973. Interpace knew that wire drawing practices at the Solon Wire Mill involved the use of excessive heat which in turn prompted brittle failures of the wire. Interpace knew at the time it established the Lacoochee plant that it did not have rail delivery facilities to accept the delivery of satisfactory aggregate and that the local aggregates could not and did not meet applicable AWWA specifications. Interpace knew that the aggregates utilized at Lacoochee caused a low modulus of elasticity in concrete thus having a direct impact on the working pressure of the pipe. Interpace knew that the Lacoochee plant was poorly run with an absolute lack of quality control.

Interpace failed or refused to correct problems found on quality audits prior to the manufacture of Pinellas County's pipe. The Chief Quality Control Supervisor at Lacoochee, Darryl Tadlock, was told not to worry about wire splitting because wire was made by putting two halves together. This was a blatant falsehood. According to Tadlock, from 1973 through the time Pinellas County pipe was made, quality audit documents were falsified. All of these things occurred at the same time that Interpace was advising to the public that its product would last for more than one hundred years, was maintenance-free and failure-free, and would not rust. Interpace experienced a 1975 failure of pipes in Center, North Dakota. Its chief engineer, Don Dodd, based on that failure and his investigation, changed his opinion concerning the viability of Class IV wire. When he wrote a memorandum critical of Class IV wire, he was instructed to destroy it. Dodd complied and the information was buried. Interpace knew that when its pipe was placed under pressure it was a dangerous product susceptible of causing great harm if permitted to burst. Interpace well knew that regarding the Pinellas County project the pipe was to be used in the main artery of a

132

public water transmission line—the heart of the Pinellas County Water System.

These facts found by the Court to have been proven do not remotely reflect an all inclusive recitation of the facts put in evidence by Pinellas County. Further evidence of gross negligence on the part of Interpace was the fact that it had prepared detailed manufacturing procedures ("MPs") and technical procedures ("TPs") and completely disregarded them. For these reasons, the Court finds that Pinellas County has made out its case against Interpace on its theory of gross or culpable negligence.

## F. FRAUD - INTERPACE

On the claim of Pinellas County asserting fraud against Interpace, several facts are controlling. The material representations of fact made to Pinellas County and of which it now complains were fraudulent, were that first, the pipe would last for one hundred years or indefinitely and second, that the pipe would conform to AWWA C301-72.

The first representation regarding the longevity of the pipe was made by Interpace salesman, Jack Butler, to D. Michael Flanery, then an engineer employed by Pinellas County. Flanery testified that he relied on Butler's representations and that, by virtue of Flanery's position at the time he could have influenced the decision of Pinellas County as to whether or not to purchase Interpace prestressed concrete pipe. Flanery did not act because of his belief of the truth of the statements made by Jack Butler.

Butler made similar representations to the then water director, Pickens Talley. Butler compared prestress concrete pipe to various iron pipe products and told Talley that Interpace pipe would last longer than iron pipe. Butler showed Talley samples of pipe and pictures of the Roman Aqueducts, all in an effort to persuade Talley to purchase Interpace pipe and to persuade him that Interpace pipe would last for more than 100 years.

Any question of the authority vested in Mr. Butler to make such statements was resolved by the advertising and promotional evidence introduced by Pinellas County reflecting the same statements or representations made in well-respected engineering publications and journals.

The second fraudulent representation came in the form of a written shop drawing or submittal sheet submitted by Interpace prior to the entry into any contract. The submittal sheet reflects:

Design Conditions:

In accordance with AWWA specification C301-72

**133**

| | |
|---|---|
| Design Pressure — psi 150 | 150 |
| Water Hammer Allowance — psi 60 | 60 |
| Max. Cover - feet 6 | 6 |

The Court finds that at the time the submittal sheet was presented, on January 17, 1977, no contract between Pinellas County and Interpace had been executed. The submittals were reviewed and approved by a CH2M Hill engineer, Dink Henderson, on February 7, 1977, and were relied upon by him in making the determination as to whether the pipe should be approved.

At the time the submittals were made to Pinellas County, Interpace knew that it could not produce pipe that complied with the terms and conditions of AWWA C301-72. It knew that the aggregate in use at the Lacoochee plant in Florida would not meet the sieve requirements of the specification; it knew that Class IV wire was inadequate, had produced failures in Center, North Dakota, and that one of its principal engineers had written a paper criticizing the use of Class IV wire. That paper was destroyed at the request of the former Chief Engineer and Vice President of Technology at Interpace, Robert Bald, prior to the submittal.

Thus, the Court finds that as to both categories of misrepresentations of fact, Interpace knew of their falsity and the Court finds they were made to induce action and did, in fact, induce action to the detriment of Pinellas County.

The Court finds that as to both categories of misrepresentations of fact, Interpace knew of their falsity and the Court finds they were made to induce action and did, in fact, induce action to the detriment of Pinellas County.

The Court finds that Flanery and Talley, by accepting Butler's representations, took no action to further study the pipe or to otherwise make recommendations to the Pinellas County Commission regarding the acceptability of the pipe. Pinellas County accepted as true the representations made in the submittals as to the conformity of the pipe to AWWA C301-72. The Court is satisfied that Pinellas County has proven all of the elements of a claim of common law fraud.

Throughout these proceedings, Interpace has argued that the fraud claim should fail either because the representations consisted of "salesmen's puffing" because the representations do not differ from the contract and, thus, this is no more than a breach of contract action and because the representations involved pormises of future performance. The Court finds each of these arguments insufficient and the defenses of Interpace are rejected.

134

First, regarding the claim of salesmen's puffing, in *Ramel v Chasebrook Construction Co.,* 135 So.2d 876 (Fla. 2d DCA 1961), the Second District Court of Appeal held that a statement which might otherwise constitute "opinion" will constitute a statement of fact if the party has exclusive or superior knowledge. In *Ramel,* the particular representation was that a home was well constructed. The defects were such that the particular seller had superior knowledge and the statement was found not to constitute opinion but rather to constitute a statement of fact under the circumstances.

Similarly, Interpace occupied a superior position regarding the development and performance of Class IV wire, knowledge of the pipeline failure at Center, North Dakota, the inadequacies of the Lacoochee aggregate, and the body of facts known to Interpace which reflected that indeed the pipe sold to Pinellas County would not and could not last for one hundred years so long as it included the components which Interpace knew were to be included in the pipe. *Accord, Beagle v Bagwell,* 169 So.2d 43 (Fla. 1st DCA 1964); *Vokes v Arthur Murray, Inc.,* 212 So.2d 906 (Fla. 2d DCA 1968).

The Court also finds that the statements of quality do qualify as statements of fact. Pickens Talley accepted the statements of Butler as true and did not believe they constituted "puffing." Interpace was charged with the duty to possess expert knowledge in the field of its product. *Advance Chemical Company v Harter,* 478 So.2d 444 (Fla. 1st DCA 1985). Statements of quality, such as those made by Interpace, are not "puffing." *See Bell v Harrington Manufacturing Co.,* 219 S.E. 2d 906 (S.C. 1975) (barn of first quality materials and workmanlike—statement of fact); *Herndon v Southern Pest Control, Inc.,* 307 F.2d 753 (4th Cir. 1962) ("insecticide not harmful to pigs" found not puffing but statement of fact).

To the argument that these statements constituted future promises, Florida law is clear that even though a statement of fact regards some action to be taken in the future, it is actionable when the promise is made without any intention of performing or is made with a positive intention not to perform. *Perry v Cosgrove,* 464 SO.2d 664 (Fla. 2d DCA 1985); *Hamlen v Fairchild Industries,* 413 So.2d 800 (Fla. 5th DCA 1982); *Vance v Indian Hammock Hunt & Riding Club, Ltd.,* 403 So.2d 1367 (Fla. 4th DCA 1981). At the time the statements made by Interpace were made, Interpace well knew that it had no ability, much less any intent, to produce at Lacoochee a pipe meeting the description given by Mr. Butler or which could meet the terms and conditions of AWWA C301-72.

Finally, the Defendant Interpace urges that the statements do not differ from the contract and this is nothing but a contract claim. To the contrary, the statements made were made to *induce* the entry into the contract. If the argument of Interpace is accepted as true, no claim for fraud in the inducement could ever lie. The Court finds that but for these statements Pinellas County would not have entered into the contract. Therefore, Pinellas County has proved its claim for fraud.

One other defense raised by Interpace relates to the Statute of Limitations and State of Repose pertaining to fraud actions. The Court determines that neither defense precludes the imposition of liability against Interpace for its fraud. The Complaint in this action was instituted in 1983. A motion for leave to amend the pleadings was filed on December 24, 1987, the date the Amended Complaint was effective. *R. A. Jones & Sone, Inc. v Holman,* 470 So.2d 60 (Fla. 3d DCA 1985). The December 24, 1987 amendment was the first time in which the tort of fraud was pled.

The Court finds that the fraud claim asserted in the Amended Complaint relates back to the initial pleading for purposes of the Statute of Limitations and, consequently, the action was filed well within the applicable time period. *Wen-Dic Construction Co. v Mainlands Construction Co.,* 463 So.2d 1187 (Fla. 2d DCA 1985); *Scarfone v Marin,* 442 So.2d 282 (Fla. 2d DCA 1983); *Clipper Express v Rocky Mountain Motor Tariff Bureau, Inc.,* 690 F.2d 1240 (9th Cir. 1980), *cert. denied* 103 S.Ct. 1234 (1983); *Brennan v Tar Heel Home Supply, Inc.,* 62 F.R.D. 190 (D. N.C. 1974); *Applied Data Processing, Inc. v Burroughs Corp.,* 58 F.R.D. 149 (D. Conn. 1973).

For these reasons, the Court is satisfied that Pinellas COunty's fraud claim has been properly asserted.

### G. ECONOMIC LOSS RULE

Related to each of the tort claims asserted by Pinellas County against Interpace and the negligence suit asserted by Pinellas County against CH2M Hill is the "economic loss rule." That rule was first enunciated by the Florida Supreme Court in *Florida Power & Light Co. v Westinghouse Electric Corp.,* 510 So.2d 899 (Fla. 1987).

Regarding the negligence claim against CH2M Hill, as the Court's Order of October 21, 1988 reflects, the Court perceives that the economic loss rule has never been extended to preclude negligence suits against professionals. The rationale contained in that order has not been disturbed in any way by any Florida appellate decision handed down since 1988 and the Court stands by that rationale regarding

136

negligent professionals. The Court has also found that CH2M Hill committed an independent tort other than its contractual obligations.

Concerning Interpace and CH2M Hill, negligence and tort suits are permissible because Pinellas County has met its burden of establishing "other property" damage.

The Court rejects the *"de minimis"* rule proposed by Interpace and CH2M Hill for two reasons. First, the Court does not find that the damages complained of are *de minimis*. Even if the magnitude of the damage is small compared to the claim relating to the defective pipe, that does not mean the damages are *"de minimis." See United Airlines, Inc. v CEI Industries of Illinois,* 499 N.E. 2d 558 (Ill. App. Ct. 1986); *Oldam's Farm Sausage Co. v Salco, Inc.,* 633 S.W. 2d 177 (Mo. App. 1982).

No Florida appellate court has addressed the catastrophic failure exception to the economic loss rule. The Court is persuaded that from a public policy standpoint the calamitous event or catastrophic event exception should be recognized as an exception to the economic loss rule. *See City of Greenville v W.R. Grace & Co.,* 827 F.2d 975 (4th Cir. 1987); *R.W. Murray Company v Shatterproof Glass Corp.,* 697 F.2d 818 (8th Cir. 1982) (applying Missour law); *Northern Power & Engineering Corp. v Caterpillar Tractor Co.,* 623 P.2d 324 (Alas. 1981). When a product fails catastrophically such as the pipe did in this case, tort principles are implicated and the economic loss rule should present no bar to suit on negligent or tort theories.

For these reasons, the Court further finds that both CH2M Hill and Interpace are amenable to suit in tort.

### H. STATUTE OF LIMITATIONS/STATUTE OF REPOSE

Both Defendants have asserted statute of limitations defenses on numerous theories. Under any view of the facts, however, no applicable statute of limitations bars Pinellas County's suit. The first rupture of the pipeline occurred in November, 1979. Suit was filed less than four years after the rupture. The Court finds, based on the facts and evidence, that the statute of limitations did not commence to run until the passage of a reasonable time after the first rupture. This time was needed for Pinellas County to determine whether the rupture was attributable to the fault of either of the Defendants or whether some other factor caused the rupture. At a point close in time to the first rupture Interpace, for example, took the position that the rupture was due to surge in the line or contractor damage. This claim by Interpace was not true. Thus, Pinellas County had some reasonable time within which to determine the true facts which caused the rupture.

137

The second rupture occurred in December 1980 and occurred under conditions of a controlled test of the line in which pressure in the line was increased to a pressure approaching the specified working pressure. A section of pipe burst at pressures approximately 150 psi under that test.

Without determining precisely when Pinellas County knew or should have known that it had a cause of action against these Defendants, the earliest time that could have triggered the running of the Statute of Limitations was the first failure in November, 1979. All of the applicable Statutes of Limitations in this case are at least four years. The suit was filed within four years of the first rupture. On that basis alone, the Court finds that the Statute of Limitation defenses are without merit.

Interpace seeks to escape liability on the basis that Pinellas County complains of the inattention and failures of the engineers to properly require testing, to properly inspect, and to properly perform the engineer's contractual obligations. Interpace urges that because the engineers were the agents for Pinellas County, Pinellas County is chargeable with the things the engineers knew or should have known.

The record is clear in this case that CH2M Hill did not communicate in any fashion to Pinellas County any facts prior to 1979 which suggested that a suit to replace the line or a cause of action against Interpace existed.

Interpace, as is found throughout these findings of fact, was guilty of falsifying quality audit reports, bad faith, fraud, and a series of other coverups and acts which contributed to Pinellas County's delay in learning the true state of affairs. The Court thus declines to "impute" the things which CH2M Hill should have known had CH2M Hill adequately performed its tasks.

In *First Bond and Mortgage Co v Ansey,* 139 So. 597 (Fla. 1932), the Supreme Court held that for information obtained by an agent to be constructive notice to its principal, the information must be present in the agent's mind and memory while he is engaged in the transaction which is sought to be effected. No proof has been submitted in the case that CH2M Hill had actual knowledge of the facts which should have suggested to Pinellas County that suit to replace the line was in order.

The rule which imputes the knowledge of an agent to a principal only applies to and will protect those who exercise good faith and will not be used as a shield for unfair dealing. *Mutual Life Insurance Co. of New York v Hilton Green,* 241 U.S. 613 (1916) (construing Florida law). Interpace was not in good faith and unfairly dealt with Pinellas County during all phases of executing contracts and the construction of

138

the pipe. Thus, regarding the statute of limitations claim, the Court rejects the "imputation of knowledge" defense raised by Interpace.

The pipe involved in this case was manufactured after the contracts were entered into in 1976 and 1977. The suit was filed in 1983, some seven years later. The Court finds that all causes of action subsequently added to the case relate back to the original filing of the complaint and, consequently, the statute of repose offers no solace to these Defendants.

## I. PUNITIVE DAMAGES

Pinellas County asserts that it is entitled to an award of punitive damages against Madison Management Group, Inc., as the successor to Interpace Corporation. Having determined that Pinellas County has made out its case for fraud and culpable negligence and strict liability, the Court must now consider the remaining issues peculiar to an award of punitive damages. Essentially, three questions merit consideration. First, this Court must determine whether Madison Management Group, Inc., as a successor corporation to Interpace Corporation, is liable for an award of punitive damages attributable to the acts of Interpace. Second, this Court must examine the character of the actions of Interpace to determine whether they rise to that level of outrageousness to warrant the imposition of punitive damages. Third and finally, this Court must determine from the evidence an appropriate amount of punitive damages to award, if any.

Concerning the first issue, the proof at trial establishes that Madison Management Group, Inc. is a Delaware corporation with its principal place of business in Illinois. It succeeded by a complicated transaction to all rights and all liabilities of Interpace Corporation, except for the assumption of liability of GHA Lock Joint to extent of $200,000.00.

It is not necessary to decide which state's law should control because the law of Illinois, Delaware, and Florida is the same on this point. In a situation in which a successor corporation assumes the debts, liabilities, and duties of a predecessor, punitive damages may be imposed against that successor. *Celotex Corporation v Pickett,* 490 So.2d 35 (Fla. 1986) (considering Florida law); *Kraul v Celotex Corp.,* 611 F. Supp. 146 (N.D. Ill. 1985), *aff'd* 827 F. 2d 80 (7th Cir. 1987) (considering Delaware and Illinois law).

Thus, having determined that Madison Management Group, Inc. is amenable to an award of punitive damages—assuming the actions of Interpace Corporation warrants such an award—a review of the facts concerning the character of the actions of Interpace is appropriate. In

so doing, the Court also refers to the findings of fact drawn elsewhere in this judgment.

The Court finds the level of corporate irresponsibility of Interpace Corporation could hardly be more dramatic. Interpace knew that it had substantially changed the major components of a long-established product, namely, prestressed concrete pipe, upon which its excellent reputation had been developed over the years. At the time it made the cost-saving changes to the pipe, such as that sold in this case, Interpace knew of tests reflecting the inadequate performance of the pipe. It knew of failures involving the key component "Class IV" prestressing wire which occurred in Center, North Dakota. After the Center, North Dakota, failure, the chief engineer at Interpace, Don Dodd, seriously questioned the further use of Class IV wire. He committed his thoughts to writing. He was thereafter instructed by his superior to destroy his critical memoranda, which he did.

Interpace also knew that it had attempted to secure express acceptance of Class IV wire by the applicable national standards committee and that, on the greater weight of the evidence, their efforts were rebuffed. Yet Interpace continued to represent to Pinellas County and others that its pipe met AWWA C301-72 standard when it plainly did not.

Substantial testimony was heard at trial regarding the affidavit or certification of compliance with C301-72. This affidavit was required by the contract in this action and was a normal practice recognized by C301-72, the national standard. Prior to manufacturing the pipe, which was sold to Pinellas County, Interpace executed a qualified affidavit of compliance for the Dade County Water System in Miami, Florida. Interpace received substantial criticism from that water authority regarding the qualified certificate. Thereafter, it engaged in a series of high level meetings and determined to sidestep the certificate issue. The court determines that a fair inference from the evidence is that Interpace purposefully did not render a certificate of compliance to Pinellas County in this matter. Notwithstanding the execution of a contract indicating that it would certify compliance, Interpace knew that it could not truthfully certify compliance in light of the materials used in the manufacture of the pipe such as the aggregate.

Also germane to the issue of punitive damages, are the corporate actions of Interpace after the many failures of its pipe which began occurring across the eastern United States in locales such as Oklahoma City, Duluth, Richmond, Fort Lauderdale, Washington Suburban Sanitary Commission, Gwinnett County and Cobb County, Georgia,

140

and Knoxville, Tennessee. The Court finds that not only did Interpace engage in a cover-up of the reasons for these failures, including the Pinellas County failures, it created a standard defense to pipe failures, namely, "contractor damage or surge damage," even in instance such as in this case when no evidence of such damage existed.

Further evidence of the corporate irresponsibility of Interpace was presented. For example, even after the many cross-country failures had commenced to occur, Interpace continued to use Class IV wire full well knowing of its substantial defects.

Concerning the amount of punitive damages to be awarded, the Court finds on the evidence that in October, 1988, just a few weeks before the commencement of this trial Madison Management Group, Inc. paid its sole shareholder a $5-million dividend. It did so at a time when it had no active operations, no employees, no prospect of generating revenues, a negative balance sheet and a host of pipe failure cases to defend across the country.

Punitive damages are not intended to bankrupt the party but it appears that Madison Management may have well been technically bankrupt at the time it paid out its dividend to its sole shareholder.

Therefore, the Court finds that the amount of the dividend which Madison Management saw fit to pay out under all the circumstances including the egregious actions of Interpace, $5-million is an appropriate award of punitive damages.

## VIII.

### ACTION OF PINELLAS COUNTY AGAINST CH2M HILL

#### A. FINDINGS OF FACT

Pinellas County sued CH2M HIll (also hereafter the "engineer") for breach of contract and negligence in violating the various duties assumed by CH2M Hill as specified in the contract between Pinellas County and CH2M Hill (hereafter CH2M Hill contract) of March 24, 1975, and the contract between Interpace and Pinellas County (hereafter Interpace contract) dated December 16, 1976. The Court has already ruled that both contracts had to be read together and that the duties assigned in both of the contracts to CH2M Hill drew both contracts and was *paid* to draw the Interpace contract. CH2M Hill assumed certain duties and responsibilities and rights in the Interpace contract and now cannot be heard to object when Pinellas County complains that CH2M Hill failed in complying with its duties and obligations under the Interpace contract. From the testimony in

141

evidence, both Pinellas County and Interpace properly assumed during the construction of the pipe that CH2M Hill had the authority and duties granted by itself to itself as engineer in the Interpace contract. If CH2M Hill was not performing such duties then this means that *no one* was performing the engineering duties necessary to protect the County from the construction of a defective pipeline.

As previously ruled, when both contracts and the national standard AWWA C301 are read together the duties assumed in the CH2M Hill contract are consistent with the duties assumed in the Interpace contract and are ones normally performed by the consulting engineer when operating under AWWA C301.

The Court will construe the intent of the contract terms of both contracts in light of the surrounding circumstances and the application of the duties of an engineer under the national standard. If there are two possible constructions of the various clauses in these contracts the Court will construe the provision against the drafter of both agreements, CH2M Hill.

## B. CH2M HILL'S OBLIGATION WAS TO MAKE SURE THAT INTERPACE CONSTRUCTED THE PIPE ACCORDING TO SPECIFICATIONS IN ORDER TO PROTECT PINELLAS COUNTY

At the time CH2M Hill acted as Pinellas County's engineer it had been the only engineering firm serving the County for many years in the past. CH2M Hill did all the work for the County. The County did not possess the technical expertise to design, interpret tests, inspect pipe construction sites or do any of the actual engineering work necessary to protect the County against defective design or manufacture of prestressed concrete pipe. In the preamble to the CH2M Hill contract the engineer represents that it has total expertise in environmental engineering which includes the design and construction of prestressed concrete pipe and pipelines. The protective engineering services listed in the contracts were definitely intended to be assumed by CH2M Hill who was, under Item B(4) of the CH2M Hill contract, required to act as Pinellas County's representative and "judge the performance" of Interpace's compliance with the specifications. CH2M Hill had the authority to "issue *all* the instructions" for the County to Interpace. The engineer could direct Interpace to stop work and "require special examination and testing of the work". CH2M Hill was to recommend final acceptance of "the construction work" at the end of the project as well as approve pay estimates as the work progressed. If it was not the intent of the parties that CH2M Hill was to protect

142

the County from improper manufacturing of the pipe by Interpace then the charge to "judge the performance" under the contract documents which included the plans and specifications or to recommend final acceptance, would not have been written into the contract. There is no other way CH2M Hill could have performed their agreed tasks without taking on the full responsibility of monitoring Interpace's manufacture of the prestressed pipe.

The pertinent provisions of Section B of CH2M Hill's contract provides:

1. An average of 4 visits per month to the construction site during construction to determine if the work is proceeding in accordance with the Contract Documents. By means of these visits the Consulting Engineers will endeavor to protect the Owner against defects and deficiencies in the work of the contractor. This shall not imply guarantee of the contractor's performance.

2. Check shop drawings and descriptive data submitted by the contractor as to general conformity to the plans and specifications.

3. Approval of pay estimates.

4. Consult and advise with the Owner, act as the Owner's representative, issue all instructions of the Owner to the contractor, prepare routine change orders as required and act as interpreter of the terms and conditions of the Contract Documents and judge the performance thereunder. Whenever the Consulting Engineers consider it necessary or advisable to effect proper carrying out of the intent of the Contract Documents, they may, as the Owner's representative, direct the contractor to stop work or require special examination or testing of the work.

\* \* \*

6. Following a final inspection with the Owner's representative, representatives of any governmental agencies having jurisdiction, and representatives of the contractor, recommend as to final acceptance of the construction work.

The word "contractor" as used in the above provisions means "Interpace". The term "contractor" in Section 1.2.2 of AWWA C301-72 is define as the corporation furnishing the pipe and fittings according to the standard. CH2M Hill denies that the engineers' duty was to make sure Interpace properly constructed the pipe; however, it freely admits that it actually did check the shop drawings submitted by Interpace under paragraph 2(b) of the CH2M Hill contract. Therefore, the word "contractor" as used in paragraph 2(B) - "check shop drawings and

**143**

descriptive data submitted by the *contractor"* must mean Interpace in paragraph 2(A). It follows that the word "contractor" must mean Interpace in all other paragraphs of the agreement as well. This contract does not define the word "contractor" in any of its provisions. At best the provisions are ambiguous and legitimately capable of being construed two different ways and are, therefore, construed against CH2M Hill.

This interpretation means that CH2M Hill's duties "during construction" were: to visit the Lacoochee plant an average of four times per month to determine if the manufacturer's "work" was proceeding in accordance with the specifications ("Contract Documents"); by means of these visits to the manufacturing plan *"to protect* the County against defects and deficiencies in the work" of Interpace; judge the performance of the work of Interpace under the specifications; recommend acceptance of Interpace construction work both during construction and upon final completion. CH2M Hill denies these obligations because the pipe was obviously not constructed according to specifications and the County was not protected. CH2M Hill contends that when its contract was drawn the County had not determined to contract directly with a pipe manufacturer and other contractors and so, therefore, the work would have been done by a corporation who would have bought the pipe from the manufacturer and completely installed the pipe. Therefore, "contractor" did not means the pipe manufacturer. Whether this is true or not CH2M Hill did not seek any amendment to its contract with the County before or after it drew the Interpace contract. It is, therefore, a finding of fact that both CH2M Hill and the County intended CH2M Hill's engineering agreement to be read in the context of the contractual relationships and duties assumed by the County, CH2M Hill, and Interpace when the Interpace contract was signed. If this were not the intention of CH2M Hill it would not have written into the Interpace contract engineering duties which are consistent with the word "contractor" being interpreted as Interpace in CH2M Hill's contract with the County.

Reading the two contracts together the obligations of CH2M Hill in the Interpace contract requires CH2M Hill to make sure that Interpace constructed the pipe according to specifications. In Interpace's contract the term "engineer" is defined as "CH2M Hill" (BC&E) - "acting for owner" Pinellas County. CH2M Hill is to approve "materials to be delivered" in the Interpace contract which states as follows:

C-01 AUTHORITY OF THE ENGINEER:

 A. The engineer will certify invoices for payment, approve or

144

disapprove schedules, working drawings and shop drawings and approve or disapprove materials to be delivered.

The above provisions requires CH2M Hill to approve the component parts and the manufacturing process and pipe "to be delivered" by Interpace. This provision is entirely consistent with CH2M Hill's being at the Interpace construction site at Lacoochee an average of four times per month acting as the Pinellas County's representative "to protect" Pinellas County "against defects and deficiencies in the work" of Interpace. Additionally, consistent with this interpretation is the provision in Interpace's contract for the engineer to "reject" - "defective material" - "when not in accordance with the plans and specifications" and require replacement. Section C-03 of the Interpace contract further provides:

> **Failure to reject any defective materials shall not in any way prevent later rejection when such defect is discovered. Such failure shall not relieve the supplier of his obligations to fulfill his contract, even though such materials may have been previously inspected by the engineer and accepted or estimated for payment, nor shall it obligate the owner to final acceptance, or prevent the owner at any time subsequent from recovering damaged materials shown to be defective.

If the engineer did not intend to assume the overseeing of Interpace in the construction of the pipe then the authority to reject the materials or the phrase "even though such materials have been previously inspected by the engineer and accepted or estimated for payment" would not have been written into Interpace's contract.

In Section C-03(a-2) of the Interpace contract the engineer is even given the right to accept minor imperfect materials. Paragraph 6 on page G-3 (rev.) of Interpace's contract provides for CH2M Hill to have the right to inspect at the manufacturing plant site and for the "engineer" (not the County) to conduct such "inspections and tests" as the engineer may require:

> 6. To permit a representative of the County and/or its engineer, at all reasonable times, to inspect the work and progress, or any of the materials used or to be used in connection therewith, and shall furnish promptly, without additional charge, all reasonable facilities, labor and materials deemed necessary by the engineer, for the conducting of such inspections and tests as he may require.

The Court finds that all of the provisions when taken together are totally consistent with CH2M Hill's assuming the duty to make sure that Interpace constructed the pipe according to specifications and to

**145**

protect the County and monitor the Lacoochee plant with full authority to approve materials, reject materials, accept minor defects, and conduct whatever tests were necessary to meet this obligation.

## C. CH2M HILL WAS RESPONSIBLE FOR INTERPRETING AND PASSING ON TESTS OF COMPONENT PARTS IN THE PIPE MANUFACTURING PROCESS

The engineer specified that Section 1.9 tests of AWWA C301 of concrete and steel be supplied to the engineer. On page 01010-3 of the Interpace contract all results of tests were to be supplied to the engineer. These tests are customarily supplied to the engineer prior to or during production so that the making of defective pipe may be stopped.

In subsection (b) of C-03 of the Interpace contract, Interpace was to furnish tests satisfactory to CH2M Hill that "the materials and finished" pipe have passed the required tests prior to delivery:

(b) INSPECTION AND TESTING OF MATERIALS: When not otherwise specifically provided in the specifications, the inspection and testing of materials and finished articles to be incorporate in the work shall be made by commercial bureaus, laboratories or agencies approved by the engineer, and the cost of such

inspection and testing shall be paid by the supplier. *The supplier shall furnish evidence satisfactory to the engineer that the materials and finished articles have passed the required tests prior to delivery,* and shall promptly remove from the delivery site any rejected materials or articles. (Emphasis supplied.)

In Section 1.9.6 of AWWA C301-72 the expense of the tests are to be borne by the manufacturer consistent with almost the identical language as is contained in subsection (b) of Section C-03 of the Interpace contract quoted above. Both contracts have the specific provision that the engineer CH2M Hill is acting for Pinellas County.

CH2M Hill contends it did not have the responsibility of reviewing the tests of concrete and wire prior to Interpace's production of the pipe for the obvious reason that although the tests were required to be submitted prior to production no such tests were submitted or reviewed. The wire and concrete were permitted to be used with no check or balance or protection of the County. CH2M Hill's position must be rejected. The provisions in the CH2M Hill contract alone impose this obligation. Through the visits to the plant CH2M Hill was to protect against defects and deficiencies in the pipe. Without tests of the concrete or mortar mix or wire mill tests (since the wire was not

146

made at Lacoochee but Solon) no protection could have been afforded the County. CH2M Hill had to review these types of tests to do its job.

In Item A(1) of the CH2M Hill contract, CH2M Hill agreed to "consult" on "laboratory tests and inspection of samples or materials" and "act as the Owner's representative in connection with any such services". The Court must ask the rhetorical question - what "laboratory tests and inspection of samples or materials" is the contract describing if not those of the pipe manufacturer?

CH2M Hill contends that paragraph A(1) of the CH2M Hill contract simply means advise as to the necessity of such tests. The Defendant overlooks the inclusion of the word "and" which means "also", in the phrase "provide consultation and advice as to the necessity of providing", etc. CH2M Hill was to "consult" as well as "advise". Even without the provision the intent to have the engineer pass upon the pipe manufacturer's tests is obvious from the other contract provisions.

## D. THE DUTY TO DESIGN THE PIPELINE, CHECK SHOP DRAWINGS, AND PROVIDE SPECIFICATIONS

CH2M Hill does not contest the fact that CH2M Hill was to prepare a complete basis for design of the pipeline. They do not contest that it was CH2M Hill's responsibility to approve Interpace's submittal sheet which included Interpace's specifications as to what materials it intended to use in pipe production, including Class IV wire, in the manufacture of the pipe and the individual pipe design formulas for each of the various pipes (54″ and 60″) to be delivered to construct the pipeline. There is some semantic dispute as to whether or not the submittal sheet and its standards and formulas was to be "approved" or "reviewed" for compliance with the specifications. Section 3-01 of the Interpace contract provides that the engineer will "approve" shop drawings. The Court finds that the duty of CH2M Hill under both contracts was to approve the shop drawings, specification sheet sheet submitted by Interpace to the engineers, and the pipe design formulas. In fact, Mr. Henderson, an engineer for CH2M Hill, who wrote "reviewed" on the front of the submittal sheet concedes that he at least, in part, reviewed the design formulas and numbers supplied by Interpace on the submittal sheet.

Pinellas County has charged CH2M Hill with breach of contract and negligence in improperly reviewing the submittal sheet, shop drawings and design formulas and approving them. At issue is the approval of Class IV wire, use of 17-gauge steel instead of 16-gauge steel, approval of the initial and resulting modular ratios and creep factor, and failure

147

to check prior Interpace jobs using Class IV wire from the Experience List submitted by Interpace. The Court will determine whether such breaches occurred or the engineers fell below the standard of care as to each of these items.

CH2M Hill admits to the duty of being required to draw the specifications. Pinellas County claims breach of contract and negligence in not providing a "complete" basis for design in CH2M Hill's failure to specify, as one of the elective tests to be supplied by the manufacturer, the reports specified in Section 2.4 of AWWA C301-72 which if specified would have required submittal by Interpace of samples of fine and coarse aggregate. CH2M Hill is also charged with breach of contract and negligence in not inquiring or determining in advance whether admixtures were being used. *See* Section 2.6 of AWWA C301-72.

There is some dispute as to whether or not CH2M Hill was to determine before drawing the specifications whether the pipe should be epoxy or cold tar coated. No cold tar epoxy coating was specified by CH2M Hill. Therefore, if the pipe is determined to have required coating this element of damage will be the sole responsibility of the engineer. The Court finds that preparation of a complete basis of design required the engineer to determine whether or not the pipeline should be cold tar epoxyed. It will be up to the Court to determine whether such breach occurred or the engineer fell below the standard of care in not specifying that the pipeline be coated.

### E. CH2M HILL BREACHED ITS CONTRACTUAL OBLIGATIONS TO PROTECT PINELLAS COUNTY FROM THE MANUFACTURE OF A DEFECTIVE PIPELINE

Since BC&E had in the past exclusively served as Pinellas County's engineer it was actually aware of the strategic importance of the 60″ and 54″ pipeline as was Pinellas County. The engineers who worked on the project acknowledged this fact in their testimony. *The theme of the whole contractual arrangement was "to protect the County".* The Water Director of Pinellas County at the time the project was initiated stated that CH2M Hill engineers were very aware of the importance of the pipeline and the engineers were to do whatever it took "to protect the County". It is obvious that drafting proper specifications, selection of the proper pipeline route, preparing a complete basis for design, and determining whether the pipe was to be coated were all directed toward CH2M Hill's acting as Pinellas County's "representative" to oversee the pipeline construction and approve pay estimates as the project progressed and certify to the County at the end of construction that Interpace had performed its contract and had manufactured the

148

pipe according to BC&E's drawn specifications. The principle way that the engineers would perform these duties was to carefully check the shop drawing submittals and design calculations submitted by Interpace, and observe pipe production and check the tests the engineers had specified the manufacturer was to give CH2M Hill for review and approval. Interpace was to "furnish evidence satisfactory to the engineer that materials and finished articles had passed the required tests prior to delivery". *See* Section 3-03(b) of Interpace Contract.

CH2M Hill was paid substantial sums for this service of 4.5% of the estimated construction costs or $292,211.16, plus an additional $72,728.11 of estimated construction costs, or a total of $364,939.27.

The CH2M Hill engineer who designed the pipeline was Mr. "Dink" Henderson. The head of the engineering services was the CH2M Hill project director, Mr. Jack Suddath. The Court has observed both witnesses called as adverse witnesses and judged their testimony and demeanor as a whole. Their actions in performing their contractual duties were at best superficial. They relied upon Interpace and its reputation to build proper pipe and breached CH2M Hill's contract obligation to, in good-faith, act as the County's representative to check on Interpace and make sure it was living up to its reputation. CH2M Hill represented that it had expert personnel who would do the engineering and monitoring. The Court finds the engineer who did the pipeline design to be unqualified. The project engineer was also unqualified and admits to not being an expert in prestressed concrete pipe. The project manager signed and sealed the plans and specifications which makes him responsible for the entire engineering work in a field in which he had no specific personal expertise in violation of Section 471.025, Fla. Stat. Therefore, CH2M Hill materially breached its contract in not providing competent engineers in the specialty required to perform the necessary engineering functions involving a prestressed concrete pipeline.

The engineers overall failure to protect the County is directly responsible for 13-½ miles of defective pipeline being placed with public money into the heart of the Pinellas County water system. Had CH2M Hill done its job the defective pipeline would not have been manufactured and put into service. There are many specific charges of breach of contractual duties by Pinellas County against CH2M Hill which will be addressed by the Court.

### (1) CH2M HILL BREACHED ITS CONTRACT IN FAILING TO SPECIFY THAT THE PIPELINE BE COLD TAR EPOXY COATED

It is the duty of a design engineer when designing a pipeline to

149

determine if the pipeline should be coated. The pipeline was not required by specifications to be cold tar epoxy coated.

The CH2M Hill design engineer who made the determination, based upon his stated qualifications, his demeanor, and his responses to questions on this subject and pipeline design in general, did not possess the proper expertise to make the decision as to whether to coat the pipe or not. He asked Price Brothers, a competitor of Interpace, whether to coat the pipe and they advised against coating. The engineer appears to have blindly followed Price Brothers' advice.

There is a conflict in the evidence and expert opinions as to whether the pipeline should be coated. As trier of the fact, the Court chooses to believe the engineering opinion that the pipe should have been specified by CH2M Hill to be coated. The basis is that aggressive CO in the form of carbonic acid in a very aggressive and corrosive form is distributed along the pipeline. Laboratory tests of the groundwater along the pipeline, which are the only groundwater tests offered into evidence, confirm this fact. If the groundwater condition was anything other than is what is shown in what appears to be a thorough and well done analysis then the Court assumed that the Defendants would have offered contrary laboratory tests. The weighing of the evidence requires giving great weight to objective groundwater tests done by disinterested qualified laboratory technicians.

The believably physical evidence that carbonation inside the mortar coating is taking place is in some of the pipe in the pipeline is persuasive. The Court has observed pictures of such carbonation in Interpace's petrographer's report, Exhibit D1-1370, photo #19, and the blowup version Exhibit 1558. The evidence offered on the pipe coating question by CH2M Hill is not believable based upon the weighing of the credibility of the witnesses and their engineering answers and expertise.

Proper engineering procedure was not followed by CH2M Hill's engineer, Mr. Henderson, in determining the coating question. He looked at only soil borings from Price Brothers along selected portions of the line. Exhibit P-326. He incorrectly denies that water samples should also have been obtained. The Price Brothers' borings showed a pH in the soil of a lot of areas of 5.5 pH or less. In April of 1975, Mr. Henderson was specifically advised in writing by Interpace that any soil with a reading of 5.5 pH should receive two coats of black asphalt. See Exhibit 325. If you have a soil pH of around 4.5 or 5 you should coat the pipe. The Price Brothers report dictates that the pipe be coated if you do not have any other analysis.

150

Therefore, Mr. Henderson's experience in evaluating the environment around the pipeline was simply inadequate. No water tests were done and the soil information at his disposal upon which he made the coating decision warranted coating the pipe. Mr. Henderson obviously ignored Interpace's engineering advice to coat the pipe received long before the Pinellas County pipe decision was made. Mr. Henderson also ignored soil information from borings from Florida Power and Harlan Laboratories acknowledged by him to have been received prior to the bid documents being sent out on the Pinellas County job. Total acidity is not the governing factor in determining whether to coat the pipe.

The Court finds that CH2M Hill breached its contract in failing to specify two coats of cold tar epoxy be placed on the Pinellas County pipe and, therefore, the County is entitled to damages for coating the new replacement pipe.

### (2) CH2M HILL BREACHED ITS CONTRACT IN FAILING TO PROPERLY REVIEW INTERPACE'S "SUBMITTAL SHEET" AND "EXPERIENCE LIST"

CH2M Hill was required to properly review and approve Interpace's submittal sheet and shop drawings, Exhibit P-5, under CH2M Hill's contract Section B(2) and Interpace's contract Section C-01. The submittals were received before Interpace started making the pipe. The submittal sheets were not properly reviewed by Mr. Henderson. Many errors in the submittals indicating the pipe was not going to be produced according to specifications and standards would have been apparent to an engineer skilled in reviewing submittals and shop drawings for prestress pipe.

### (3) WRONGFUL APPROVAL OF CLASS IV WIRE

The Court has already made findings that "Interpace Class IV wire" was improperly developed, did not come within the standards of Section 2.8.1 of AWWA C301-72 or ASTM A227-71 and was improperly manufactured. The Court has also held that even by approval of the engineer, Interpace was not relieved of liability for failing to manufacture the pipe according to specifications. The national standard and Pinellas County engineering contracts envisioned a service of checks and balances. There are provisions for engineers to check on the pipe manufacturer at each step of the manufacturing process. Review of the submittal sheets and shop drawings was the first check that Pinellas County engineers had on Interpace's intentions in manufacturing the pipe. CH2M Hill totally "dropped the ball" in this regard.

151

The submittal sheets show wire size to be governed by ASTM A227-21 and A648-73. Under "wire class" *no standard* is cited except the designation "IV" meaning Class IV wire. The County correctly claims that the reviewing engineer should have caught the fact that Class IV wire was not permitted under the specifications and standards. This task was one of the primary obligations of the engineer. The engineer should have looked at Section 2.8.1 of AWWA C301-72 and ASTM A227-71 and determined that Class IV wire was not permitted under the applicable standards. The same analysis made by the prior Court's findings in this regard should have been followed by CH2M Hill engineer Mr. Henderson's review. Mr. Henderson did not look up the standards at the time to determine if Class IV wire was permitted. He felt no obligation to investigate Class IV wire because of the submittal sheets absence of specifying a standard or reference to using Class IV wire. Mr. Henderson has no expertise in metallurgy and in fact there was not metallurgist on staff at CH2M Hill for him to have consulted.

Mr. Henderson agrees that A648-73 is *not* in the specifications. He does not know why Interpace included the standard in the submittal sheet. He is not sure it concerned him at the time. He agrees Class IV wire is not permitted under A648-73. The specification ASTM A648-73 should definitely have put Mr. Henderson on notice that something was wrong with the submittal sheet and the matter should have been thoroughly checked at that point.

CH2M Hill breached its contract through the actions of Mr. Henderson. With a new class of wire and no standard cited for its use, he should not have ignored the stated intention of Interpace to use Class IV 8-gauge wire on *all* Pinellas County pipe. His review constituted no review at all of the most critical component part of a prestress pipe. CH2M Hill fell below the standard of care in approving Class IV wire without requiring the submission of tests, making inquiry of metallurgists, or reviewing prior tests Interpace performed as was their right under the Interpace contract. These findings constitute a major breach of the engineering contracts in permitting defective unsanctioned wire to be placed on the entire pipeline which now is so defective that the entire must be replaced.

## (4) FAILURE TO CHECK INTERPACE "EXPERIENCE LIST"

The Interpace contract required Interpace to submit to the engineers and experience list of past similar jobs. The purpose of the list is to provide the engineer with a method of checking the past performance of the manufacturer. The standard of care at the time was to make inquiry otherwise there would be no reason for the request. The term

152

used in the request of "similar design specifications" would include Class IV wire. The Detroit Water Board is on the list. The Detroit Water Board had rejected Class IV wire. Mr. Henderson of CH2M Hill did not check any jobs on the list. Had the list been checked to inquire about the use of Class IV wire, as it should have been, then CH2M Hill would have been put on notice that Class IV wire was at least suspect. CH2M Hill breached its contract in not checking the experience list for problems on similar jobs. Had such a check been made the problem with Class IV wire would have been uncovered. Again, another check of the manufacturer was bypassed by CH2M Hill. CH2M Hill Engineer, Robert Ghitto's, explanation that the experience list is simply to exclude bidders who are not qualified to make pipe is rejected.

## (5) FAILURE TO PROPERLY EXAMINE DESIGN FORMULAS AND EQUATIONS LEADING TO PRODUCTION OF DEFECTIVE AND UNDER PRESSURE RATED PIPE

The submittal sheets and shop drawings specified the initial and resultant modular ratio and creep factor together with the formulas for making each individual pipe. Review and approval of these submittals was again one of the primary responsibilities of the engineer.

The substance of Mr. Henderson's testimony on this point is that he didn't either do or recheck any of the calculations. The Court is satisfied from the overall tenure and testimony of Mr. Henderson that he did not check the calculations or the important modular ratio figures which vitally bear on the question of whether the pipe would be made at the working and transient pressures specified. Florida lime-stone (lime rock) is well known to be soft and porous. Mr. Henderson knew or should have known of these qualities and that the new plant at Lacoochee was using soft Florida aggregate. Mr. Henderson claims that a consulting engineer did not have to check the design calculations. The Court finds to the contrary. After listening to the testimony it is not clear what Mr. Henderson did check to protect Pinellas County from the problems visited on the County as the result of the defective manufacture of the pipeline. Mr. Henderson does not appear to be qualified to review a submittal sheet or the equations. Neither is Mr. Suddath who was the project manager and was supposed to review Mr. Henderson's work. These design formulas were founded by CTL to be inadequate to produce pipe with soft Florida aggregate. Again, there was no check and balance. Because of CH2M Hill's breach of contract in failing to properly review the submittal sheet and shop drawings and calculations, and by CH2M Hill providing untrained personnel to

**153**

review such submittals, Pinellas County now has a pipeline which does not have the pressure ratings specified and is made from substandard aggregate.

Appendix A of AWWA C301-72 provides that "supporting data shall be provided if requested by the engineer". CH2M Hill could have and should have required supporting test data that the pipe were designed according to Appendix A and the cubic parabola. The information received would have been the same test information as developed by CTL in testing Pinellas County pipe. It must be assumed that such tests would have shown the pipe defectiveness since all CTL tests failed the pressure-strain P test. Here is yet another check and balance overlooked by the engineers if CH2M Hill was truly intending to comply with its contractual duty to protect the County.

### (6) CH2M HILL BREACHED ITS CONTRACT BY APPROVING USE OF 17-GAUGE STEEL INSTEAD OF 16-GAUGE STEEL

The submittal sheets calls for 17-gauge steel while 16-gauge steel should have been used. CH2M Hill should have reviewed the national standard and compared it to the submittal sheet and caught the error. The submittal should have been rejected. The breach of contract ordinarily would seem minor except for the finding of this Court already made that the number of prestressing wire wraps are dependent on the steel cylinder thickness used in design calculations. Interpace compounded this breach by, utilizing 16-gauge cylinders in manufacturing many of the pipes with the result that these pipes have an insufficient number of wire wraps per foot to compensate for the thicker 16-gauge cylinder. Thus, the pipes were designed assuming thinner cylinder steel than permitted by the specifications and, in addition, in pipes which were actually made using 16-gauge steel cylinders, were underwrapped or under reinforced with pressure wire. The testimony of the engineering expert called by CH2M Hill on this question is rejected as cold rolled steel instead of hot rolled steel was used.

### F. BREACH OF CONTRACT BY CH2M HILL FOR NOT INSPECTING THE MANUFACTURING PLANT AN AVERAGE OF FOUR (4) TIMES PER MONTH AND NOT ANALYZING, REVIEWING, APPROVING OR REQUIRING TO BE SUBMITTED TESTS OF INTERPACE COMPONENT PARTS

The Court has held that one of the contractual duties of CH2M Hill was to protect the County by monitoring the Lacoochee manufacturing plant and obtaining and reviewing the manufacturing tests. There

154

remains for determination whether or not the engineer breached these duties.

## (1) CH2M HILL BREACHED ITS CONTRACTUAL DUTY TO INSPECT THE PIPE MANUFACTURING PLANT

Pinellas County experts contend that the provision contained in paragraph B(1) of the CH2M Hill contract required the engineer to inspect the Lacoochee plant to make sure that Interpace was properly manufacturing the pipe according to specifications. CH2M Hill contends that the "construction site" meant the laying site. While the Court has already made its ruling on this point, it is noted that if CH2M Hill's contention was correct it would be duplicative and redundant of the County's hiring of inspectors to inspect the laying of the pipe by the contractor Bumby & Stimpson.

The weight of the evidence shows that Pinellas County did not have the expertise to inspect the pipe at the laying site and hired an individual named Jim Fason to handle residential inspections. Mr. Fason was called by CH2M Hill and testified that his responsibilities in inspecting the pipe on behalf of Pinellas County were not to see to it that the pipe was made according to specifications but only to determine any deficiencies that could be observed from the outside of the pipe such as mortar coating cracks, holes that needed patching, bell and spigot flange problems, etc. He became quite irate when on cross-examination it was suggested that you could tell from the outside of the pipe that the pipe had been manufactured according to specifications. He stated that only by viewing the manufacturing process could you tell if specifications had been met.

The Court has heard from one of the inspectors who was at the laying site for the entire period of time the pipe was being installed, Mr. Fason and is satisfied that the greater weight of the evidence is that there were not superficial or other defects not properly addressed when the pipe was installed. Pinellas County is found to have had no notice that internally the pipe was grossly defective.

Factually, CH2M Hill cannot certify final acceptance, protect the County from defects, and judge the performance of Interpace in complying with Interpace's contract obligations without observing the pipe's manufacture at the Lacoochee plant. CH2M Hill admitted through the head of the Clearwater office that at no time did CH2M Hill ever send anyone to Lacoochee to inspect the materials used or judge Interpace's performance under its contract or specifications. Interpace's chief engineer stated that it was not unusual for inspectors to be in plants in the 1970's.

155

This controversy centered around the admitted fact that the project manager visited Lacoochee at least 3 to 4 times during the manufacture of Pinellas County's pipe. The County contended that if CH2M Hill was really correct in its position that it was to visit the laying site on an average of four (4) times per month, Mr. Suddath didn't do that either. The Court is faced with the requirement of determining who is telling the truth.

Mr. Suddath was pressed hard in his video deposition produced by Pinellas County and his live testimony on cross-examination about the purpose of his visits to Lacoochee if contractually CH2M Hill had no obligation to visit the plant. His answer to why he visited Lacoochee was that he was "curious". When asked what he had learned after the first visit his answer was in essence "nothing". He admitted to having no expertise to determine whether the pipe was being manufactured properly. The evidence was that no one on CH2M Hill's staff had such expertise. Under such testimony it is obvious that whether at the laying site or at the plant, Mr. Suddath was not qualified to meet CH2M Hill's contractual duties to protect Pinellas County from defects and deficiencies in the work of Interpace. The testimony is therefore weighed and construed by the Court as tantamount to an admission that CH2M Hill did not comply with its inspection requirement agreed to in Section B(1) and B(4) of the CH2M Hill contract. The Court finds that Mr. Suddath was at the pipe plant going through the inspection motions without having the capacity for determining whether faulty manufacturing procedures were in progress. His testimony is unbelievable that he was there only out of "curiosity".

Pinellas County produced a Pinellas County inspector who testified that he did not see Mr. Suddath at the laying site of the actual pipeline through the period of one year and three months the pipe was being laid . Mr. Suddath would usually go to the County trailer kept some distance from the actual laying site. Mr. Suddath usually wore a suit or clothes not suitable for construction inspection. You need a four-wheel drive vehicle to go through the rugged terrain to the laying site. Mr. Suddath did not make such trips. Mr. Suddath would usually check at the trailer and then leave.

CH2M Hill produced a witness not even on the witness list named Johnnie Jones who was the foreman for Bumby & Stimpson who was on the job throughout the laying of the pipeline. He was asked on direct examination if CH2M Hill engineers were at the laying site to which he replied "several times". On cross-examination he was asked what he meant by "many times" to which he replied *three*. He then went on to say that CH2M Hill engineers were definitely not at the

156

laying site an average of four (4) times per month. The engineers are bound by their own testimony which they have produced.

Based upon the demeanor of the witnesses and the greater weight of the evidence, the Court finds that the engineers were not monitoring the manufacturing plant as they should have been and were not at either the plant or the laying site an average of four (4) times per month in direct violation of the engineers' contract. CH2M Hill breached its obligation to inspect the pipe and protect the County from defects and deficiencies in the work of Interpace.

All sorts of obvious improper manufacturing techniques were going on at Lacoochee as previously found by the Court. There was no quality control. A majority of the defects found in the excavated pipe could have been detected by a properly trained engineer if CH2M Hill had sent one to the plant.

The majority of defects found upon stripping could only have been found at the time the pipe was made. *In the eyes of the Court, CH2M Hill is just as responsible as Interpace for a grossly defective pipeline being placed into service.*

## (2) CH2M HILL BREACHED ITS CONTRACT BY NOT ADVISING PINELLAS COUNTY TO HAVE FULL-TIME OR PART-TIME INSPECTORS AT THE PIPE MANUFACTURING PLANT

Pinellas County has also sued CH2M Hill for failure to advise Pinellas County to provide full-time inspectors at Interpace's Lacoochee plant under Section A(1) of the CH2M Hill's contract. CH2M Hill never advised that inspectors should be used. Full-time inspectors would obviously have been able to catch substantially all of the numerous quality control and improper manufacturing procedures which took place when the pipeline was made.

With this charge CH2M Hill is caught in a dilemma. If the engineers duty was to visit the Lacoochee plant an average of four (4) times per month, a qualified engineer would have found the improper manufacturing procedures as found by this Court in these findings. If inspection was not a duty assumed under the contract then certainly Pinellas County should have been advised that full-time or part-time inspectors should be assigned to the manufacturing plant. Pinellas County has produced qualified engineering opinion to this effect and that in failing to give such advice CH2M Hill fell below the standard of care. The Court concurs. CH2M Hill held itself out as the experts in such matters and were paid for their advice. Lacoochee was known to

**157**

the engineers to be a new plant. The importance of this pipeline was also known to the engineers. It was common to have inspectors at the plants in the 1970's. In fact, a specific provision in the national standard required the manufacturer to permit such inspections. See Section 1.7.1 of AWWA C301-72. The right of plant inspection was written into Interpace's contract by CH2M Hill. See paragraph 6, page C-3 of Interpace contract.

Based upon the great weight of the evidence, the Court finds that CH2M Hill breached its contract with the County in failing to advise Pinellas County to have full and/or part time inspectors at the Lacoochee plant.

### (3) CH2M HILL BREACHED ITS CONTRACT BY NOT REVIEWING MANUFACTURING TESTS OR REQUIRING THAT THE SPECIFIED TESTS BE SUBMITTED FOR REVIEW

The engineer specified that the manufacturer give the engineer certain tests under Section 1.9 of AWWA C301-72 before construction. Again, this was a check on the component parts provided as an option under the national standard. CH2M Hill never reviewed the tests nor did it insist on their production before the engineers permitted full scale production to commence. Throughout the project the engineer knowing they had not reviewed the specified tests and knowing there was no expert monitoring of the manufacture of the pipe approved periodic payments to Interpace. The engineer bypassed the last check and balance it had built into the specifications by certifying the job complete to Pinellas County and that the pipe had been made according to the plans and specifications without first obtaining Interpace's affidavit that the pipe had been made according to its contract and specifications. The Court does not understand how CH2M Hill could require the submittal of an affidavit and then certify the job complete according to the specifications knowing that the affidavit by the manufacturer certifying compliance with the specifications had not been submitted.

One of the options which could have been specified and written into the specifications was for Interpace to supply the fine and coarse aggregates from the Lacoochee plant under Section 2.4 of AWWA C301-72. Knowing that the plant was new, that Florida limestone was being used and was soft, CH2M Hill violated its contract to provide proper specifications by not specifying that Interpace comply with Section 2.4 of AWWA C301-72.

The Lacoochee aggregate had never met AWWA specifications since the plant opened. This deficiency would have been found and a major

158

portion of the defects stopped had the engineer taken advantage of this check and balance. However, the Court has no reason to believe that, had the tests been specified, the conduct of the engineer in reviewing the results would have been any less deficient. But the allegation has been made and the Court must find that CH2M Hill breached its contract for failure to specify Section 2.4 tests under AWWA C301-72.

### (4) CH2M HILL'S BELIEF THAT THE PIPELINE COULD NOT BE OPERATED AT THE SPECIFIED WORKING PRESSURE OF 150 PSI AND THAT THE LINE WOULD ONLY LAST 50 YEARS

Under CH2M Hill's contract the engineer was to provide a complete basis for design which includes specifying the proper operating and surge pressures in the line. *See* paragraph A(2) of the CH2M Hill contract. Mr. Henderson, when designing the pipeline, specified 150 psi operating pressure and 210 psi working plus surge (transient) pressure. However, he testified that he only assumed that the line would operate at a minimum pressure of 40 psi and a maximum pressure of 100 psi. He stated he only planned 10 years in advance when he designed the line consistent with a 10 Year Master Plan previously done for the County by CH2M Hill. Mr. Henderson was emphatic that under no circumstance would he advise operating the line at greater pressures than 100 psi. Mr. Suddath agreed with this conclusion. Mr. Henderson reasoned that he built in a safety margin on his own of 50 psi which, in effect, from his standpoint meant that Pinellas County could never safely operate at over 100 psi operating pressure. In contradictory fashion, Mr. Henderson acknowledges that the specifications require the manufacturer to manufacture a pipe to withstand a design operating pressure of 150 psi and that working pressure under AWWA C301-72 means the maximum operating pressure at which the pipe is actually going to be operated. He insists that he bound the manufacturer to produce a pipe of 150 psi working pressure.

Pinellas County has sued CH2M Hill for breach of contract and negligence contending that CH2M Hill did not advise the COunty that the line could only be safely operated at 100 psi and that, therefore, CH2M Hill under designed the pipeline so that the line would not operate at the needed higher pressures as the County grew. Of course, if the working pressure wasn't designed correctly than the transient pressure wouldn't be adequate either. Mr. Henderson does not remember ever advising the County of the 100 psi limitation.

Pick Talley, the Water Director at the time the pipeline was designed, said that at no time was he advised that the line can only be operated at a maximum of 100 psi working pressure in the future. He

**159**

understood the lines operating pressure would be 150 psi for needed growth and expansion in the future and he would not have agreed to such limitations.

In essence, the County claims that somehow CH2M Hill knew that in fact the County was not going to get a pressure rated pipe of 150 psi working pressure—210 surge—as in fact the greater weight of the evidence shows from the CTL tests.

The County has produced expert testimony which is believed by the Court that if CH2M Hill was of the opinion that the pipe was undependable at pressures of 150 psi and could only be used at 100 psi, CH2M Hill breached its contract and fell below the acceptable engineering standards of care for pipeline design engineers. Under these circumstances the water system demand would not be met. In sum, CH2M Hill did not build sufficient flexibility into the pipeline under their secret design assumptions. Mr. Henderson was impeached on the point with a letter written by him in which pipeline meters were to be set at 150 psi and the statement made that occasionally pressures at between 120 and 140 psi could be expected.

Again, based upon judging the credibility of the witnesses CH2M Hill owed a duty to Pinellas County to advise the County that pipe of 150 psi working pressure and 210 psi working plus surge (transient) pressure was specified, the County could only depend upon a maximum 100 psi working pressures and less than 210 working plus surge (transient) pressure. The County would have then had the option of increasing working pressure and surge pressure specifications. The knowledge that CH2M Hill now states it had when the pipe was designed should have been used for the benefit of the County. Such knowledge would have required the engineer to check on the manufacturer to make sure that ⅓ of the working pressure was not being cut out of the pipe. Instead, the testimony is that CH2M Hill did nothing and by failing to take appropriate engineering action and advising its clients of the true facts, the engineer breached its contractual obligations to the County. Under Section A(1) as well as A(2) of the CH2M Hill contract, such advice and consultation was mandatory.

An additional charge by the County against CH2M hill in the same vein is the claim that CH2M Hill believed the pipeline would only last 20 to 50 years when it designed the line and didn't advise the County of this fact. Mr. Henderson confirms that he expected the line to last 20 to 50 years. He did not tell Pinellas County of his opinion. The Water Director at the time recalled discussions with Henderson and Suddath and the Interpace salesman that the pipe had no finite life and

160

could last 100 years or longer. The prestressed concrete pipe people told him that concrete would get harder over time so there was no limit of the expected life of concrete pipe. It could go on as long as 100 years, 200 years, or beyond-"it may go on forever". The Interpace salesman said that there was no known limit of the pipe's life and the pipe was expected to go on indefinitely. The Court believes this testimony.

The then Water Director in conversation with Henderson was not told that the pipeline would last 50 years. The Director would have gotten another type of pipe had he been so advised. The Court also believes this testimony. It is consistent with the salesman's testimony and Interpace's advertising.

The Court must find that CH2M Hill's admissions constitute admissions that it breached its contract with Pinellas County. It is not practical to put in such a strategic line and have it last only for 50 years.

## G—IMPROPER DESIGN AND PLACEMENT OF VACUUM RELIEF VALVES

CH2M Hill was to prepare proper basis for design of the pipeline under Section A(2); (3) of the CH2M Hill contract. Vacuum relief valves were designed to be spaced along the pipeline to prevent damage to the line by surge. A vacuum relief valve has an air inlet with a float valve connected to the top of the pipe in the pipeline so that if a negative pressure (surge) wave comes by the valve, air will be released into the line disbursing the vacuum cavity behind the surge wave. CH2M Hill design the valves to be installed in vaults at ground level and some below ground level. Inspection of the below ground level valves revealed that they were filled with water and 5 of 8 valves were under water. The bottom of the vault contained only gravel, and groundwater came up through the bottom as well. The valves had to be raised. Pinellas County has sued CH2M Hill for the cost of raising the valves above water level and correcting the problem.

The Court has seen a picture of one of the valves (vaults) (Exhibit 1141). It was filled with putrid groundwater. If the valves were constructed as specified by CH2M Hill when a surge came by the valve, the valve would open and pour contaminated water into the public water supply line. This would contaminate the water supply in the pipe. Also, since water would first be dumped in the line instead of air the surge would not be dissipated and the valve would not prevent the surge and potential damage to the pipe. Therefore, CH2M Hill breached its contract with Pinellas County and fell below the standard

**161**

of care in improperly designing and placing the vacuum relief valves. Pinellas County is entitled to recover damages against CH2M Hill for repair and raising of the valves.

## IX.

## ACTION AGAINST CH2M HILL FOR NEGLIGENCE

The Court has already ruled on the legal right to sue the professional engineers, CH2M Hill. This ruling is confirmed in these findings and judgment and the Court's specific order on the point is attached as Exhibit "B".

The Court has also made findings of fact on several claims against CH2M Hill for breach of contract. In essence, Pinellas County has made the same claims against the engineer for negligently falling below the standard of care of engineers in designing the pipeline and performing engineering services as Pinellas County's representative in monitoring the construction of the pipeline.

The County has produced competent engineering opinions which the Court believes and accepts that CH2M Hill fell below the standard of care as follows: failure to properly obtain and interpret soil and water tests to detective aggressive soil and groundwater which would attack the pipeline and to, therefore, fail to specify that the pipe be epoxy cold tar coated; failure to properly review the information on the Interpace submittal sheets and shop drawings thereby failing to prevent Class IV wire from being placed on all Pinellas County pipes; failure to properly review the information on the Experience List which would have revealed the fact that Class IV wire was undesirable and defective; failure to check the figures and formulas in the submittal sheets and shop drawings and calculations of the manufacturer involving the modular ratios and creep factor resulting in manufacture of pipe not meeting the working and transient pressures specified; failure to properly review the Interpace submittal and shop drawings thereby permitting the use of 17-gauge instead of 16-gauge steel in the pipe cylinders; the use of untrained and unqualified engineers to review the Interpace submittals and shop drawings and to act as project manager of the pipeline project; by allowing specifications which did not require the wire to be ductile; by approving pipe designs with inadequate safety factors; by permitting Interpace to specify ASTM A648-73 which was not sanctioned by the specifications or by AWWA C301-72; failure to specify, perform or to have performed sufficient inspection and testing of materials used in the manufacture of the pipe to insure the pipe would be manufactured and delivered as required by the specifications; failure to inquire as to whether admixtures were being used in the

162

manufacture of the pipe; failure to require Interpace to produce Section 1.9 AWWA C301-72 tests specified and then to review such tests; failure to specify that Section 2.4 of AWWA C301-71 be complied with by Interpace thereby requiring the manufacturer to submit aggregate samples and information; failure to inspect or detect defects and deficiencies in Interpace's pipe production by sending qualified engineers to inspect the manufacturing plant at Lacoochee; failure to detect the total lack of quality control at Lacoochee and the entire list of defects found in these findings to have been manufactured into the pipe; certifying the project to Pinellas COunty to be complete according to specifications before requiring certification by Interpace that it had manufactured the pipe according to specifications; failure to detect the pipe was being manufactured with wire which contained serious seams and which was grossly susceptible to pitting, hydrogen embrittlement and stress corrosion; failure to detect the production of mortar coating instead of the specified concrete coating; specified a concrete coating but permitting pipe to be furnished with a mortar coating; failure to detect the use of improper or thinner mortar coating which was layered, porous and not dense or durable; failure to detect the use of undersized wire diameters; failure to detect inadequate curing of core and mortar coating; failure to detect out-of-round cylinders in the pipe; failure to detect lack of proper slurrying; failure to detect carbonation of the concrete cores on all pipes; failure to advise Pinellas County of the need for full-time or part-time inspectors at the Lacoochee plant; failure to investigate Class IV wire and require the wire to undergo adequate testing; failure to provide for sufficient flexibility in the Pinellas County water system which would allow Pinellas County to operate the pipeline at 150 psi working pressure and 210 psi transient pressure in the future as population and water demand increases; failure to design and locate proper vacuum relief valves; failure to advise Pinellas County that in the engineers' opinion the pipeline, if constructed according to specifications, could not possibly be operated at more than a maximum of 100 psi and would not last but 20 to 50 years; causing through lack of inspection and failure of two Pinellas County taps from eccentrically positioned cylinders, and one pipe with a defective manhole.

In *Florida Power & Light Co. v Westinghouse Electric Corp.,* 510 SO.2d 899 (Fla. 1987) a party can be sued for negligence for violation of an *independent duty* separate and apart from a contractual duty assumed by a professional engineer. Such independent duties exist in this case.

First, under statutory requirements of DER, CH2M Hill was re-

163

quired as the project engineer for Pinellas County to obtain a permit for the 60″ and 54″ transmission main. An application was actually filed by BC&E and admitted into evidence. Under the requirements of the permit CH2M Hill was required to certify to DER and the Pinellas County Public Health Department that the pipeline had been constructed according to plans and *"specifications"*. No such certification was made by CH2M Hill as independently required by statutory law. Whether certification was made or not makes no difference here. The independent duty owed by CH2M Hill to the County was breached because the pipeline was not constructed according to specifications which included AWWA C301-72. Therefore, there was a breach of independent duty by CH2M Hill owed to Pinellas County forming a legal basis for an action in negligence under *Westinghouse, supra.* The Court finds that CH2M Hill breached this duty and was negligent in failing to first determine whether or not the pipeline was constructed according to plans and specifications and then certifying such compliance with the State and local agencies required by law.

Additionally, CH2M Hill violated a statutory duty in having the plans sealed by an engineer which was far beyond the professional expertise and specialty (if one even existed) of Mr. Suddath under Section 471.025(3), Fla. Stat. Mr. Suddath has already been found to be unqualified by his own admissions to seal the plans and specifications for the pipeline. Therefore, there exists yet another separate breach of independent duty owed to Pinellas County by CH2M Hill which permits suits upon the theory of negligence under *Westinghouse.* The Court finds that CH2M Hill breached this statutory duty and was negligent in permitting an engineer without the professional capability or specialty to seal such a document for the construction of a prestressed concrete pipeline.

The facts as found and the conclusions reached in the findings of facts and the section on breach of contract actions against Interpace and CH2M Hill make it unnecessary to reiterate such findings. They all support the conclusion that CH2M Hill fell below the engineering standard of care many times. As the Court has said it is the Court's view that CH2M Hill's failure to protect the County through the use of monitoring and manufacture of the pipe which was to be placed in the pipeline, and its failure in exercising the engineering checks and balances established for the protection of a purchaser under the national standards CH2M Hill is just as responsible as Interpace for placing into service a grossly defective pipeline. Therefore, the County is entitled to replacement damages against CH2M Hill based upon the theory of negligence.

164

## X.

## DAMAGE DEFENSES - THE APPROPRIATE REMEDY

Much evidence has been adduced regarding the appropriate means of fashioning a remedy which will serve to make Pinellas County whole. Each of the proposed remedies merits full consideration.

### A. THE REPAIR SLEEVE REMEDY

Interpace, through its witness, Frank Heger, proposed the use of a "repair sleeve" to remedy the defective pipeline. Although Mr. Heger, like all of the other Interpace and CH2M Hill experts dispute the need for any remedy, this Court finds that indeed Pinellas County is entitled to relief based on the facts set forth above. Heger's proposal in essence is that over-the-line surveys should be utilized to identify potentially faulty pipe. Pipe demonstrating evidence of corrosion should then be excavated and the mortar coating chipped away to expose the underlying rusted prestressing wires. The defective wire should then be cut away and a repair sleeve, which is a metal or steel cylindrical structure, be strapped around the weakened area of pipe and the gaps then filled in with mortar or concrete, thus restoring the strength of the pipe. Evidence was presented that a similar method, has been used to restore strength to damaged concrete pipe in isolated instances, such as damage to a section of pipe caused by construction equipment. In such an isolated application, the Court perceives that such an approach to repair might be sound and cost efficient. Considering all of the evidence presented on this issue, however, the Court finds that the greater weight of the evidence is that such an approach will not serve to remedy the extensive defects in the Pinellas County line in a cost effective way.

The witnesses for the defense cited no example in which the repair sleeve methodology had been utilized to remedy a line in a state of deterioration due to ongoing corrosion, faulty mortar coating, and defective components such as those which exist in the Pinellas County pipe. Instead, the testimony was uncontroverted that this approach has only been used in limited circumstances.

That fact coupled with the inherent deficiencies in over-the-line surveys, indicates that the major flaw with the repair sleeve approach is that of detecting pipe or portions of pipe which require the application of a repair sleeve.

When pressed on cross-examination regarding the precise details of how the repair sleeve remedy would be applied in the field, Heger on more than one occasion testified that guesswork or speculation was

involved. He could not, to the satisfaction of the Court, define how the specific areas of pipe involving corroded wire would be exposed without going to tremendous expense in stripping of mortar coating and determining the places in which a repair sleeve would solve the problem of the deterioration of the prestressing wire. He further conceded that in any pipe in which a repair sleeve would exceed forty inches in length that it would then be necessary to replace the entire section of pipe. Each section of pipe is roughly twenty feet in length. Based on all of the evidence it appears that the repair sleeve approach would be much like applying a band-aid to a patient in need of major surgical intervention.

Because of the uncertainties of this remedy, the unlikelihood of its success in curing the problem, its limited use, and the speculative nature of the proposed remedy, the Court finds that it cannot fashion an award of money damages predicated upon the repair sleeve remedy and, therefore, the repair sleeve defense is rejected.

## B. CATHODIC PROTECTION

Another remedial suggestion offered by Interpace is that of cathodically protecting the pipeline. Cathodic protection systems are frequently used to protect corrosion-prone structures from corrosion. The method proposed by Interpace entailed installing a zinc sacrificial anode, or a series of them, along the entire thirteen-mile pipeline (In some areas such as underlying roads or streets, Interpace concedes that removal of pipe may be required.)

The system proposed by Interpace involves the physical connection of the sacrificial zinc anode to each pipe section by wires affixed at three different locations on each section of pipe. Each section of pipe would necessarily have to be uncovered, have mortar coating chipped away, and the cathodic protection system wires affixed to the prestressing wires on each pipe section. The entire system would then be affixed to certain monitoring stations along the pipeline.

In situations in which a customer in the first instance would elect to cathodically protect a prestressed concrete pipe system the pipe would be manufactured with built-in metal connections or straps to facilitate the use of cathodic protection. The Pinellas County pipe was not manufactured with cathodic protection in mind. The Interpace proposal thus presents special problems and additional expense.

The Court finds on the evidence that notwithstanding the virtues of a cathodic protection system, several serious problems indicate that cathodic protection is not an adequate remedy for the Pinellas County

166

pipeline. The Court believes Pinellas County's experts who say that cathodic protection should *not* be used.

Mr. Benedict testified that before the specifics of any cathodic protection system could be determined, a detailed design would be required. Such a design would include the study of several factors. No such study has been performed by anyone to date.

As of the date of this trial, neither Mr. Benedict nor any other witness on behalf of Interpace had conducted any such study. For example, evidence was presented of a cathodic protection study done by Mr. Benedict for Interpace regarding a prestressed concrete pipeline much like that involved in Pinellas County located in Knoxville, Tennessee. The report entailed dozens of pages and recognized several potential problems with cathodic protection. No such report has been written or undertaken regarding the Pinellas County pipeline, yet, Interpace would have this Court base its entire damage award on such a system. This the Court is unwilling to do. This is an action at law and not in equity. Once the Court renders its judgment in this case, no vehicle will exist to revisit the question in the event the system proposed by Interpace in truth and in fact does not work. Thus, any damages award based on the cost of installing a cathodic protection system would leave the cure to chance.

Further, the Court was particularly impressed by certain evidence presented during cross-examination. As previously related, in approximately 1974, a serious failure occurred in Center, North Dakota, involving prestressed concrete pipe manufactured by Interpace with Class IV prestressing wire. The Center, North Dakota line was a cathodically-protected line. Mr. Benedict testified that he was not an expert in hydrogen embrittlement, a phenomenon which would have to be considered fully before determining the efficacy of any proposed cathodic protection system. Mr. Benedict, however, admitted and appeared by his demeanor to be perturbed by the fact that Interpace had not shown him the three-page report written by Dr. Ronald Latanision of the MIT Corrosion Laboratory. The Dr. Latanision report commented on the Center, North Dakota failure. In that report, Dr. Latanision opined, though he required more information from Interpace, that hydrogen embrittlement coupled with cathodic protection may have actually accelerated damage to the pipeline. Evidence was presented that indeed cathodic protection can, if "over protection" occurs, actually accelerate harm to a pipeline as opposed to protecting it.

Aside from the evidence presented that cathodic protection has not

**167**

been fully considered and may indeed effect a cure worse than the disease, evidence was also presented regarding a conflicting oil line in the Florida Power right-of-way in which the present Pinellas County line is reposed. A section of oil line owned and operated by Florida Power exists in the right-of-way and is cathodically protected with a magnesium anode. Evidence was presented that a magnesium anode could possibly compete with the zinc anode proposed by Mr. Benedict thereby creating an untenable situation. Mr. Benedict never contacted Florida Power to resolve any potential conflicts.

The evidence presented by Mr. Benedict himself suggested that the use of magnesium anodes on Pinellas County's line would not be advisable because it could lead to the generation of voltages sufficient to "over protect" Pinellas County's line and accelerate either corrosion or hydrogen embrittlement.

In sum, this Court is not prepared to fashion a damages award upon the off chance that if a study were done, it might be that cathodic protection could, in whole or in part, serve as a viable remedy. The law of damages in the State of Florida, as this Court perceives it, does not require this Court to award damages on the basis of the cutting edge of science, or the hope that a highly-technical solution will succeed. Therefor, based upon the greater weight of the evidence, the Court finds that cathodic protection is not the answer and is without merit.

### . C. THE OVER-THE-LINE SURVEYS/INTERNAL INSPECTIONS/SURGE TANKS/REPAIR THE PIPE AS IT BLOWS/DO NOTHING REMEDIES

Numerous other solutions are proposed by Interpace. In the alternative to repair sleeves or cathodic protection, the Defendants made a mishmash of proposals which included the use of ongoing over-the-line surveys, internal inspections, the repair of pipes as they blow up, which envisions leaving the pipeline in service which applies the "band aid" approach and continuous disruption of the County's water supply.

Over-the-line surveys are useful tools because they provide some indicator of the existence of corrosion under the ground and do not require costly excavation. The technique, however, by the great weight of the evidence, has not been sufficiently developed to be at all reliable. For example, a pipe wrench left in the ground lying on top of a pipe might indicate corrosion where none existed. This kind of false reading does not so much concern the Court. The real concern with over-the-line surveys is their known shortcomings in failing to detect corrosion where it exists. According to the testimony of expert Robert Price, corrosion cannot be detected below the spring line or center line of the

168

pipe. This means that the survey is entirely insufficient to consider damage to one-half of the pipeline. Price also related to other factors which render the over-the-line survey unreliable as a solution to this problem. Other Pinellas County experts agree.

Internal inspections involve dewatering the pipeline and sending men through the line to view the interior of the pipeline. While these inspections may have some valuable purpose, they only reveal flaws to the inside concrete core. Evidence was presented of many sections of pipe which were near failure and inherently flawed which had no evidence of deterioration on the inner core. In fact, a major problem with the pipe relates to the outside mortar coating and its failure to protect the prestressing wire. Internal inspections do nothing to uncover cracked, delaminated, or otherwise faulty mortar coating.

The "repair the pipe as you go" remedy is also untenable. Aside from the impossibility of fixing a damage award based on such an approach, the importance of the Pinellas County 60-inch and 54-inch pipelines has already been reviewed in these findings of fact in detail. The public health, safety and welfare involves, of which both Defendants were well aware at the inception of this project, does not permit a "let's take a chance attitude." At times in this action, the Defendants have leveled criticism at Pinellas County for not having acted to spend its own funds to replace the pipeline. The Court does not find that Pinellas County had a legal obligation to replace the pipeline before resolution of this litigation.

The Court has seen evidence and hear testimony regarding the two burst sections of pipe which occurred in this line and has heard evidence of calamities occurring elsewhere regarding failed prestressed concrete pipe under pressure. Fatalities have occurred in at least once instance and the potential for disaster in many location along the Pinellas County line is evident. A "repair-as-you-go" remedy, in light of the serious condition of the line, the substantial failure of the manufactured pipe to conform to the contract specifications and applicable standards, cannot be accepted by the Court when weighing the evidence.

As part of its economic analysis of the various remedies, Interpace also proposed the use of surge tanks to enable Pinellas County to operate the line at pressures less than the design pressure of 150 psi and to provide some additional protection. No witnesses, however, came forward with an actual design of surge tanks, none testified that failures would not occur as a result of surge tanks and surge tanks are no remedy for ongoing corrosion processes. Thus, based on the scant

**169**

evidence and the County's expert testimony to the contrary regarding surge tanks, this Court does not find their use to be an adequate remedy in light of all the evidence.

Finally, Interpace even proposed, through its "service life" analyst, Mr. Jerrell Thomas, that the best economic decision would be to do nothing. This Court has already indicated that it is not inclined to find liability on the part of both Defendants and yet award no damages or to accept a "do-nothing" remedy in light of all of the evidence. Nonetheless, some comment regarding the testimony of Mr. Thomas and his service life analysis which directly related to each of the remedies suggested by Interpace is appropriate.

Mr. Thomas' entire testimony was predicated on the use of a mathematical model known as the "Markov model". The Court finds that the Markov model, on all the evidence, is entirely inappropriate to consider the service life of a complex structure such as the prestressed concrete pipe which Interpace manufactured for Pinellas County. Indeed, Mr. Thomas testified that when confronted with a very similar service life analysis request by the American Railroad Association, he utilized another method known as the "Monte Carlo" method designed to consider the many interrelated factors concerning failure modes. When pressed on cross-examination, Mr. Thomas could not disagree that each of the factors that prompted the use of the "Monte Carlo" method in the one engagement were present in this case. Nonetheless, he selected the Markov model. The results of the Markov model lead to ludicrous findings such as the opinion which he expressed on cross-examination that he was 85% certain that no rupture would occur in the Pinellas County pipeline through the year 3078. If this testimony is accepted as true, Interpace, notwithstanding the numerous departures from standards, its massives failures and its cover-up of them has manufactured a structure which will approach the Egyptian pyramids in longevity. Thus, the Court cannot accept this position as believable.

Thomas also testified that the Markov model requires an application in which "discrete states" can be developed in which the transition from one discrete state to another is not dependent on the past. It also depends upon the application of a uniform rate of passage from one discrete state to another. The "states" chosen by Mr. Thomas were, for example, State One equal zero to two failed wires, State Two equals three to four failed wires, State Three equals five to six failed wires and so on. The failed wires must be consecutive.

The overwhelming evidence in this case indicates that the mechanism by which failure occurs of prestresssing wires cannot be so simply

170

mathematically pigeonholed. The failure of a prestressing wire on pipe such as that found in this case has dramatic affects on surrounding wires and to the overlying mortar coating such that subsequent failures would be greatly accelerated. The Markov model, as prepared by Mr. Thomas, does not take these facts into account. The Court believes the testimony presented by the County in rebuttal that the Markov model does not apply to this case.

The Court also finds that several assumptions made by Mr. Thomas are simply not supported by the evidence and, consequently, regardless of the validity of the Markov model or its appropriateness in this case, his testimony is not worthy of belief. For example, Thomas assumes that no natural deterioration of the pipe will occur. He assumes a certain quality of mortar coating. He assumes the over-the-line survey is an investigative tool of far greater reliability than the proofs suggest. None of these assumptions are supported by the facts of the case.

For these reasons, the miscellaneous remedies proposed and Mr. Thomas' view of the economics of the situation are not supported by the greater weight of the evidence and are rejected.

### D. THE CH2M HILL SOLUTION

The evidence presented by CH2M Hill was not nearly so innovative as that presented by Interpace. CH2M Hill simply takes the position that either it did nothing wrong, or nothing is wrong with the pipe. It did present evidence competing with that proposed by Pinellas County regarding damages. One key witness, Mr. Ghiotto, admitted that his damage calculations were flawed in that he selected an inappropriate index. Regardless, the Court will now address the issue of compensatory damages.

### XI. COMPENSATORY DAMAGES

### A. SUMMARY OF DAMAGE AWARD

Concerning an appropriate award of money damages, the Court views the issues as mixed questions of fact and law. On the greater weight of the evidence, the Court awards to Pinellas County the following amounts and components of compensatory damages against both Defendants:

| COMPONENT OF DAMAGE | AMOUNT |
|---|---|
| 1. Cost of Replacement of Pipeline— Less Credit to Defendants for Benefit Conferred | $15,638.622.00 |

**171**

2. Cost to Acquire New Rights-of-Way
 a) Land acquisition $ 814,000.00
 b) Cost of attorneys' fees and professional fees—landowners that Pinellas County is reasonably certain to incur $ 407,000.00
 c) Cost of legal representation— Pinellas County *$ 61,000.00*
 TOTAL $ 1,282,000.00
3. Cost of Repairs—First Rupture $ 59,973.79
4. Water Loss—First Rupture $ 3,990.83
5. Lost Revenues—First Rupture $ 33,622.24
6. Cost of Repairs—Second Rupture $ 101,170.32
7. Water Loss—Second Rupture $ 1,856.27
8. Engineering Studies and Investigations—Exclusive of Litigation related Costs
 a) CTL Laboratories $ 321,079.00
 b) Gould & Lewis $ 75,515.00
 c) Jones, Edmunds & Associates $ 356,000.00
 d) Openaka Corporation $ 125,160.00
 e) Excavation, pipe purchases, rights-of-way costs, transportation expenses, miscellaneous vendors, etc. $ 606,180.69
9. Failed Tap at Lake St. George Memorial Day Weekend 05/19/89 *$ 43,889.79*
 TOTAL COMPENSATORY DAMAGES— BOTH DEFENDANTS $18,523,999.93

A description of the Court's rationale and the meaning of each of these components follows in this action.

## B. PREJUDGMENT INTEREST

Under Florida law, those components of damages which are liquidated are subject to an award of prejudgment interest at the appropriate statutory rate. Prejudgment interest was calculated at the annual rate of 6% through June 30, 1982 and thereafter at the annual rate of 12%. Fla. Stat. § 687.01; *Trend Cain Co. v Honeywell, Inc.,* 487 So.2d 1029 (Fla. 1986). Below are the prejudgment interest calculations and awards pertaining to the components of compensatory damages awarded by the Court:

| COMPONENT OF DAMAGE | AMOUNT OF PREJUDGMENT INTEREST |
|---|---|
| 1. Cost of Replacement of Pipeline (this component of damages is calculated as of the present date and consequently no prejudgment interest attaches) | - 0 - |
| 2. Cost to Acquire New Rights-of-way (this is an item yet to be expended by Pinellas County and consequently no prejudgment interest attaches) | - 0 - |
| 3. Cost of Repairs—First Rupture | $ 63,582.67 |
| 4. Water Loss—First Rupture | $ 4,231.96 |
| 5. Lost Revenues—First Rupture | $ 35,648.81 |
| 6. Cost of Repairs—Second Rupture | $106,253.39 |
| 7. Water Loss—Second Rupture | $ 1,950.36 |
| 8. Engineering Studies and Investigations —Exclusive of Litigation related Costs | |
| a) CTL Laboratories (9/86) | $128,466.76 |
| b) Gould & Lewis (11/28/89) | $ - 0 - |
| c) Jones, Edmunds & Associates (calculated from 11/28/89) | $ 3,862.32 |
| d) Openaka Corporation (11/28/89) | $ 1,357.95 |
| e) Excavation, pipe purchases, rights-of-way costs, transportation expenses, miscellaneous vendors, etc. | $402,159.59 |
| 9. Failed Tap at Lake St. George | *$ 3,116.88* |
| TOTAL INTEREST | $750,639.69 |

## C. EPOXY COATING DAMAGES—AGAINST CH2M HILL SOUTHEAST, INC. ONLY

Substantial testimony was heard in this case regarding the subject of groundwater attack, the corrosive effects of the environment, and the susceptibility of the pipe to deterioration as a result of the failure to protect it through the use of an epoxy tar coating. On the greater weight of the evidence, the Court determines that CH2M Hill breached the standard of care by failing to recommend the epoxy coal tar coating and in light of the environment into which the pipe is to be placed, that Pinellas County should have compensatory damages for this omission.

In assessing damages against CH2M Hill only on this item, the Court is fully cognizant of the recent decision in *Lochrane Engineering, Inc. v Willingham Real Growth Investment Fund, Ltd.*, 552 So.2d 228 (Fla. 5th DCA 1989). Coincidentally, the counsel for the partially successful appellants in *Lochrane* were also counsel for the engineers in this action.

The Court finds, in answer to certain questions raised by the *Lochrane* decision, that the initial design by the engineers was inadequate to meet the needs of Pinellas County. As the *Lochrane* court observed, a professional engineer is liable for professional negligence when an insufficiently designed structure fails and that failure causes damages. *Id.* at 233. On this basis, the engineers stand liable for the compensatory damages described above because the Court finds the inadequacies of the work of CH2M Hill standing alone proximately caused these injuries.

In addition, the Court finds that just as in the "drain field" hypothetical set forth in the *Lochrane* decision CH2M Hill is responsible for the additional cost of epoxy coal tar coating which Pinellas County must now incur as a direct result of the inadequate design by CH2M Hill. CH2M Hill is not responsible for those costs which Pinellas County would have initially incurred, but did not—because the pipe coating was not specified in the first instance. It is responsible, however, for the increased cost to Pinellas County. *Soriano v Hunton, Shivers, Brady & Assoc.*, 524 So.2d 488 (Fla. 5th DCA 1988). The additional cost to Pinellas County is $783,388.00. This component of damages was calculated by comparing the September 30, 1989, cost of epoxy coating with the reasonably certain cost of the coating on November 30, 1989, the date of the first rupture. This represents a conservative estimate of that cost in that it credits CH2M Hill with three and one-half years of construction costs inflation. The testimony of all the damages experts reflect that the 1976 construction costs were substantially lower than those accruing in 1979 and that April 1990 costs are higher than those arising in the fall of 1990.

For these reasons, the Court determines that while this additional award will serve to fairly compensate Pinellas County, by no means does it reflect an excessive award based on all the facts.

## D. EXPLANATION OF COMPENSATORY DAMAGE AWARDS

Because of the magnitude of the damage awards rendered in this cause, an explanation of the various components of damages is warranted.

174

## (1) REPLACEMENT COST OF PIPELINE LESS CREDIT TO DEFENDANTS FOR BENEFIT CONFERRED

The largest component of damages, is intended to compensate Pinellas County for that portion of the cost of replacement of the pipeline which includes the cost of materials, labor and the requisite engineering services.

Each party presented competing evidence on the cost of replacement of the line and the Court finds, that on the greater weight of the evidence as of September 30, 1989, the cost of these elements of damages if $17,771.162.00.

The Defendants have contended that the Court should not use a present replacement cost because of the rule that damages should be measured at the time of the breach or at the time the damage occurs. *See Grossman Holding, Ltd v Hourihan,* 414 So.2d 1037 (Fla. 1982). As the *Grossman* court reasoned:

The purpose of money damages is to put the injured party in as good a position as that which full performance would have put him . . . *Id.* at 1039 *(citing* Comment to Section 346, Restatement (First) of Contract 1932.

To reach this end, the COurt must avoid economic waste. *Id.* Further, the Court must recognize the law of damages to be flexible. *Anchorage Asphalt Paving Co. v Lewis,* 629 P.2d 65 (Ala. 1981). *See Temple Beth Shalom v Thyne Const. Corp.,* 399 So.2d 525 (Fla. 2d DCA 1981); *Gory Associated Ind. v Jupiter Roofing,* 358 So.2d 93 (Fla. 4th DCA 1978)

On this issue, the Court finds that the "diminution in value" approach to damages does not apply because there is no market for a thirteen-mile segment of a pipeline and the pipeline is totally defective.

Further, the Court finds that to fix the replacement value of the line at the date of the breach or injury—November, 1979—would result in a windfall to Pinellas County.

If the Court were to select November, 1979 as the date upon which to base its damage award, the Court would be required by Florida law to also award prejudgment interest. *U.S. Home Corp. v Suncoast Utilities, Inc.,* 454 So.2d 601 (Fla. 2d DCA 1984). The statutory rate of prejudgment interest from November, 1979 until June 30, 1982 was six percent (6%). Thereafter prejudgment interest must be calculated at twelve percent (12%).

The Court finds that the project cost or the installation of the original line in November, 1979 was $9,678,900.00. This number was

arrived at by determining the reasonable project costs in December, 1976 by utilizing the average of the Interpace and Price Brothers bids for materials as was demonstrated by one of the Defendant's experts, John Weideman. The Court does not find that the Interpace bid represents a reasonable projection of costs at the time because it was based on flawed materials including pipe manufactured with miles of inherently defective Class IV prestressing wire. Thus, the more probable reasonable cost for adequate pipe could be determined by, as Weideman suggested, averaging the Interpace and Price Brothers bids for materials. From the December, 1976 base, Mr. Weideman utilized the Engineering News Record to bring the figure forward to November, 1979. According to his testimony, the inflation factors was 125.7 as against the December, 1976 base. Thus, the project costs as of November, 1979 are reflected by the $9,678,900.00 figure. Calculating prejudgment interest on that amount would result in an award of prejudgment interest as follows:

Prejudgment Interest November 1979 to
June 30, 1982
(6% statutory rate) $1,498,293.72

Prejudgment Interest July 1, 1982 to
December 31, 1989
(12% statutory rate) $7,549,542.00

Therefore, the total project cost plus prejudgment interest is $18,726,835.00. Comparing these figures to the damages as of September, 1989 reflects a $1-million benefit to Pinellas County. The analysis does not stop there, however, because the John Oxley estimate, which the Court finds to be the most appropriate, also includes figures for the excavation work required to remove portions of the defective pipe which were never contemplated in the original project costs. Thus, if those components of work were added into the 1979 base figure, the use of a 1979 base figures would result in an even greater damage award to Pinellas County.

The Court finds that Pinellas County is entitled to replace its line, it is not, however, entitled to a windfall.

Therefore, the Court determines that the most appropriate time at which to fix damages is that used by Oxley, September 30, 1989. The use of this date represents some benefit to the Defendants as well because the damages award will not actually take effect until the rendition of this judgment several months later.

Regarding the decision to award replacement damages, when the public health, safety and welfare is implicated and a structure is in the

176

deplorable condition which the Court has found, replacement is the appropriate remedy. See Rhode Island Turnpike & Bridge Auth. v Bethlehem Steel Corp., 119 R.I. 141, 379 A.2d 344 (1971).

Concerning the subject of credit to the Defendants for any benefit conferred, the Court recognizes that although service has been interrupted from time to time and Pinellas County has not been permitted to use the pipeline with the flexibility that it might have desired because of the pipeline's defective condition, nonetheless Pinellas County has used the line and some benefit has been received. The Court finds, therefore, that the Defendants are entitled to some offset or credit based on the actual usage of the line.

While there are many approaches to measuring the benefit conferred, the most simple and straightforward evidence on the issue was to reduce this component of damages by comparing the length of actual use, through the rendition of this judgment, with the expected life of the pipeline.

The pipe went into service in 1978 and Pinellas County will have had twelve years of use of that line as of the time of the rendition of the judgment. The Court finds, on the greater weight of the evidence, that the pipe should have been expected to last in service for one hundred years or longer. After having represented to its customers that the pipe would indeed serve for one hundred years or more, Interpace cannot now seriously contend that some shorter life expectancy should be utilized.

The engineers have offered no competent engineering evidence which suggests that adequately constructed prestressed concrete pipe should have a life expectancy of less than one hundred years. Giving the Defendants credit for twelve years of actual use as against the one-hundred-year life expectancy of the pipe, results in a twelve percent (12%) reduction in this component of the damages. Therefore, this component of the damages should be reduced by $2,132,539.44. Thus, the Court, giving full credit to the Defendants for the benefit conferred, finds that the cost of replacement of the pipeline less the benefit conferred is $15,638.622.00.

## (2) COST TO ACQUIRE NEW RIGHTS-OF-WAY

The testimony regarding the need to acquire new rights-of-way to accommodate the replacement line and the construction efforts was uncontroverted. The Defendants offered no evidence from any real estate appraiser or expert, such as L. James Parham, H. Rex Oxen and Susan Churuti, who practice regularly in the field of condemnation of

**177**

land. The Court finds their testimony to be reasonable and by the greater weight of the evidence, the award of $1,282,000.00 fairly reflects the expected cost of acquiring thirty-three parcels of land, the attendant cost for attorneys' fees and professional fees to landowners, and the cost of legal representation of the Pinellas County Water System.

While obviously this component of damages is less certain than counting up pieces of pipe and estimating the cost of them, that uncertainty is not fatal to the County's claim. The damages are certain to occur and the method of calculating them is a reasonable one. The Defendants do not dispute that if the line is replaced Pinellas County will incur expenses in securing new rights-of-way and they offered no competing evidence regarding the amounts. Therefore, the Court finds that these damages have been proven with the requisite reasonable certainty.

### (3) THE REMAINING COMPONENTS OF COMPENSATORY DAMAGES

The remaining items of damages are self-explanatory and include the cost of repairs of the first and second ruptures, the lost revenues, the professional studies which were needed, the cost of excavations, pipe purchases, the actual cost of rights-of-way already incurred, and the like. The evidence presented by the County excluded those professional efforts which related to litigation efforts although some of the studies may ultimately have been utilized to bolster or support expert opinions. The Court finds that, separate and apart from litigation, these studies were reasonably necessary to determine the cause of the ruptures, and to determine the appropriate engineering solutions.

### (4) PREJUDGMENT INTEREST

The Court has awarded prejudgment interest on those items of expenditures actually made by Pinellas County where a basis was presented for the Court to make such a calculation. As to those items which were incurred prior to July 1, 1982, the Court utilized a six percent (6%) statutory rate of prejudgment interest and after July 1,1982, the Court used a twelve percent (12%) statutory rate. Prejudgment interest was calculated up to and including December 31, 1989. The Court used that cutoff date in an abundance of caution, again to insure that the County was not awarded a windfall in the form of excessive prejudgment interest.

### (5) RIGHT TO SETOFF

During the pendency of this case, Pinellas County was paid monies

178

by other Defendants in settlement of claims made in this case against them. The total sum received was $260,000.00. Both Interpace and CH2M Hill are entitled to a setoff in that amount.

## XII.

## CONCLUSIONS OF LAW

The Court makes the following conclusions of law:

1. The Court has jurisdiction of the parties and the subject matter of this cause;

2. Interpace materially breached its contract with Pinellas County thereby grossly and defectively manufacturing the Pinellas County pipeline;

3. Interpace negligently manufactured the pipe placed in the Pinellas County pipeline;

4. Interpace breached its implied warranty of merchantability;

5. Interpace breached its implied warranty of fitness for particular purpose;

6. Interpace is responsible to Pinellas County for damages under the doctrine of strict liability in tort;

7. Interpace is responsible to Pinellas County for punitive damages under the doctrine of strict liability in tort, culpable negligence and fraud of $5,000,000.00;

8. CH2M Hill materially breached its engineering contract for services with Pinellas County;

9. CH2M Hill negligently breached its duties owed to Pinellas County in performing engineering services for Pinellas County and permitting the construction of a grossly defective pipeline;

10. Pinellas County is entitled to compensatory damages and pre-judgment interest from Interpace in the sum of $19,014,630.62;

11. Pinellas County is entitled to compensatory damages and pre-judgment interest against CH2M Hill in the sum of $19,014,630.62;

12. In addition, Pinellas County is entitled to damages from CH2M Hill for failure to specify that the pipeline be coal tar epoxy coated in the sum of $783,388.00.

## XIII. FINAL JUDGMENT

Based on the foregoing, it is HEREBY ORDERED AND ADJUDGED:

1. Judgment is hereby rendered in favor of Pinellas County and against Madison Management Group, Inc. for the total sum of $24,014,630.62 together with interest at the rate of twelve (12%) percent per annuum for which sum let execution issue;

2. Judgment is hereby entered in favor of Pinellas County and against CH2M Hill Southeast, Inc., in the amount of $19,798,018.82 together with interest at the rate of twelve (12%) percent per annuum for which sum let execution issue;

3. Judgment is reserved to tax costs against the Defendants;

4. In addition, Pinellas County is hereby awarded its taxable costs against both Defendants, Madison Management Group, Inc. and CH2M Hill Southeast, Inc. The Plaintiff is instructed to file within 30 days of the entry of this judgment, a Motion to Tax Costs. The Defendants are instructed to file with the Court, within 30 days of service of Plaintiff's Motion to Tax Costs, its specified detailed objections to the claimed taxable costs of the Plaintiff, Pinellas County. The Court will then set an evidentiary hearing on the Motion to Tax Costs.

DONE AND ORDERED in St. Petersburg, Pinellas County, Florida, this 6th day of June, 1990.